**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| J. DEAL PARTNERSHIP I, L.P., NOSTER CAPITAL MASTER FUND, AND AQUAMARINE MASTER FUND LP, on behalf of themselves and all other similarly situated unitholders of TEEKAY OFFSHORE PARTNERS, L.P., <br><br> v. <br><br> TEEKAY OFFSHORE PARTNERS, L.P., TEEKAY OFFSHORE GP, LLC, WILLIAM UTT, IAN CRAIG, KENNETH HVID, CRAIG LAURIE, DAVID LEMMON, JIM REID, DENIS TURCOTTE, GREG MORRISON, BILL TRANSIER, BROOKFIELD ASSET MANAGEMENT, INC., BROOKFIELD BUSINESS PARTNERS, L.P., <br><br> Defendants. | Case No. _19-cv-6483_____ <br><br><br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs J. Deal Partnership I, L.P., Noster Capital Master Fund, and Aquamarine Master Fund LP (together, "Plaintiffs"), on behalf of themselves and all other similarly situated holders of common units of Teekay Offshore Partners L.P. (the "Partnership" or "TOO"), by and through their undersigned counsel, bring this Verified Class Action Complaint against the Partnership, Teekay Offshore GP L.L.C. (the "General Partner"), certain of its current and former directors (the "Individual Defendants"), Brookfield Asset Management, Inc. ("BAM"), and Brookfield Business Partners L.P. ("Brookfield") (collectively, the "Defendants"). Each Plaintiff alleges the following based upon personal knowledge as to itself and other Plaintiffs, and based upon information and belief, including the investigation of Plaintiffs' counsel, which included review of publicly

available information, and communications with representatives of the Partnership or the General Partner as to all other matters.  Plaintiffs hereby demand a trial by jury.

## NATURE OF THE ACTION

1.      This case seeks to hold Brookfield Business Partners and its affiliates, the entities that control Teekay Offshore Partners, accountable for a sustained and manipulative scheme to depress the Partnership's market value in order to effect a "take-under" of the Partnership by squeezing out the minority unitholders at a grossly unfair price.

2.      The Partnership is an international energy shipping and storage company.  After years of strong performance, TOO—like the entire energy shipping industry—faced financial troubles during the energy industry meltdown of 2016.

3.      Appearing on the scene at the time, Brookfield initially provided the Partnership much-needed capital to withstand the downturn and to finance its long-term capital spending projects.  In exchange for its capital, Brookfield negotiated for and received significant financial returns.  However, the unfettered ability to acquire the entire business for an unfair price only *twenty months* after its equity investment was not among these benefits.

4.      As explained herein, since 2017, Brookfield has gone from a helpful financing source to a predatory controller of TOO.  *First*, in 2019, Brookfield used its control over the Partnership to completely shut down TOO's distributions to its unitholders, even as the Partnership's financial position (expecting over $300 million per annum in cash flow) was more than sufficient to permit the distributions (approximately $16 million per annum) that provide the reason for investors to own the units.  Indeed, given the expected improvements in the Partnership's bottom line, the appropriate course of action would have been to *increase* distributions.  *See* Section E below.

5.      *Second*, Brookfield caused the Partnership to issue numerous series of notes and preferred stock that served marginal business purposes but further buried the TOO units in the capital structure.  The effect of Brookfield's repeated issuance of odd securities superior to TOO equity was to keep the TOO unit price depressed even as both the energy markets and TOO's own financial position was drastically improving.  *See* Sections B and D below.

6.      *Third*, just as TOO's long-term capital investments were set to flower, creating over $400 million in annual free cash flow, Brookfield seized upon an unrelated financial crisis at Teekay Corporation to go from mere controller to holder of 74% of the Partnership's units, paying the below market price of $1.05 per unit to bail TK out.  Because of an option Brookfield could exercise in the event it is able to purchase (on the open market or otherwise) another 6% of the Partnership's units, the General Partner and its board became obliged to take proper defensive action to block Brookfield from effecting further unit purchases.  Instead, they have stood idly by and even taken part in enabling Brookfield to gain the full benefit of its unit-value depressing actions.  *See* Section E below.

7.      *Fourth*, just a week after its opportunistic purchase of TK's units, Brookfield started the final phase of its squeeze-out scheme.  In order to anchor the Partnership's unit price at a depressed level until it can complete the squeeze-out of all remaining unitholders for a song, Brookfield publicly announced its intention to press TOO's controlled board to approve a buyout deal at $1.05 per unit.  Importantly, by announcing the offer at a sub-market price and claiming it would then "negotiate" with the Partnership's Conflicts Committee, Brookfield effectively told the markets that the Partnership would not create long term value for public investors, causing the units to trade based solely on expectations of the lowest possible price Brookfield would pay to complete its squeeze-out scheme.  *See* Section F below.

8.     Through puppeteering the General Partner and pushing the deal thorough a compromised committee, Brookfield is attempting to force the limited holders to sell their units at a price far below their intrinsic value.  Brookfield's problem, however, and the fundamental basis of this lawsuit, is that its disloyal scheme breaches the duties that the General Partner and its Affiliates owes to the minority common unitholders under the Partnership's Sixth Amended and Restated Agreement of Limited Partnership of Teekay Offshore Partners L.P., dated as of January 23, 2018 (the "Partnership Agreement").

9.     Specifically, and as further detailed below, the Partnership Agreement provides unitholders critical protections in the event the General Partner or its affiliates (such as Brookfield) wishes to complete a related-party transaction like the proposed squeeze out.  Nevertheless, in June 2018, Brookfield proposed an offering of hundreds of millions of dollars of notes.  The offering provided new liquidity that allowed Brookfield to reap a 52% return on its initial investment in less than a year.  Not only was this a related-party transaction—favoring Brookfield to the detriment of minority unitholders—but this transaction also over-levered TOO to fund Brookfield's $72 million-dollar personal return.  The resulting depressed unit price laid the groundwork for Brookfield's present attempt to squeeze out the minority unitholders.  The timing of this refinancing, occurring on the heels of the recapitalization, created concerns that Brookfield no longer cared about the common unitholders.

10.     One avenue the General Partner might pursue is to effect the transaction on fair terms.  Of course, Brookfield does not wish to complete a "take-under" on fair terms.  Another avenue would be for the General Partner to negotiate the deal with a truly independent Conflicts Committee.  However, in the 6-K announcing Brookfield's $1.05 offer, the General Partner made clear that the deal would be negotiated with the then-existing Conflicts Committee.  However,

because the Conflicts Committee includes Bill Transier, who both played a critical role in the restructuring of Brookfield affiliate Westinghouse Electric Company, Inc. and now serves as one of its directors, the Committee's supposedly independent membership is fatally tainted from the outset.  Thus, Brookfield cannot rely on the Conflicts Committee's approval.

11.     Brookfield's, the General Partner's, and the Conflict Committee's misconduct in setting up, proposing, structuring and effecting this improper offer is premeditated and in bad faith. For the reasons further set forth below and as will be shown at trial, the Court should enjoin or invalidate any and all further breaches by Defendants, and award unitholders the fair value of their long-suffering investments, which are being taken away just as the value of years of investment are about to come to fruition.

## PARTIES

### A.     Plaintiffs

12.     Plaintiff J. Deal Partnership I, L.P. ("JDP") is a current holder of roughly 1.2 million of the Partnership's common units.  It has continuously been a unitholder since September 2017 and was a unitholder of TOO at the time of the wrongdoing complained of.  It has its principal place of business in the State of Texas and is organized under the laws of the State of California.

13.     Plaintiff Noster Capital Master Fund ("Noster") is a current holder of roughly 900,000 of the Partnership's common units.  It has continuously been a unitholder since May 2016 and was a unitholder of TOO at the time of the wrongdoing complained of.  It has its principal place of business in, and is organized under the laws of, the Cayman Islands.

14.     Plaintiff Aquamarine Master Fund LP ("Aquamarine") is a current holder of roughly 1 million of the Partnership's common units.  It has continuously been a unitholder since October 2017 and was a unitholder of TOO at the time of the wrongdoing complained of.  It has its principal place of business in, and is organized under the laws of, the British Virgin Islands.

**B.      Defendants**

15.      Defendant Teekay Offshore Partners L.P. ("TOO" or the "Partnership") is a global marine energy, transportation, and storage company.  TOO is a limited partnership organized under the laws of the Marshall Islands with its principal executive offices in Bermuda.  The Partnership's common units and preferred shares are publicly traded on the New York Stock Exchange ("NYSE").

16.      Defendant Teekay Offshore GP L.L.C. (the "General Partner") is the general partner of the Partnership.  It is a Marshall Islands limited liability company 100-percent owned by Brookfield TK TOGP, L.P., itself a Bermuda limited partnership.

17.      Defendant William Utt ("Utt") is the Chair of the Board of Directors of the General Partner (the "Board").  He has served in this position since 2017.  Prior to that, he served as the Chairman, President, and CEO of KBR Inc.  Until June 2019, he had also served as Director and Chairman of Teekay Corporation and as a director of Teekay GP L.L.C., the general partner of another Teekay-related limited partnership.  He currently resides in Houston, Texas.

18.      Defendant Ian Craig has served as a member of the Board since 2017.  Prior to that, he served as a senior executive in numerous oil and gas ventures affiliated with Shell Oil.  He is the Chair of the Board's Conflicts Committee, and on information and belief, is a resident of the United Kingdom.

19.      Defendant Kenneth Hvid has served as a member of the Board since 2011.  He has been the President and CEO of the Teekay Corporation since 2017.  On information and belief, he is a resident of Vancouver, British Columbia, Canada.

20.      Defendant Craig Laurie has served as a member of the Board since 2018.  He is a Managing Partner in BAM's Private Equity Group and has been associated with various

Brookfield-related entities since at least 1997.  He maintains his principal office in New York, New York.

21.     Defendant David Lemmon has served as a member of the Board since 2006.  Prior to this, he was the President and CEO of Colonial Pipeline Company and President of Amoco Pipeline Company.  He is a member of the Board's Conflicts Committee, and resides in Las Vegas, Nevada.

22.     Defendant Jim Reid has served as a member of the Board since 2017.  He is a Managing Partner and Chief Investment Officer in BAM's Private Equity Group and has been with various Brookfield-related entities since at least 2003.  On information and belief, he resides in Toronto, Canada.

23.     Defendant Denis Turcotte has served as a member of the Board since 2017.  He is a Managing Partner in BAM's Private Equity Group and has been with associated with various Brookfield-related entities since at least 2006.  He resides in Montreal, Canada.  He currently serves as Chairman of the Board at Westinghouse Electric Company, where co-Defendant Bill Transier serves as a director.

24.     Defendant Gregory Morrison replaced non-party Walter Weathers as a member of the Board on July 8, 2019.  Appointed to the Board by Brookfield, Mr. Morrison currently sits on a number of other boards, including those of various international subsidiaries of BAM.  On information and belief, he resides in Warwick, Bermuda.

25.     Defendant Bill Transier has served as a member of the Board since March 2019. He is the CEO of Transier Advisors, LLC.  Mr. Transier holds himself out as an "independent" Board member, but in fact works to advance the interests of Brookfield and BAM.  For example, he advertises that he participated in the restructuring of Westinghouse Electric Company, which

was undertaken by Brookfield and is itself a Brookfield affiliate.  Transier also currently serves on the board of Westinghouse Electric Company, which is chaired by Turcotte.  He currently resides in Houston, Texas.

26.     The individuals listed in ¶¶ 17-25 above are collectively referred to herein as the "Individual Defendants."

27.     Defendant Brookfield Asset Management, Inc. ("BAM") is an alternative asset management company with over $300 billion of assets under management.  BAM is headquartered in Toronto and incorporated in Canada.  It has corporate offices in New York City and is listed on the NYSE under the ticker BAM.  Every year, BAM holds its annual investor day in New York City.

28.     Defendant Brookfield Business Partners L.P. ("Brookfield") is a publicly-traded limited partnership spun off from BAM in 2016.  It is traded on both the NYSE and the Toronto Stock Exchange and is headquartered in Bermuda.  Brookfield was purportedly established as BAM's primary vehicle to own and operate business services and industrial operations on a global basis.  Like BAM, Brookfield holds an annual investor day each September in New York City, at which Brookfield discusses its investments, including TOO.   TOO's acquisition is part of Brookfield's nascent "infrastructure services" segment strategy.

**C.     Relevant Non-Parties**

29.     Teekay Corporation is a corporation incorporated in the Marshall Islands, with its principal place of business located in Bermuda.  Prior to Brookfield's aggressive acquisition of common units in 2017, Teekay Corporation was the controlling shareholder in the General Partner.  To refinance approximately $400 million of its 2020 bond maturity, Teekay Corporation recently sold its remaining TOO units to Brookfield at the depressed market price.

30.    Non-party Walter Weathers served as a member of the Board of Directors of the General Partner from September 2017 until July 8, 2019, when he was replaced by Defendant Morrison.  He is a Senior Vice President for BAM.  Weathers lives in Houston, Texas.

## JURISDICTION

31.    This Court has jurisdiction over this Action pursuant to 28 U.S.C. § 1332 because diversity exists between Plaintiffs and each of the Defendants and the amount in controversy exceeds $75,000, exclusive of interests and costs.

32.    This court has personal jurisdiction over each Defendant because the Individual Defendants caused the Partnership to initiate the Proposed Transaction (the "Transaction"), which seek to coercively and improperly acquire all of the outstanding common and preferred units, which are exclusively traded on the NYSE.  The harm imposed by these actions falls on a market located in New York and investors in that market.

33.    Likewise, TOO and its representatives have been coordinating, negotiating, and finalizing this Proposed Transaction over a weekslong period in New York City with Brookfield and its lawyers from the New York office of Kirkland & Ellis LLP.  As the Conflicts Committee is allegedly assessing and negotiating the Proposed Transaction along with TOO representatives, they too use resources located in New York.

34.    On information and belief, each Individual Defendant conducts regular business in New York and has a consistent presence therein.  Each Individual Defendant regularly meets and conducts shareholder business related to the Partnership in New York.

35.    Each Individual Defendant caused TOO and the General Partner to engage in the practices complained of herein by virtue of their exercise of control and ownership over the business and corporate affairs of the Company, which are global in scope.

36.     Under the Partnership Agreement, each Individual Defendant owed and owes TOO and Teekay GP and its unitholders obligations to act in good faith.

37.     Thus, each of the Defendants is subject to New York's "long arm" jurisdiction because it or he transacts business in New York and committed torts within and without the state that it or he expected or should reasonably have expected its or his acts to have consequences in New York and derive substantial revenue from interstate or international commerce.

38.     Venue is also proper in this district pursuant to 28 U.S.C. § 1391 because the units that are the subject of Plaintiffs' claims trade exclusively in this district and the Defendants directed their activities towards this district.  Thus, a substantial part of the events giving rise to the claim occurred here.

## OBLIGATIONS AND DUTIES OF THE DEFENDANTS

39.     The duties of the General Partner (and its affiliates) and Brookfield TK TOGP L.P. are set out by the Partnership Agreement.  The General Partner makes all decisions for the Partnership, subject to the limited voting rights of the unitholders.  The Board of Directors of the General Partner oversees the Partnership's operations.

40.     The Partnership Agreement is governed by the Marshall Islands Limited Partnership Act ("MILPA").  The MILPA expressly states that it is to be "applied and construed" to be "uniform with the laws of the State of Delaware," where it does not conflict with either the MILPA's express provisions or with the decisions of the High and Supreme Courts of the Republic of the Marshall Islands.

41.     The General Partner and its Affiliates are generally required to act in good faith. Section 7.9(b) of the Partnership Agreement imposes, with limited exceptions, a "good faith" requirement on the determinations of the General Partner when it acts in its capacity as such.  The

good faith standard requires that the person making such determinations "reasonably believe" that the determination is in the "best interests of the Partnership, unless the context otherwise requires."

42.    Under Section 1.1 of the Partnership Agreement, an "Affiliate" of the General Partner is defined as any Person that "directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with, the Person in question."  Control "means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise."

43.    Under the Delaware law and the Partnership Agreement, the usual rule evaluates contractual conduct by whether it is entirely fair.  Section 7.9(a) of the Partnership Agreement also creates limited safe harbors that can be used when a conflict of interest arises between, on the one hand, the General Partner or any of its Affiliates, and on the other, the Partnership or any member of the Partnership, "any resolution or course of action by the General Partner or its Affiliates in respect of such conflict of interest shall be permitted and deemed approved by all Partners," and would not constitute a breach of the Agreement or any duty implied by law or equity, if (but only if) the course of action falls into one of four categories.

44.    The four categories that cleanse a conflict of interest transaction are: (i) "Special Approval," (ii) approval "by the vote of a majority of the Outstanding Common Units (excluding Common Units owned by the General Partner and its Affiliates)", (iii) if the course of action is "on terms no less favorable to the Partnership than those generally being provided to or available from unrelated third parties," or (iv) if the course of action is "fair and reasonable to the Partnership, taking into account the totality of the relationships between the parties involved (including other transactions that may be particularly favorable or advantageous to the

11

Partnership)."  Under Delaware law, Section 7.9(a) also contains an implied obligation on the part of the General Partner and its Affiliates not to mislead unitholders.

45.     Under the Definitions set out in the Partnership Agreement, approval of a transaction by a majority of the Conflicts Committee constitutes "Special Approval."

46.     Under the Partnership Agreement, the "Conflicts Committee" is defined as "a committee of the Board of Directors of the General Partner composed ***entirely*** of two or more directors who are not (a) security holders, officers or employees of the General Partner, (b) officers, directors or employees of any Affiliate of the General Partner or (c) holders of any ownership interest in the Partnership Group other than Common Units and who also meet the independence standards required of directors who serve on an audit committee of a board of directors established by the Securities Exchange Act of 1934, as amended, and the rules and regulations of the Commission thereunder and by the" NYSE.

47.     Section 14.3(a) and (b) of the Merger Agreement provides that, except as provided in 14.3(d) or 14.3(e), a merger must be approved by the "affirmative vote or consent" of holders of a "Unit Majority."  The Partnership Agreement defines a "Unit Majority" as a majority of the Outstanding Common Units, voting as a class.

48.     Section 15.1(a) of the Partnership Agreement provides an option to the General Partners and its affiliates to squeeze out the unitholders at a preset formulaic price, but only in limited circumstances (the "Tender Offer" right).  Specifically, these circumstances are "if at any time the General Partner and its Affiliates hold more than 80% of the total Limited Partner Interests of any class or series then Outstanding, the General Partner shall then have the [transferable] right, … exercisable at its option, to purchase all, but not less than all, of such Limited Partner Interests of such class or series then Outstanding held by Persons other than the General Partner and its

Affiliates."  Such a purchase must be "at the greater of (x) the Current Market Price as of the date three days prior to" the date on which a notice is mailed and "(y) the highest price paid by the General Partner or any of its Affiliates for any such Limited Partner Interest of such class or series purchased during the 90-day period preceding the date that the notice described in Section 15.1(b) is mailed."

## SUBSTANTIVE ALLEGATIONS

### A.  The Partnership's Business

49.  In August 2006, non-party Teekay Corporation formed TOO as a Marshall Islands limited partnership in order to further develop its operations in the offshore market.

50.  Over the years, the Partnership has grown substantially, expanding its services from providing simple marine transportation and storage to include oil production, long-distance towing, and offshore installation, maintenance, and safety services to the offshore oil industry.

51.  While the Partnership operates worldwide, it focuses on the deep-water offshore oil regions of the North Sea, Brazil, and the eastern coast of Canada, primarily operating in the following segments: (i) the Floating Storage Production and Offloading ("FSPO") Segment; (ii) the Shuttle Tanker Segment; (iii) the Floating Storage and Offloading ("FSO") Segment; (iv) the Unit for Maintenance and Safety ("UMS") Segment; (v) the Towage and Offshore Installation Vessels Segment; and (vi) the Conventional Tanker Segment.

52.   The Partnership's shuttle tankers and FSO units are primarily subject to long-term, fixed-rate time-charter or bareboat charter contracts, which provides stable cash flow to the Partnership.  The Partnership's growth strategy focuses primarily on increasing its fleet of FSPO units under medium to long-term charters while evaluating opportunities to expand into related offshore services segments.

53.     In March 2016, the Partnership sold its two conventional tankers and subsequently chartered-in both vessels for three years each, both with additional one-year extension options. During this time, both vessels traded in the spot conventional tanker market.  TOO's long-distance towage and offshore installation vessels also operate on either spot contracts or voyage-charter contracts.  Voyage-charter contract revenue is less volatile than revenue from spot market rates, as project budgets are prepared and maintained in advance of the contract commencement.

54.     TOO's business model is designed to depend on long-term contract revenues rather than be linked to the spot market in crude oil.  Nonetheless, as described further below in Section B, for many years TOO's market price correlated remarkably with that of crude oil.  This trading dynamic reflects the risk of contractual counterparty bankruptcy or default in times of extreme energy market stress.

55.     While the Partnership has amassed valuable assets, with long-term contracts in place for its fleet of FSPO and shuttle tanker vessels, it has previously struggled to access financing to pay for its newbuilds.  As a result, its leverage and the oil market collapse in 2016 resulted in liquidity shortfalls.  As described below, Brookfield's capital infusion initially appeared to benefit the company; over time, Brookfield's intent to seize TOO for itself became clear.

**B.     The Partnership's Capital Structure**

56.     On December 13, 2006, the Partnership made an initial public offering of 7,000,000 common units at a price of $21.00 per unit.[1]  For the first year and a half of trading on the NYSE, the common units regularly traded at or above the offering price.

---

[1] The Partnership has also issued several series of preferred stock over the years, three of which are currently outstanding, though none are relevant to the instant litigation.

57.     Historically, and as evidenced by the first graph below, the trading price for TOO (in blue) has closely correlated with relevant industry and market indicators such as the Brent crude oil index (in white).

58.     At the height of the financial crisis, the closing price of TOO's common units declined, falling to $3.00 per unit by October 2008 and largely remaining under $10.00 per unit until the end of 2009.

59.     As the market recovered, TOO's market price rallied, reaching highs above $30.00 per unit in early 2014 before beginning another descent in mid-2014, when global crude oil prices began to decline.



60.     However, as visualized and explained below, after Brookfield gained its majority stake in TOO in 2017, the market price for TOO common units dropped and its correlation with the Brent crude index disappeared.



61.     Indeed, the market price for TOO common units has declined over 53 percent since mid-2017.  By contrast, over the same period indices for Brent Oil and S&P 500 have grown 38 and 19 percent, respectively.

**C.      Brookfield Takes Control of the Partnership in 2017**

62.     As part of a comprehensive solution to strengthen the Partnership's balance sheet, on July 26, 2017, Teekay Corporation and the Partnership jointly announced their intention to enter into a strategic partnership with Brookfield.   In addition to other financing initiatives, the contemplated transaction included a $640 million equity investment by Brookfield.

63.     Brookfield re-capitalized the Partnership with an investment of $610 million at a price of $2.50 per common unit, with Teekay Corporation investing a further $30 million.   In exchange, Brookfield and Teekay Corporation received 65.5 million warrants of the Partnership on a pro rata basis.

64.     The cash from these newly-issued shares was used to retire all then-outstanding preferred shares in the Partnership, which was expected to save the Partnership approximately $28 million in annual distributions.

65.     As a condition of Brookfield's equity investment, the Partnership agreed to reduce its existing common unit distribution to reinvest cash in the business, pay down debt, and further

strengthen the Partnership's balance sheet. Cutting distributions at that time—to get TOO out of its crisis—was justifiable.  Refusing to either manage the business appropriately for growth or return capital to common unitholders, however, was not.

66.     The transaction fully financed the Partnership's existing growth projects which, when delivered over the subsequent few quarters, were expected to add an incremental $200 million of annual cash flow for the Partnership.

67.     As part of this transaction, Brookfield increased its ownership interest in the Partnership to approximately 60% and acquired a 49% interest in the General Partner, as well as an option to acquire an additional 2% of the General Partner—which would give it outright majority control of the General Partner—subject to the satisfaction of certain conditions.

68.     When the deal closed on September 25, 2017, Brookfield also acquired the right to elect four members to the nine-member Board of Directors of the General Partner.  Concurrently with the closing, Individual Defendant Jim Reid was elected to the Board, along with other Brookfield nominees David Levenson, Walter Weathers, and Bradley Weismiller.

69.     The deal strengthened the Partnership's balance sheet, improved its liquidity, and provided financing for the Partnership's existing growth projects, thus delivering substantial near-term cash flow growth through the first quarter of the 2018 fiscal year.

70.     Among other things, Brookfield's investment transformed the Partnership's capital structure by extending maturities on debt and swaps.  For instance, the Partnership sold an existing $200 million parent loan to Brookfield at a discount to par, and Brookfield extended the loan maturity to 2022.  As a result of these transformations, the Partnership has no meaningful debt maturities until 2022.

71.     The cash proceeds from the recapitalization also allowed the Partnership to pay down debt, thus significantly reducing the Partnership's leverage.

72.     Accordingly, since Brookfield became TOO's financial sponsor, the Partnership's financial fundamentals have dramatically improved.  The Partnership's leverage ratio improved by 38%, from about 7.4x to approximately 4.5x, below peers and in line with management's stated target, while adjusted EBITDA increased nearly 50% between 2017 and 2018.

73.     This has not, however, been reflected in the market price of TOO's common units, which trade at a discount to more highly leveraged peer companies with worse balance sheets.

74.     In no small part, this is due to Brookfield's lack of communications and self-dealing.  When it made its initial public offering, the Partnership had been marketed as a high-dividend-paying company.  Throughout the majority of its history, TOO was owned by yield-oriented investors.  Recapitalization of the Partnership by Brookfield, however, transformed TOO into a company that reinvested cash flows for growth rather than paying them out, thus requiring marketing to an entirely different investor base—marketing which never occurred.

75.     Instead, after control of the General Partner passed to Brookfield, Brookfield and the General Partner made minimal communications to minority unitholders explaining their future strategies and changed accounting and KPIs.  Nor did the General Partner and Brookfield hold roadshows or TOO investor days.

76.     After Brookfield's investment, trading volumes for TOO units fell off a cliff.  By September 2018, TOO's nominal trading volume had dropped to the 97th percentile of the Russell 3000 companies.  This result was premeditated; throughout 2018 Brookfield had been deliberately reducing TOO's investment appeal.

### D.      Brookfield Closes its Grip

77.      As of January 1, 2018, the public held a total of 26.7% of the Partnership's outstanding common units.  Brookfield TK TOLP L.P. and Brookfield TOGP L.P., affiliates of Brookfield, held 59.5% of the Partnership's outstanding common units and a 49% interest in the General Partner, respectively.  An affiliate of Teekay Corporation held the remaining 13.8% of the Partnership's outstanding common units and a 51% interest in the General Partner.

78.      In Spring of 2018, investors began to question Brookfield's strategy with TOO.  On June 13, 2018, Brookfield proposed an offering of $500 million in unsecured notes, which received a rating of Caa2.  Despite this poor rating, Brookfield then increased their offering by 40 percent on June 25 and June 26.  With the new liquidity, Brookfield paid themselves back part of their initial investment.  They earned $200 million and a $12 million make-whole on an intercompany loan they had acquired for only $140M from Teekay: a 52% return on their money in less than one year.  This transaction effectively re-leveraged TOO by funding Brookfield's $72 million-dollar personal return.  In other words, Brookfield went from a savior in the summer of 2017 to a plunderer less than a year later.

### E.      Brookfield Squeezes Teekay Out of TOO

79.      Despite the fact that Brookfield had only months earlier paid itself the equivalent of nearly ***four years' worth*** of dividend payments on all of the outstanding common units, in January 2019, Brookfield through the General Partner cut TOO's common dividend to zero cents.

80.      Despite making clear that the Partnership expected over $300 million a year in increased cash flows, Brookfield and the General Partner did not choose the logical act of increasing dividends.  Instead, it gave itself a large cut of the new fruits of the Partnership.

81.      Teekay Corporation, in the meanwhile, has seen its unit price plummet 95% since its 2014 high.  Teekay Corporation needed to guarantee certain term loans at its other public

subsidiary, Teekay Tankers Ltd., and needed $400 million—over 100 percent of its own equity value—to refinance its 2020 bond maturity.  As a result of subordination issues created by the guarantee and other unfavorable conditions, Teekay Corporation found that refinancing the entirety of its 2020 bond would require monetization of its TOO stake.

82.     By then, Teekay Corporation had already sold control of TOO to Brookfield, and TOO's dividend was reduced to zero.  Running out of options, Teekay elected to sell its remaining TOO assets—units, warrants, and 49% of the General Partner—to Brookfield for $100 million. This desperation play allowed Teekay Corporation to issue a smaller bond ($250 million) at lower interest rates (9.25%).

83.     To satisfy their near-term financing needs, on April 29, 2019, Teekay Corporation and its various affiliates agreed to sell all of their remaining interests in the Partnership to Brookfield in a non-arms'-length distressed block sale (the "Exit Sale"), at an effective price of $1.05 per common unit.  These interests, which were sold for a total purchase price of $100 million cash, included: (i) 56,687,484 common units of the Partnership; (ii) 49% of the outstanding interest in the General Partner; (iii) warrants to purchase an aggregate of 17,255,000 common units of the Partnership; and (iv) Teekay Corporation's interest in a 2018 credit agreement between various Teekay and Brookfield entities.  The Exit Sale, which had never been marketed to the broader public, closed on May 8, 2019.

84.     The Partnership filed a Form 6-K with the SEC on May 10, 2019, disclosing the completion of the Exit Sale.

85.     Post-sale, Brookfield beneficially owns over 300 million common units of the Partnership, representing approximately 74% of the total outstanding common units, as well as 100% of the General Partner interest in TOO.  Brookfield also holds warrants to purchase over 65

million common units, which, if exercisable, will increase its holdings to over 77% of the outstanding TOO common units.

86.     If the Board and the General Partner were acting in good faith for the benefit of the Partnership and the minority unitholders, they would seek to take more defensive measures in light of TOO's depressed price—e.g., a poison pill to stop Brookfield from getting over the 80% threshold.  Yet they take no action, because the General Partner and Board are controlled by and act for Brookfield.

**F.     The Proposed Transaction Undervalues the Company**

87.     On May 17, 2019, only a week after the 6K announced the completion of the Exit Sale, Brookfield and its affiliates (the "Consortium") moved.  The Consortium delivered an offer (the "Offer Letter") to the General Partner asking that the General Partner's Conflicts Committee consider selling to the Consortium the remaining publicly-traded units of TOO (the "Proposed Transaction").  In asking the Conflicts Committee to consider the transaction, Brookfield intended for the Conflicts Committee to grant Special Approval.

88.     In exchange for the outstanding TOO units held by minority unitholders, the Offer Letter provides a price of $1.05 per TOO common unit (the "Offer Price").

89.     On May 20, 2019, BAM filed the Offer Letter from Brookfield with the NYSE as an exhibit to a 13D filing.

90.     The Offer Letter states that Brookfield expects that the Transaction would be structured as a merger between TOO and a Brookfield Consortium subsidiary, with TOO surviving the merger as a wholly-owned subsidiary of the Brookfield Consortium.  The offer letter does not include any agreement by Brookfield to refrain from launching a tender offer in the event that the General Partner declined the proposal.  Of course, as set out below, Brookfield had no concern that its proposal would be rejected.

91.     The $1.05 per common unit price is 10% below $1.16, the price at which the units were trading on the open market as of May 17, 2019, the last date before news that Brookfield had made its offer.  Indeed, the units had never in their history traded as low as $1.05, and had traded as high as $1.78 in April 2019, less than a month before Brookfield's offer.

92.     By contrast, the liquidation value of the Partnership—assessed on public information—likely exceeds $2.60 per unit.  By extension, because the Partnership operates as a going concern and is not in danger of bankruptcy, each unit should be worth considerably more.

93.     Plaintiff JDP, based on its own detailed analysis, believes that TOO is worth at least $4 dollars per unit.

94.     Not only is the offered price exceedingly low relative to the trading history of TOO's common units, but also the fundamentals of the Partnership—including $5.4 billion of signed contracts—make evident that the price offered by Brookfield is predatory.  In merger industry parlance, the Proposed Transaction is a "take-under."

95.     The Offer Price is also at a 20 percent discount to TOO's rounded 30-day volume weighted average price ("VWAP") and 90-day VWAP of 1.30, and a 58 percent discount to the $2.50 per unit that Brookfield paid per TOO unit in 2017.

96.     Unlike other publicly traded common units of offshore midstream petroleum partnerships, which in the year-to-date have increased in value from 13 to over 40 percent, and as evidenced above in Section B, TOO market prices have experienced zero or negative growth.

97.     Similarly, TOO common units trade at a price that fails to reflect recent internal operational improvements, including the improved leverage ratio (to ~4.5x from ~7.4x), and the increased adjusted EBITDA (higher by ~48% from 2017 to 2018).

98.     The publicly traded price of TOO units is and has been artificially depressed by the self-dealing and manipulative practices of its new controller, Brookfield.

### G. The General Partner and Its Controller, Brookfield, Undertake A Fundamentally Unfair Sales Process

99.     On May 30, 2019, the Conflicts Committee of the General Partner announced that it had formally appointed Evercore Group as its financial advisors and Potter Anderson as its lawyers.  Consistent with the General Partner's intent to push the deal through the Special Approval safe harbor, the announcement also states that the "Conflicts Committee mandated to consider the Proposed Transaction consists entirely of non-Brookfield affiliated Teekay Offshore directors."

100.     This latter statement is inaccurate.  According to TOO's April 30, 2019 public filing, in March 2019 Teekay Corporation "appointed Mr. William L. Transier as a member ... of the conflicts committee."  Transier replaced John J. Peacock, who similarly served on the Conflicts Committee and who resigned concurrently with Mr. Transier's appointment.

101.     Transier is the CEO of Transier Advisors.  Since 2017, Transier has served as a director of Westinghouse Electric Company—a Brookfield affiliate—and indeed worked with Brookfield on the Westinghouse restructuring.

102.     Transier sat on the Conflicts Committee at the time Brookfield made its underpriced offer to the General Partner and continues to serve on the Committee.  As a result, the Conflicts Committee was tainted from the outset and fails the criteria required in the Partnership Agreement to provide valid Special Approval of the Proposed Transaction.

103.     The General Partner also has made no effort to see if other buyers exist that would present better terms to the Partnership and the minority unitholders.

104.    Brookfield continues to consolidate their stake in the Partnership.  As of the date of this complaint, it owns around 74 percent of the common units of TOO and holds a conditional option to buy another 3%.

### G. The Conflicts Committee's Failure to Restrain a "Creeping Squeeze-out" Illustrates Its Lack of Independence

105.    Under the Partnership Agreement, if Brookfield accumulated 80% of TOO common units, it would be entitled to squeeze out the minority unitholders without their consent by buying up all the limited partnership interests at a price that references the recent market price of the common units.

106.    The purpose and effect of Brookfield's announcement of their inadequate offer is to further anchor the market's valuation of TOO common units closer to the price of $1.05 per unit than TOO units' actual value, which exceeds this price.

107.    This ploy additionally allows Brookfield to buy up TOO common units as they become available and continue consolidating their ownership of the Partnership.

108.    If Brookfield can add just 6 percent of TOO's common units to its holdings, which is less than half of all common units outstanding, it will be able to take TOO private without any consent from the common unitholders and reap the rewards of the improved operational and industry conditions.

### CLASS ALLEGATIONS

109.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all other holders of Partnership common units as of July 11, 2019 that are being, have been, or will be harmed by the conduct described herein (the "Class").

24

Excluded from the Class are Defendants, and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant, and their successors in interest.

110.    This action is properly maintainable as a class action.

111.    The Class is so numerous that joinder of all members is impracticable.  As of July 10, 2019, there were 410.4 million common units outstanding, with 109.4 million of those units in the public float and held by numerous individuals and entities across the country.  While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs believe there are over twenty members in the Class.  All members of the Class may be identified from records maintained by TOO or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

112.    Questions of law and fact are common to the Class, including:

    i.    Whether the Defendants have breached their obligation to act in good faith and/or their duties under the Limited Partnership Agreement with respect to Plaintiffs and other members of the Class in connection with the Transaction;

    ii.    Whether Plaintiffs and the other members of the Class have been or will be harmed by such misconduct; and

    iii.    Whether Plaintiffs and the other members of the Class are entitled to injunctive relief or damages as a result of such misconduct.

113.    Plaintiffs are committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiffs' claims are typical of the claims of other members of the Class and Plaintiffs have the same interests as the other members of the Class.

Accordingly, JDP, Noster, and Aquamarine are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.

114.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to such adjudications or would substantially impair or impede their ability to protect their interest.

115.    The Defendants have acted or refused to act on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

116.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.  Plaintiff anticipates that there will be no difficulty in the management of this litigation as a class action.

## COUNT I

### Against All Defendants for
### Breach of Section 7.9(b) of the Partnership Agreement (Duty To Act in Good Faith)

117.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

118.    Under Section 7.9(b) of the Partnership Agreement, the General Partner—and by extension its individual directors and affiliates BAM and Brookfield—owe duties to act or cause the General Partner to act in good faith.

119.    By not resisting the controlling shareholder's efforts to suppress the price of TOO common units through, among other strategies, the take-under offer, and the other actions and omissions alleged herein, the Partnership, the General Partner, BAM, and Brookfield failed to act in good faith.

120.    This failure breached the Section 7.9(b) of the Partnership Agreement.

121.    Plaintiffs and the Class suffered and are suffering damages as a direct and proximate result of the breaches of the Partnership Agreement by the Partnership, the General Partner, BAM, and Brookfield in an amount to be proved at trial.

## COUNT II

### Against All Defendants for
### Prospective Breach of Section 7.9(a) of the Partnership Agreement

122.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

123.    Under Section 7.9(a) of the Partnership Agreement, the General Partner—and by extension its individual directors and affiliates BAM and Brookfield which cause the General Partner to act—may only proceed with a conflicted transaction if certain safe harbors or conditions are met.

124.    By the actions and omissions alleged herein, the Partnership, the General Partner, BAM, and Brookfield seek to push a conflicted transaction through a sham process, that cannot and will not meet any of the four safe harbors or conditions.

125.    Plaintiffs and the Class will suffer further damages as a direct and proximate result of the prospective breach of the Partnership Agreement by the Partnership, the General Partner, BAM, and Brookfield, in an amount to be proved at trial.

## COUNT III

**Against the All Defendants for, in the Alternative,**
**Breach of Implied Covenant of Good Faith and Fair Dealing**

126.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

127.    Every limited partnership agreement has implied a covenant of good faith and fair dealing, such that no party to such contract may act to deprive the other of the benefits and bargains of the agreement.

128.    The Partnership, General Partner, BAM, and Brookfield were thus bound by an implied-in-law covenant under the Partnership Agreement to perform their obligations in good faith and not take any action that might deprive Plaintiffs of the benefits of their bargain under the agreement.

129.    The Partnership, the General Partner, and the Individual Defendants breached the implied covenant to act in good faith and deal fairly by entertaining the manipulative take-under offer.  That is, the Partnership, General Partner, and Individual Defendants breached the implied covenant by not unambiguously rejecting the take-under offer.

130.    BAM and Brookfield breached—in addition or in the alternative to the breach of contract set forth in Count I—the implied covenant to act in good faith and deal fairly with each Plaintiff by, among other things, using their control positions to manipulate the price of TOO units to make and make publicly the take-under offer, which makes easier their accumulation of 80 percent of the TOO units.

131.    By the actions and omissions alleged herein, the Partnership, the General Partner, BAM, and Brookfield violated the implied covenant of good faith and fair dealing.

132.    The actions and omissions alleged herein by the Partnership, the General Partner, BAM, and Brookfield substantially and directly impaired the value of the Partnership Agreement and the TOO units to Plaintiff and are inconsistent with the intent of the parties.

133.    Each breach of the implied covenant by the Partnership, General Partner, BAM, and Brookfield was material, intentional, knowing, and in willful and reckless disregard of the rights and interests of Plaintiffs and the Class.

134.    Plaintiffs and the Class suffered damages as a direct and proximate result of the Partnership, the General Partner, BAM, and Brookfield's breaches of the implied covenant of good faith and fair dealing in an amount to be proved at trial.

## COUNT IV

### Against Brookfield and BAM for
### Tortious Interference

135.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

136.    BAM and Brookfield know of the existence and validity of the Partnership Agreement and the contractual relationship between each Plaintiff and the Partnership.

137.    By making an offer BAM and Brookfield intentionally and improperly procured a breach of the Partnership Agreement without justification.

138.    BAM and Brookfield used their control over the Partnership and the General Partner to cause those entities to breach the Partnership Agreement.

139.    Plaintiffs and the Class have been injured by being deprived of the benefit of their bargain in an amount to be determined at trial.

29

## COUNT V

### Against Brookfield and BAM for
### Prospective Tortious Interference

140.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

141.    BAM and Brookfield know of the existence and validity of the Partnership Agreement and the contractual relationship between each Plaintiff and the Partnership.

142.    In making and publicizing the take-under offer, BAM and Brookfield intentionally and improperly seek to procure a breach of the Partnership Agreement.  This breach lacks any justification.

143.    BAM and Brookfield seek to use their control over the Partnership and the General Partner to cause those entities to breach Section 7.9(a) of the Partnership Agreement.

144.    Plaintiffs and the Class have been injured by being deprived of the benefit of their bargain in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, as follows:

A.  Declaring that this action is properly maintainable as a Class Action;

B.  Declaring that the Defendants breached their duties to the Class;

C.  Declaring that the Defendants breached their duties in failing to stop Brookfield;

D.  Enjoining, preliminarily and permanently, the Proposed Transaction;

E.  Directing Defendants to fairly and fully disclose all material information concerning the Proposed Transaction;

30

F.  In the event the Proposed Transaction is completed before entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

G.  Awarding damages to Plaintiffs and the Class;

H.  Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorneys' fees; and

I.  Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.


DATED: July 11, 2019

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**


/s/ *Mark Lebovitch*
Mark Lebovitch
David Wales
Jacqueline Y. Ma
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
MarkL@blbglaw.com
DavidW@blbglaw.com
Jacqueline.Ma@blbglaw.com


**HARRIS ST. LAURENT LLP**


/s/ *Jonathan Harris*
Jonathan Harris
Joseph Gallagher
Correy A. Kamin
40 Wall Street, 53rd Floor
New York, NY 10005
Tel: (212) 397-3370
Fax: (212) 202-6206
jon@sc-harris.com
jgallagher@sc-harris.com
ckamin@sc-harris.com


*Attorneys for Plaintiffs and the Class*