**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE TEEKAY OFFSHORE PARTNERS L.P. COMMON UNITHOLDERS LITIGATION** | Case No. 1:19-cv-06483-RA |

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs J. Deal Partnership I, L.P., Noster Capital Master Fund, Aquamarine Master Fund LP, Steven A. Monosson, and Mark Whiting (together, "Plaintiffs"), on behalf of themselves and all other similarly situated holders of common units of Teekay Offshore Partners L.P. (the "Partnership" or "TOO"), by and through their undersigned counsel, bring this Consolidated Class Action Complaint against the Partnership, Teekay Offshore GP L.L.C. (the "General Partner"), Brookfield Asset Management, Inc. ("BAM"), Brookfield Business Partners L.P. ("Brookfield"), and certain current and former directors and officers of the Partnership, the General Partner, and Brookfield (the "Individual Defendants") (collectively, the "Defendants"). Each Plaintiff alleges the following based upon personal knowledge as to itself or himself and their own financial analysis, and based upon information and belief, including the investigation of Plaintiffs' counsel, which included review of publicly available information, and communications with representatives of the Partnership or the General Partner as to all other matters. Plaintiffs hereby demand a trial by jury.

## NATURE OF THE ACTION

1.     This case seeks to hold Brookfield and its affiliates, the entities that control the Partnership, accountable for their breach of duties and contractual obligations, through their deceitful, sustained, and manipulative scheme undertaken in bad faith to depress the Partnership's market value in order to squeeze out the minority unitholders at a grossly unfair price.

2. The Partnership is an international energy shipping and storage company. Its business has strong fundamentals because it benefits from high barriers to entry, stable relationships with large producers, and a stable source of revenue through long-term contracts. After years of strong performance, TOO—like the entire energy shipping industry—faced financial troubles during the energy sector meltdown of 2016.

3. Appearing on the scene at the time, Brookfield initially provided the Partnership much-needed capital to withstand the downturn and to finance its long-term capital spending projects. In exchange for its capital, Brookfield negotiated for and received significant financial returns. However, the right to artificially depress the price of the Partnership's publicly-traded membership units to take complete ownership of the business for a song only *twenty months* after Brookfield's equity investment was not among these benefits. Indeed, Brookfield's actions were taken in bad faith and were highly unfair to the Partnership's limited partners and minority unitholders.

4. As explained herein, since 2017, Brookfield has gone from a helpful financing source to a predatory controller of TOO. *First*, in 2019, Brookfield used its control over the Partnership to completely shut down TOO's distributions to its unitholders. It did so even as the Partnership's financial position (expecting over $300 million per annum in cash flow) was more than sufficient to justify distributions (approximately $16 million per annum); investors in businesses structured like TOO invest because they expect such distributions. Indeed, given the expected improvements in the Partnership's bottom line, the appropriate course of action would have been to *increase* distributions. The only reason to eliminate distributions would have been to shatter investor confidence in the value of the units, thereby lowering their price without altering

the fundamentals of the business.  This ensured that Brookfield could keep all of the Partnership's value for itself.  *See* Section E, *infra*.

5.      ***Second***, Brookfield, through its control of the General Partner, caused the Partnership to issue numerous series of notes and preferred stock that served marginal business purposes but further buried the TOO units in the capital structure.  The effect of Brookfield's repeated issuance of odd securities superior to TOO equity were to keep the TOO unit price depressed even as both the energy markets and TOO's own financial position was drastically improving.  This unfair related party transaction violated, among other things, the General Partner's contractual obligation to act in good faith. *See* Sections B and D, *infra*.

6.      ***Third***, just as TOO's long-term capital investments were set to flower, creating over $400 million in annual free cash flow, Brookfield seized upon an unrelated financial crisis at Teekay Corporation to go from mere controller of the General Partner to the sole owner of the General Partner and holder of 74% of the Partnership's units, paying the below market price of $1.05 per unit to bail out Teekay Corporation.  Brookfield also had the right to exercise an option that would have placed another 6% of TOO's units under its control.  In normal circumstances, Brookfield's gobbling up of TOO equity would have triggered the General Partner's (and its Board's) obligation to take defensive action to block a Brookfield takeover.  Instead, they stood idly by and even took part in enabling Brookfield to gain the full benefit of its unit-value depressing actions.  *See* Section E, *infra*.

7.      ***Fourth***, just a week after its opportunistic purchase of TOO's units, Brookfield started the final phase of its squeeze-out scheme.  In order to anchor the Partnership's unit price at a depressed level before completing the squeeze-out of all remaining unitholders for less than their units were actually worth, Brookfield publicly announced its intention to press the board of

directors of the General Partner—which it controlled—to approve a buyout deal at $1.05 per unit. This was a take under.  Importantly, by announcing the offer at below the already depressed market price and claiming it would then "negotiate" with the Partnership's Conflicts Committee, which ostensibly existed for the purpose of "cleansing" this conflicted transaction, Brookfield effectively told the markets that the Partnership would not create long-term value for public investors, causing the units to trade based solely on expectations of the lowest possible price Brookfield would pay to complete its squeeze-out scheme.  *See* Section F, *infra*.

8.      ***Fifth***, Brookfield also purchased TOO debt at a large discount, used its position of control to force the Partnership to buy the debt back at face value plus a true up payment, resulting in a quick profit of over $70 million to Brookfield.  Ironically, Brookfield sought to justify the low price for the current merger by claiming TOO needed capital, even though Brookfield had taken out a large amount of capital from the Partnership to drive down the price of the units.

9.      Indeed, it took the initial filing of these consolidated lawsuits in July 2019 to force Brookfield to offer a marginally higher price of $1.55 per unit in October 2019.  The transaction closed at this price on January 22, 2020 (the "Merger").  This still meaningfully undervalues the Partnership, and was little more than an attempt to improve Brookfield's optics while leaving the unfair economics of its initial offer intact.

10.     Nowhere is this more apparent than in the Partnership's own (and, by virtue of its controlling role, Brookfield's own) "green bond" offering in respect of the Partnership's wholly-owned subsidiary Teekay Shuttle Tankers, L.L.C., which it presented to investors in October 2019. In it, the Partnership—which at the time was 76% owned by Brookfield—advertised strength in the business fundamentals of the Partnership and an expectation of high revenue growth.  The only explanation for this divergence from the more bearish outlook provided by Brookfield's chosen

financial advisor, Evercore, is that Brookfield values its own naked economic interest above its contractual and legal obligations to TOO's minority unitholders.

11.     Through puppeteering the General Partner and pushing the deal through a compromised Conflicts Committee, Brookfield forced the limited-partner unitholders to sell their units at a price far below their intrinsic value.  Brookfield's problem, however, and the fundamental basis of this lawsuit, is that its disloyal scheme taken in bad faith breaches the duties that the General Partner and its affiliates owe to the minority common unitholders under the Partnership's Sixth Amended and Restated Agreement of Limited Partnership of Teekay Offshore Partners L.P., dated as of January 23, 2018 (the "Partnership Agreement"), which was the limited partnership agreement in force before the Merger closed.

12.     Specifically, and as further detailed below, the Partnership Agreement provides unitholders critical protections in the event the General Partner or its affiliates (such as Brookfield) takes action unfair to the limited partners and unaffiliated unitholders in furtherance of a conflicted transaction like the Merger.  This would certainly include Brookfield's June 2018 issuance by TOO of hundreds of millions of dollars of notes with marginal business purpose, which not only enriched Brookfield, it depressed TOO's unit price and laid the groundwork for Brookfield's squeeze out of the minority unitholders.  The timing of this refinancing, occurring on the heels of the recapitalization, leads to the inescapable conclusion that Brookfield ignored the interests of the other common unitholders.

13.     Had it wanted to act in good faith and in accordance with its contractual duties, Brookfield still had at least two viable paths to taking control of TOO.  The General Partner could have taken steps to ensure that the Merger closed on fair terms—but fairness was not important to Brookfield.  Alternatively, the General Partner could have established a truly independent

Conflicts Committee to negotiate the deal. However, in the Form 6-K announcing Brookfield's $1.05 offer, the General Partner made clear that the deal would be negotiated with the then-existing Conflicts Committee. The Conflicts Committee was, however, compromised from the start, because its members included two individuals who did not meet the standards of independence under the Partnership Agreement. As such, Special Approval could not be achieved under the Partnership Agreement, or in fairness to the unitholders. This conflicted committee in turn selected advisors that were, in actuality, incurably biased in favor of Brookfield. Remarkably, the two non-independent members who purportedly left the Conflicts Committee prior to its approval of the Merger continued to participate in the Conflicts Committee's process notwithstanding their ties to Brookfield. Thus, Brookfield cannot rely on the Conflicts Committee's approval, which was fatally tainted from the outset.

14.     Brookfield's, the General Partner's, and the Conflicts Committee's misconduct in setting up, proposing, structuring and effecting this improper offer is premeditated and in bad faith, in violation of the partnership agreement and the Defendants' duties. As the Defendants forced through this Merger with no ability of the minority unitholders to vote on or stop the transaction, this lawsuit is their only available remedy. For the reasons further set forth below and as will be shown at trial, the Court should award unitholders the fair value of their long-suffering investments, which are being taken away just as the value of years of investment are about to come to fruition.

## PARTIES

### A.     Plaintiffs

15.     Plaintiff J. Deal Partnership I, L.P. ("JDP"), at the time it filed its initial complaint in July 2019, held roughly 1.2 million of the Partnership's common units. It had continuously been a unitholder since September 2017 through December 2019 and was a unitholder of TOO at

6

the time of the wrongdoing complained of.  It has its principal place of business in the State of Texas and is organized under the laws of the State of California.

16.     Plaintiff Noster Capital Master Fund ("Noster") held roughly 900,000 of the Partnership's common units until the Merger closed.  It had continuously been a unitholder since May 2016 and was a unitholder of TOO at the time of the wrongdoing complained of.  It has its principal place of business in, and is organized under the laws of, the Cayman Islands.

17.     Plaintiff Aquamarine Master Fund LP ("Aquamarine") held roughly 1 million of the Partnership's common units until the Merger closed.  It had continuously been a unitholder since October 2017 and was a unitholder of TOO at the time of the wrongdoing complained of.  It has its principal place of business in, and is organized under the laws of, the British Virgin Islands.

18.     Plaintiff Steven A. Monosson ("Monosson") held or controlled roughly 791,000 of the Partnership's common units until the Merger closed.  He had continuously been a unitholder since October 2008 and was a unitholder of TOO at the time of the wrongdoing complained of.  He is a resident of the state of California.

19.     Plaintiff Mark Whiting ("Whiting") held or controlled roughly 1.3 million of the Partnership's common units until after Merger-related materials were sent to him after December 13, 2019, and remained a common unitholder until the Merger closed.  He had been a continuous unitholder since September 2015 and was a unitholder of TOO at the time of the wrongdoing complained of.  He is a resident of the state of California.

**B.     Defendants**

20.     Defendant Teekay Offshore Partners L.P. ("TOO" or the "Partnership") is a global marine energy, transportation, and storage company.  TOO is a limited partnership organized under the laws of the Marshall Islands with its principal executive offices in Bermuda.  The Partnership's

common units and preferred shares were publicly traded on the New York Stock Exchange ("NYSE") until the close of trading day on January 22, 2020.

21.      Defendant Teekay Offshore GP L.L.C. (the "General Partner") is the general partner of the Partnership.  It is a Marshall Islands limited liability company 100-percent owned by Brookfield TK TOGP, L.P., itself a Bermuda limited partnership.

22.      Defendant William Utt ("Utt") is the Chair of the Board of Directors of the General Partner (the "Board").  He has served in this position since 2017.  Prior to that, he served as the Chairman, President, and CEO of KBR Inc.  Until June 2019, he had also served as Director and Chairman of Teekay Corporation and as a director of Teekay GP L.L.C., the general partner of another Teekay-related limited partnership.  He currently resides in Houston, Texas.

23.      Defendant Ian Craig ("Craig") has served as a member of the Board since 2017.  Prior to that, he served as a senior executive in numerous oil and gas ventures affiliated with Shell Oil.  He is the Chair of the Board's Conflicts Committee, and on information and belief, is a resident of the United Kingdom.

24.      Defendant Kenneth Hvid ("Hvid") has served as a member of the Board since 2011.  He has been the President and CEO of the Teekay Corporation since 2017.  On information and belief, he is a resident of Vancouver, British Columbia, Canada.

25.      Defendant Craig Laurie ("Laurie") has served as a member of the Board since 2018.  He is a Managing Partner in BAM's Private Equity Group and has been associated with various Brookfield-related entities since at least 1997.  He maintains his principal office in New York, New York.

26.      Defendant David Lemmon ("Lemmon") served as a member of the Board from 2006 to January 23, 2020.  Prior to this, he was the President and CEO of Colonial Pipeline

Company and President of Amoco Pipeline Company.  He was a member of the Board's Conflicts Committee, and resides in Las Vegas, Nevada.

27.     Defendant Jim Reid ("Reid") has served as a member of the Board since 2017.  He is a Managing Partner and Chief Investment Officer in BAM's Private Equity Group and has been with various Brookfield-related entities since at least 2003.  On information and belief, he resides in Toronto, Canada.

28.     Defendant Denis Turcotte ("Turcotte") has served as a member of the Board since 2017.  He is a Managing Partner in BAM's Private Equity Group and has been with associated with various Brookfield-related entities since at least 2006.  He resides in Montreal, Canada.  He currently serves as Chairman of the Board at Westinghouse Electric Company, where co-Defendant Bill Transier serves as a director.

29.     Defendant Gregory Morrison ("Morrison") replaced Defendant Walter Weathers ("Weathers") as a member of the Board on July 8, 2019.  Appointed to the Board by Brookfield, Morrison currently sits on a number of other boards, including those of various international subsidiaries of BAM.  Morrison is the President and CEO, and a director of Trisura International Holdings Ltd., an insurance provider spun off from BAM in 2017.  He is also President and a director of Brookfield Capital Partners (Bermuda) Ltd., a member of the consortium Brookfield put together to buy out the Partnership's remaining common unitholders.  Morrison is a citizen of Canada.

30.     Defendant Bill Transier ("Transier") has served as a member of the Board since March 2019.  He is the CEO of Transier Advisors, LLC.  Mr. Transier holds himself out as an "independent" Board member, but in fact works to advance the interests of Brookfield and BAM. For example, he advertises that he participated in the restructuring of Westinghouse Electric

Company ("Westinghouse"), which was undertaken by Brookfield and is itself a Brookfield affiliate. Transier also currently serves on the board of Westinghouse, which is chaired by Turcotte. He currently resides in Houston, Texas.

31.     Defendant Walter Weathers ("Weathers") served as a member of the Board from September 2017 to July 8, 2019. He was a senior vice president in BAM's private equity group during his membership on the Board, except from May 2019 onward, when he started employment as Chief Financial Officer of Tally Energy Services, a private equity firm that focuses on building a portfolio of oil and gas operations. On information and belief, Weathers is a resident of Houston, Texas.

32.     The individuals listed in ¶¶ 22-31 above are collectively referred to herein as the "Individual Defendants."

33.     Defendant Brookfield Asset Management, Inc. ("BAM") is an alternative asset management company with over $300 billion of assets under management. BAM is headquartered in Toronto and incorporated in Canada. It has corporate offices in New York City and is listed on the NYSE under the ticker BAM. Every year, BAM holds its annual investor day in New York City.

34.     Defendant Brookfield Business Partners L.P. ("Brookfield") is a publicly-traded limited partnership spun off from BAM in 2016. It is traded on both the NYSE and the Toronto Stock Exchange and is headquartered in Bermuda. Brookfield was purportedly established as BAM's primary vehicle to own and operate business services and industrial operations on a global basis. Like BAM, Brookfield holds an annual investor day each September in New York City, at which Brookfield discusses its investments, including TOO. TOO's acquisition is part of Brookfield's nascent "infrastructure services" segment strategy.

### C.      Relevant Non-Parties

35.      Teekay Corporation is a corporation incorporated in the Marshall Islands, with its principal place of business located in Bermuda.  Prior to Brookfield's aggressive acquisition of common units in 2017, Teekay Corporation was the controlling shareholder in the General Partner. To refinance approximately $400 million of its 2020 bond maturity, Teekay Corporation sold its remaining TOO units to Brookfield at a depressed price.

36.      Evercore Group LLC ("Evercore") is an investment bank incorporated in Delaware with corporate headquarters in New York City.  Evercore served as the financial advisor for the Conflicts Committee in evaluating Brookfield's offer.

### SUBJECT MATTER JURISDICTION

37.      This Court has subject matter jurisdiction over this Action pursuant to 28 U.S.C. § 1332 because diversity exists between each of the Plaintiffs and each of the Defendants and the amount in controversy exceeds $75,000, exclusive of interests and costs.

38.      Moreover, because at least one named plaintiff and one named defendant are citizens of different states and the amount in controversy exceeds $5,000,000, this Court has jurisdiction under the Class Action Fairness Act.  28 U.S.C. § 1332(d).

39.      Plaintiffs JDP, Monosson, and Whiting are residents and citizens of California. Plaintiff Noster is a resident and citizen of the Cayman Islands.  Plaintiff Aquamarine is a resident and citizen of the British Virgin Islands.

40.      Complete diversity exists because none of the named plaintiffs share the same residence or citizenship with any of the named defendants.  None of the Defendants are citizens or residents of California, the Cayman Islands, and the British Virgin Islands.  Defendants TOO and the General Partner are residents or citizens of Bermuda and the Marshall Islands.  Defendants Brookfield and BAM are residents and citizens of Canada.  Individual Defendants Utt, Transier,

and Weathers are residents of Texas.  Individual Defendant Morrison is a resident in Bermuda.
Individual Defendant Craig is a resident of the United Kingdom.  Individual Defendants Turcotte,
Reid, and Hvid are residents of Canada.  Individual Defendant Lemmon is a resident of Nevada.

## PERSONAL JURISDICTION

41.     This court has personal jurisdiction over each Defendant because the Individual
Defendants caused the Partnership to initiate and execute the merger between Brookfield and TOO
(the "Merger"), through Brookfield's coercive and improper acquisition of all of the outstanding
common units, which are exclusively traded on the NYSE.  The harm imposed by these actions
falls on a market located in New York and investors active in that market.

42.     TOO, Brookfield, and BAM have purposely availed themselves of the protections
of laws in New York and projected themselves into New York by having their stock trade on a
stock exchange within the district and by thus raising capital through New York residents.
Therefore, they reasonably expected to be haled into Court here because their actions could
potentially defraud New York investors.

43.     Moreover, the Teekay Group each year holds a live investor and analyst meeting in
New York City to discuss the Teekay entities' financial performance, thus purposely availing
themselves of the protections of New York law.  On information and belief, TOO either presents
at or officers from TOO attend these presentations.  Hvid, as Teekay Corporation's CEO, presents
at these meetings.

44.     Likewise, each year, Brookfield and BAM hold an investor day conference in New
York City.

45.     On information and belief, Brookfield and BAM share the same corporate offices.
BAM has corporate offices in New York City, and on information and belief, Brookfield occupies

12

those offices, as well.  Defendant Laurie, a BAM managing partner, is based in the New York offices.  Thus, each company transacts business in New York City, and therefore, purposely availed themselves of the protections of New York law.

46.     In particular, multiple key events in the negotiation, finalization, and execution of the Merger took place in New York. TOO, Brookfield, the Conflicts Committee, and their representatives coordinated, negotiated, and finalized the Merger over a weekslong period from the New York offices of Kirkland & Ellis LLP ("K&E").

47.     As the Conflicts Committee was allegedly assessing and negotiating the Merger along with TOO representatives, they also used other resources located in New York.  The Conflicts Committee's financial advisor during negotiations over the Merger, who on several occasions engaged with representatives of Brookfield directly, was Evercore, an investment bank headquartered in New York.  On information and belief, all discussions involving Evercore were conducted either in person or on the telephone with the representative or representatives of Evercore being present physically in New York City.

48.     Furthermore, the Conflicts Committee was represented by Potter Anderson & Corroon LLP ("Potter"), a law firm based in Wilmington, Delaware.  Potter frequently engaged with Brookfield's counsel, K&E, and on information and belief, many of the attorneys from K&E who were involved in the negotiation of the Merger were based in New York City.  On information and belief, the discussions between Potter and K&E occurred either in person in New York City or occurred over the telephone where the representative(s) from K&E would have been physically present in New York City.

49.     Moreover, the counsel for TOO has been Baker Botts LLP ("Baker"), and many of the attorneys from Baker who worked for TOO on the Merger, on information and belief, were also based in New York City.

50.     On information and belief, each Individual Defendant conducts business in New York and has minimum contacts sufficient to establish personal jurisdiction over each of them in New York.  On information and belief, each Individual Defendant regularly meets and conducts shareholder business related to the Partnership in New York.

51.     Each Individual Defendant caused TOO and the General Partner to engage in the practices complained of herein by virtue of their exercise of control and ownership over the business and corporate affairs of the Company, which are global in scope.

52.     Under the Partnership Agreement, each Individual Defendant owed and owes TOO and the General Partner and its unitholders obligations to act in good faith.

53.     Thus, each of the Defendants is subject to New York's "long arm" jurisdiction because it or he or she transacts business in New York and committed torts within and without the state, so that that it or he or she expected or should reasonably have expected their acts to have consequences in New York and derive substantial revenue from interstate or international commerce, and have benefited from the protection of New York law.

## VENUE

54.     Venue is also proper in this district pursuant to 28 U.S.C. § 1391 because the units that are the subject of Plaintiffs' claims traded exclusively in this district and the Defendants directed their activities towards this district.  Thus, a substantial part of the events giving rise to the claim occurred here.

## JURISDICTION AND VENUE BY CONSENT

55.     Personal jurisdiction and venue are also proper in this Court because Defendants have consented to resolve legal disputes in New York City under the forum selection clause in the Second Amended and Restated Limited Liability Company Agreement (the "GP Agreement"), which states:

> Any and all suits, legal actions or proceedings arising out of this agreement (including against any director or officer of the company) shall to the fullest extent permitted by law be brought solely in the Supreme Court of the State of New York, New York County, or the United States District Court for the Southern District of New York and each member hereby to the fullest extent permitted by law irrevocably and unconditionally submits to and accepts the exclusive jurisdiction of such courts[.]

GP Agreement § 13.16 (emphasis removed).

56.     Plaintiffs have standing to enforce the GP Agreement because they are its intended third-party beneficiaries or are directly related to it.  This suit is, among other things, against the General Partner and its directors for direct harm to Plaintiffs and similarly situated limited partners who held common units of TOO.  Moreover, the purpose of the General Partner is to run the Partnership, and the vast majority of the economics of the Partnership are held in limited-partner units.

57.     On September 30, 2019, the Brookfield parties and their Brookfield affiliates also signed an Equity Commitment Letter with one another to finance the Merger.  This Equity Commitment Letter was publicly filed with the United States Securities and Exchange Commission in connection with the proposed Merger.  TOO is expressly given the status of a third-party beneficiary to enforce this Equity Commitment Letter.  Plaintiffs also have standing to sue as third-party beneficiaries or as parties directly related to the contract because the Equity Commitment Letter's purpose is to benefit the parties to the Merger by providing financing.  The

Brookfield parties consented to jurisdiction by the courts of New York to enforce the terms of the

Letter agreement, as per the Equity Commitment Letter:

> All issues and questions concerning the construction, validity, interpretation and enforceability of this Equity Commitment Letter will be governed by, and construed in accordance with, the Laws of the State of New York, without giving effect to any choice of Law or conflict of Law rules or provisions (whether of the State of New York or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of New York.  Any Action seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Equity Commitment Letter or the transactions contemplated hereby will be brought and **determined exclusively in the federal and state courts located in the County of New York in the State of New York**; *provided*, that if the federal and state courts located in the County of New York in the State of New York do not have jurisdiction, any such action will be brought exclusively in the United States District Court for the Southern District of New York or any other court of the State of New York, and each of the parties hereby consents to the exclusive jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such action and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such action in any such court or that any such action that is brought in any such court has been brought in an inconvenient forum.  Process in any such action may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court.

Equity Commitment Letter ¶ 16(a) (emphasis added).

## **OBLIGATIONS AND DUTIES OF THE DEFENDANTS**

58.     The duties of the General Partner (and its affiliates) and Brookfield TK TOGP L.P. are set out by the Partnership Agreement.  The General Partner makes all decisions for the Partnership, subject to the limited voting rights of the unitholders.  The Board of Directors of the General Partner oversees the Partnership's operations.

59.     The Partnership Agreement is governed by the Marshall Islands Limited Partnership Act ("MILPA").  The MILPA expressly states that it is to be "applied and construed" to be "uniform with the laws of the State of Delaware," where it does not conflict with either the

16

MILPA's express provisions or with the decisions of the High and Supreme Courts of the Republic of the Marshall Islands.  The Partnership's most recent annual report filed on Form 20-F with the United States Securities and Exchange Commission ("SEC") makes a similar statement about following Delaware law.

60.     Section 7.9 of the Partnership Agreement distinguishes between actions the General Partner takes in its official capacity as General Partner from actions the General Partner takes in its individual capacity and further establishes a standard of conduct for those categories of actions.

61.     Section 7.9 also applies to actions taken by the General Partner that "any of its Affiliates causes it to" take.  Section 1.1 of the Partnership Agreement defines an "Affiliate" of the General Partner as any Person that "directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with, the Person in question" and defines "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise."  Brookfield is an "Affiliate" of the General Partner by dint of its control of the General Partner, as discussed in Section C, *infra*.  Under Delaware law, the controller of a general partner also owes duties to the limited partners when the controller directs the general partner in actions that affect the limited partners.  Because of Brookfield's control and direction of the General Partner, it owes the same duties to the limited partners, as articulated in the GP Agreement and the Partnership Agreement, as the General Partner and its directors.

62.     When the General Partner takes an action in its individual capacity, the standard set forth in Section 7.9(c) applies.  When acting it its individual capacity, the General Partner is "entitled to make such determination or to take or decline to take such other action free of any fiduciary duty or obligation whatsoever to the Partnership or any Limited Partner" and is "not . . .

required to act in good faith or pursuant to any other standard imposed by this Agreement, any Group Member Agreement, any other agreement contemplated hereby or under the Marshall Islands Act or any other law, rule or regulation or at equity."

63.     By contrast, when the General Partner acts in its official capacity, it must consider interests other than its own.  Section 7.9(b) imposes a general, overarching, obligation of "good faith" over the General Partner and its Affiliates, meaning that "unless another express standard is provided for in this Agreement, the General Partner, or such Affiliates causing it to do so, shall make such determination or take or decline to take such other action in good faith and shall not be subject to any other or different standards imposed by this Agreement, any Group Member Agreement, any other agreement contemplated hereby or under the Marshall Islands Act or any other law, rule or regulation or at equity."  For the General Partner or its Affiliate to act in "good faith," it must "reasonably believe that [its] determination or other action is in the best interests of the Partnership[.]"  Acting in "good faith" thus precludes the General Partner from taking an action in its official capacity that is highly unfair to the limited partners and the unaffiliated unitholders.

64.     Under governing Delaware Supreme Court precedent interpreting almost identical language, this imposes a "contractual fiduciary standard similar if not identical to entire fairness." *Brinckerhoff v. Enbridge Energy Co., Inc.*, 159 A.3d 242, 262 (Del. 2017).

65.     When a conflict of interest arises between, on the one hand, the General Partner or any of its Affiliates, and on the other, the Partnership or any member of the Partnership, Section 7.9(a) of the Partnership Agreement offers several contractual safe harbors to a conflicted transaction.  Under Section 7.9(a), "any resolution or course of action by the General Partner or its Affiliates in respect of such conflict of interest shall be permitted and deemed approved by all

Partners," and would not constitute a breach of the Partnership Agreement or any duty implied by law or equity, if (but only if) the course of action falls into one of four safe harbors.

66.     The four safe harbors that cleanse a conflict of interest transaction are:  (i) "Special Approval"; (ii) approval "by the vote of a majority of the Outstanding Common Units (excluding Common Units owned by the General Partner and its Affiliates)"; (iii) if the course of action is "on terms no less favorable to the Partnership than those generally being provided to or available from unrelated third parties"; or (iv) if the course of action is "fair and reasonable to the Partnership, taking into account the totality of the relationships between the parties involved (including other transactions that may be particularly favorable or advantageous to the Partnership)."  Under Delaware law, Section 7.9(a) also contains an implied obligation on the part of the General Partner and its Affiliates not to mislead unitholders.

67.     The Partnership Agreement defines "Special Approval" as "approval by a majority of the members of the Conflicts Committee."  Recent Delaware law interpreting a nearly identical provision has required the Conflicts Committee to act in good faith whenever they "make [a] determination or decline to take such other action."  *Morris v. Spectra Energy Partners (DE) GP, LP*, 2017 WL 2774559, at *6 (Del. Ch. June 27, 2017).  And Defendants are only relying on Special Approval.  Defendants are not relying on the other three safe harbors: approval by the majority of unaffiliated unitholders' vote; a deal structure that is no less favorable to those available from third parties; or an argument that the Merger is fair and reasonable to the Partnership.

68.     The Partnership Agreement further defines "Conflicts Committee" as "a committee of the Board of Directors of the General Partner composed ***entirely*** of two or more directors who are not (a) security holders, officers or employees of the General Partner, (b) officers, directors or employees of any Affiliate of the General Partner or (c) holders of any ownership interest in the

Partnership Group other than Common Units and who also meet the independence standards required of directors who serve on an audit committee of a board of directors established by the Securities Exchange Act of 1934, as amended, and the rules and regulations of the Commission thereunder and by the" NYSE.

69.     According to the NYSE Listed Company Rules, "[n]o director qualifies as 'independent' unless the board of directors affirmatively determines that the director has no material relationship with the listed company (either directly or as a partner, shareholder or officer of an organization that that has a relationship with the company)."

70.     When a conflict of interest arises, the Partnership Agreement authorizes but does not require the General Partner to seek Special Approval.  If the General Partner does not seek Special Approval, the Board may nonetheless "determine[] that the resolution or course of action taken with respect to a conflict of interest" is either "on terms no less favorable to the Partnership than those generally being provided to or available from unrelated third parties" or is "fair and reasonable to the Partnership," under Sections 7.9(a)(iii) and (iv), respectively.  If the Board makes such a determination, the Partnership Agreements provides a rebuttable presumption that, "in making its decision, the Board of Directors of the General Partner acted in good faith."  This rebuttable presumption does not apply where, as here, the General Partner attempts to avail itself of the Special Approval safe harbor with respect to a conflict transaction.

71.     Although Section 7.9(e) purports to disclaim any fiduciary duties owed by the General Partner to the Partnership or any Limited Partners, the Partnership recently disclosed that "[o]ur general partner's officers and directors have fiduciary duties to manage our business in a manner beneficial to us and our partners" in its most recent Form 20-F filed with the SEC.  Section

20

3.3 of the GP Agreement further states that the directors of the General Partner owe fiduciary duties to the General Partner.

72.     Section 14.3(a) and (b) of the Partnership Agreement provides that, except as provided in 14.3(d) or 14.3(e), a merger must be approved by the "affirmative vote or consent" of holders of a "Unit Majority."  The Partnership Agreement defines a "Unit Majority" as a majority of the Outstanding Common Units, voting as a class.

73.     Section 15.1(a) of the Partnership Agreement provides an option to the General Partners and its Affiliates to squeeze out the unitholders at a preset formulaic price, but only in limited circumstances (the "Tender Offer" right).  Specifically, these circumstances are "if at any time the General Partner and its Affiliates hold more than 80% of the total Limited Partner Interests of any class or series then Outstanding, the General Partner shall then have the [transferable] right, . . . exercisable at its option, to purchase all, but not less than all, of such Limited Partner Interests of such class or series then Outstanding held by Persons other than the General Partner and its Affiliates."  Such a purchase must be "at the greater of (x) the Current Market Price as of the date three days prior to" the date on which a notice is mailed and "(y) the highest price paid by the General Partner or any of its Affiliates for any such Limited Partner Interest of such class or series purchased during the 90-day period preceding the date that the notice described in Section 15.1(b) is mailed."

## SUBSTANTIVE ALLEGATIONS

### A.     The Partnership's Business

74.     In August 2006, non-party Teekay Corporation formed TOO as a Marshall Islands limited partnership in order to further develop its operations in the offshore market.

75.     Over the years, the Partnership has grown substantially, expanding its services from providing simple marine transportation and storage to include oil production, long-distance towing, and offshore installation, maintenance, and safety services to the offshore oil industry.

76.     While the Partnership operates worldwide, it focuses on the deep-water offshore oil regions of the North Sea, Brazil, and the eastern coast of Canada, primarily operating in the following segments: (i) the Floating Storage Production and Offloading ("FSPO") Segment; (ii) the Shuttle Tanker Segment; (iii) the Floating Storage and Offloading ("FSO") Segment; (iv) the Unit for Maintenance and Safety ("UMS") Segment; (v) the Towage and Offshore Installation Vessels Segment; and (vi) the Conventional Tanker Segment.

77.      The Partnership's shuttle tankers and FSO units are primarily subject to long-term, fixed-rate time-charter or bareboat charter contracts, which provides stable cash flow to the Partnership.  The Partnership's growth strategy focuses primarily on increasing its fleet of FSPO units under medium to long-term charters while evaluating opportunities to expand into related offshore services segments. Its current overall contract portfolio includes several late-stage growth projects that are expected to provide significant near and longer-term cash flow growth.

78.     Predictably, given the sheer complexity of transporting energy on the open seas, the machinery and infrastructure required to operate TOO's business is enormously expensive (costing millions to buy and billions to build), thus creating significant barriers to entry.  This favors TOO as an established player in the field, and has allowed it to maintain deep-rooted relationships within the relatively small world of international petroleum producers.

79.     In March 2016, the Partnership sold its two conventional tankers and subsequently chartered-in both vessels for three years each, both with additional one-year extension options. During this time, both vessels traded in the spot conventional tanker market.  TOO's long-distance

towage and offshore installation vessels also operate on either spot contracts or voyage-charter contracts. Voyage-charter contract revenue is less volatile than revenue from spot market rates, as project budgets are prepared and maintained in advance of the contract commencement.

80. TOO's business model is designed to depend on long-term contract revenues rather than be linked to the spot market in crude oil. Nonetheless, as described further below in Section B, for many years TOO's market price correlated remarkably with that of crude oil. This trading dynamic reflects the risk of contractual counterparty bankruptcy or default in times of extreme energy market stress.

81. Taken together, these factors have produced a business with strong fundamentals. As Brookfield highlighted when it initially invested in TOO, by 2017, the Partnership had "consolidated assets of $5.6 billion and its fleet of 62 offshore vessels provides critical services to its customers." It specifically highlighted TOO's annual adjusted EBITDA of $590 million; strong relationships with global exploration and production companies, and corresponding average contract durations of 4 years with generally strong prospects for extension in any given case; and control of approximately 40% of the world's shuttle tanker fleet.

82. While the Partnership has amassed valuable assets, with long-term contracts in place for its fleet of FSPO and shuttle tanker vessels, it has previously struggled to access financing to pay for its new builds. As a result, its leverage and the oil market collapse in 2016 led to liquidity shortfalls. When Brookfield first arrived on the scene with an offer to repair the Partnership's balance sheet, its capital infusion appeared to benefit the company; it was not until much later that Brookfield's intent to seize TOO for itself became clear.

**B.     The Partnership's Publicly Traded Common Units**

83.     On December 13, 2006, the Partnership made an initial public offering of 7,000,000 common units at a price of $21.00 per unit.[1]  For the first year and a half of trading on the NYSE, the common units regularly traded at or above the offering price.

84.     Historically, and as evidenced by the first graph below, the trading price for TOO (in blue) has closely correlated with relevant industry and market indicators such as the Brent crude oil index (in white).

85.     At the height of the financial crisis, the closing price of TOO's common units declined, falling to $3.00 per unit by October 2008 and largely remaining under $10.00 per unit until the end of 2009.

86.     As the market recovered, TOO's market price rallied, reaching highs above $30.00 per unit in early 2014 before beginning another descent in mid-2014, when global crude oil prices began to decline.



87.     However, as visualized and explained below, after Brookfield gained its majority stake in TOO in 2017, the market price for TOO common units dropped and its correlation with

---

[1] The Partnership has also issued several series of preferred stock over the years, three of which are currently outstanding, though none are relevant to this litigation.

the Brent crude index disappeared.  Since the Partnership's fundamentals improved dramatically following Brookfield's investment (see subsection C, *infra*), the only answer to why a liquidity injection did not reverse a unit price decline brought on by a liquidity crisis is that Brookfield took steps to keep it artificially low.



88.     Indeed, the market price for TOO common units has declined over 53 percent since mid-2017.  By contrast, over the same period indices for Brent Oil and S&P 500 have grown 38 and 19 percent, respectively.

**C.     Brookfield Takes Control of the Partnership in 2017**

89.     Like the rest of the energy sector, the Partnership saw its market price fall in 2016, and it began facing liquidity shortfalls.  As part of a comprehensive solution to strengthen the Partnership's balance sheet, on July 26, 2017, Teekay Corporation and the Partnership jointly announced their intention to enter into a strategic partnership with Brookfield.  In addition to other financing initiatives, the contemplated transaction included a $640 million equity investment by Brookfield.

90.     Brookfield re-capitalized the Partnership with an investment of $610 million at a price of $2.50 per common unit, with Teekay Corporation investing a further $30 million.  In

exchange, Brookfield and Teekay Corporation received 65.5 million warrants of the Partnership on a pro rata basis.

91.     The cash from these newly-issued shares was used to retire all then-outstanding preferred shares in the Partnership, which was expected to save the Partnership approximately $28 million in annual distributions.

92.     As a condition of Brookfield's equity investment, the Partnership agreed to reduce its existing common unit distribution to reinvest cash in the business, pay down debt, and further strengthen the Partnership's balance sheet. Cutting distributions at that time—to get TOO out of its crisis—was justifiable.  Refusing to manage the business appropriately for growth to return capital to common unitholders once the crisis had passed, however, was not.

93.     The transaction fully financed the Partnership's existing growth projects which, when delivered over the subsequent few quarters, were expected to add an incremental $200 million of annual cash flow for the Partnership.

94.     With respect to governance, the transaction saw Brookfield increase its ownership interest in the Partnership to approximately 60% and acquired a 49% interest in the General Partner, as well as an option to acquire an additional 2% of the General Partner—which would give it outright majority control of the General Partner—subject to the satisfaction of certain conditions.

95.     When the deal closed on September 25, 2017, Brookfield also acquired the right to elect four members to the nine-member Board of Directors of the General Partner.  Concurrently with the closing, Defendants Reid and Weathers were elected to the Board, along with other Brookfield nominees David Levenson and Bradley Weismiller.

96.     Even without outright control of the Board or the General Partner, Brookfield obtained significant rights that gave it negative control through veto power over several important matters.  These included requiring Brookfield's consent for the Partnership to: (a) authorize, split, or reclassify equity securities; (b) incur debt of greater than $50 million; (c) amend corporate policies or organizational documents; (d) enter into a transaction with an affiliate for over $1 million; (e) enter an acquisition, divestment, or capital investment of more than $50 million; (f) commence or settle litigation of over $5 million; (g) enter into a transaction that would require the approval of the common unitholders; (h) change the size of the General Partner board; (i) make material changes to the employment of officers; (j) effect a material change in the nature of the business or operations; (k) approve a business plan or budget that would increase annual expenditures of more than 5%; (l) declare or pay a dividend of above 1 cent; and (m) redeem, purchase, or otherwise acquire equity securities of the general or limited partnership.

97.     The deal strengthened the Partnership's balance sheet, improved its liquidity, and provided financing for the Partnership's existing growth projects, thus delivering substantial near-term cash flow growth through the first quarter of the 2018 fiscal year.

98.     Among other things, Brookfield's investment transformed the Partnership's capital structure by extending maturities on debt and swaps.  For instance, the Partnership sold an existing $200 million parent loan to Brookfield at a discount to par, and Brookfield extended the loan maturity to 2022.  As a result of these transformations, the Partnership has no meaningful debt maturities until 2022.

99.     The cash proceeds from the recapitalization also allowed the Partnership to pay down debt, thus significantly reducing the Partnership's leverage.

100.    Accordingly, when Brookfield became TOO's financial sponsor, the Partnership's financial fundamentals improved dramatically.  The Partnership's leverage ratio improved by 38%, from about 7.4x to approximately 4.5x, below peers and in line with management's stated target, while adjusted EBITDA increased nearly 50% between 2017 and 2018.  These were exactly the types of improvement one would expect to spark an increase in the market price of TOO's common units.

101.    This did not happen.  Instead, TOO's common units began trading at a discount to more highly leveraged peer companies with worse balance sheets.

102.    In no small part, this was due to Brookfield's wrongdoing.  When it made its initial public offering, the Partnership had been marketed as a high-dividend-paying company. Throughout the majority of its history, TOO was owned by yield-oriented investors. Recapitalization of the Partnership by Brookfield, however, transformed TOO into a company that reinvested cash flows for growth rather than paying them out, thus requiring marketing to an entirely different investor base—marketing which never occurred.

103.    Instead, after Brookfield took control of the General Partner, Brookfield and the General Partner significantly reduced their communications to minority unitholders, and took virtually no steps to explain their future strategies and changed accounting and KPIs.  Neither did they hold roadshows or TOO investor days.

104.    After Brookfield's investment, trading volumes for TOO units fell off a cliff.  By September 2018, TOO's nominal trading volume had dropped to the 97th percentile of the Russell 3000 companies.  This result was premeditated; throughout 2018 Brookfield had been deliberately reducing TOO's investment appeal.

28

**D.      Brookfield Closes its Grip**

105.    Up until mid-2018, Brookfield's actions—reinvesting instead of returning cash, not seeking additional investment, and declining to engage with the other common unitholders—were highly suspect and disconcerting.  They soon became objectively unsupportable in light of Brookfield's contractual and legal duties of good faith to the minority investors.

106.    As of January 1, 2018, the public held a total of 26.7% of the Partnership's outstanding common units.  Brookfield TK TOLP L.P. and Brookfield TOGP L.P., affiliates of Brookfield, held 59.5% of the Partnership's outstanding common units and a 49% interest in the General Partner, respectively.  An affiliate of Teekay Corporation held the remaining 13.8% of the Partnership's outstanding common units and a 51% interest in the General Partner.

107.    In Spring of 2018, investors began to question Brookfield's strategy with TOO.  On June 13, 2018, Brookfield proposed an offering of $500 million in unsecured notes, which received a rating of Caa2.  Despite this poor rating, Brookfield then increased their offering by 40 percent on June 25 and June 26.

108.    With the new liquidity, Brookfield paid itself hundreds of millions of dollars.  It earned $200 million and a $12 million make-whole on an intercompany loan it had acquired for only $140M from Teekay: a 52% return on its money in less than one year.  This transaction effectively re-leveraged TOO by funding Brookfield's $72 million-dollar personal return (as none of these proceeds were shared with the other common unitholders), while putting the Partnership back into a financial hole.  There was no compelling economic basis to take on this debt other than to enrich Brookfield and bury the common units in TOO's capital structure, thereby making its equity less attractive on the market.

109.    On July 3, 2018, Brookfield exercised its option to purchase 2% of the General Partner units, becoming the controlling unitholder of the Partnership with a 51% stake, with the

right to elect seven out of nine directors of the Board.  Because the General Partner has the authority to undertake almost every operational action without the Limited Partners' approval, including the distribution of dividends, Brookfield gained affirmative control of TOO through its majority control of the General Partner.

110.    Brookfield's exercise of its option in 2018 caused a Change in Control event that required the Partnership to offer to repurchase debt that was originally due by 2019; therefore, in July 2018, Teekay was forced to upsize a $500 million debt offering into a $700 million offering to cover the cost of this buyback.  The bulk of this $700 million offering was purchased by Brookfield, further entrenching its ownership and control of the Partnership.

111.    Put plainly, Brookfield went from a savior in the summer of 2017 to a plunderer less than a year later.

**E.    Brookfield Squeezes Teekay Corporation Out of TOO**

112.    Despite the fact that Brookfield had only months earlier paid itself (and no one else) the equivalent of nearly ***four years' worth*** of dividend payments on all of the outstanding common units, in January 2019, Brookfield through the General Partner cut TOO's dividend to common unitholders to zero.

113.    Despite making clear that the Partnership expected over $300 million a year in increased cash flows, Brookfield and the General Partner did not choose the logical act of increasing dividends—or even the arguably defensible act of using that cash to invest in new capital projects that would redound to the benefit of all unitholders.  Instead, it gave itself a large cut of the new fruits of the Partnership.

114.    Teekay Corporation (a separate entity from the Partnership), in the meanwhile, had seen its unit price plummet 95% since its 2014 high.  Teekay Corporation needed to guarantee certain term loans at its other public subsidiary, Teekay Tankers Ltd., and needed $400 million—

over 100 percent of its own equity value—to refinance its 2020 bond maturity.  As a result of subordination issues created by the guarantee and other unfavorable conditions, Teekay Corporation found that refinancing the entirety of its 2020 bond would require monetization of its TOO stake.

115.    By then, Teekay Corporation had already sold control of TOO to Brookfield, and faced further pressure because TOO's dividend had been reduced to zero.  Running out of options, Teekay elected to sell its remaining TOO assets—units, warrants, and 49% of the General Partner—to Brookfield for $100 million.  This desperation play, which Brookfield took full advantage of, allowed Teekay Corporation to issue a smaller bond ($250 million) at lower interest rates (9.25%).

116.    To satisfy their near-term financing needs, on April 29, 2019, Teekay Corporation and its various affiliates agreed to sell all of their remaining interests in the Partnership to Brookfield in a non-arms'-length distressed block sale (the "Exit Sale"), at an effective price of $1.05 per common unit.  These interests, which were sold for a total purchase price of $100 million cash, included: (i) 56,587,484 common units of the Partnership; (ii) 49% of the outstanding interest in the General Partner; (iii) warrants to purchase an aggregate of 17,255,000 common units of the Partnership; and (iv) Teekay Corporation's interest in a 2018 credit agreement between various Teekay and Brookfield entities.  The Exit Sale, which had never been marketed to the broader public, closed on May 8, 2019.

117.    The Partnership filed a Form 6-K with the SEC on May 10, 2019, disclosing the completion of the Exit Sale.

118.    Forecasting the Conflicts Committee's weakness a mere month later, the Conflicts Committee, consisting of Lemmon and Craig, who were nominated to the Board by Teekay Corporation, approved this fire sale despite its grossly unfair valuation.

119.    Post-sale, Brookfield beneficially owned over 300 million common units of the Partnership, representing approximately 74% of the total outstanding common units, as well as 100% of the General Partner interest in TOO.  Brookfield also held warrants to purchase over 65 million common units, which, if exercised, would increase its holdings to over 77% of the outstanding TOO common units.

120.    Under the Partnership Agreement, if Brookfield accumulated 80% of TOO common units, it would be entitled to squeeze out the minority unitholders without their consent by buying up all the limited partnership interests at a price that references the recent market price of the common units.

121.    If Brookfield could add just 6 percent of TOO's common units to its holdings, it would be able to take TOO private without any consent from the common unitholders and reap the rewards of the improved operational and industry conditions.  This fact was well-known to the Conflicts Committee, and, as disclosed in the Information Statement, *infra*, was discussed and evaluated when the Conflicts Committee determined how to negotiate with Brookfield when Brookfield made a take-under offer shortly afterwards.

122.    Under these circumstances, good faith would have required the Board and the General Partner to act for the benefit of the Partnership and not act in a highly unfair manner to the minority unitholders by extension, and take more defensive measures in light of TOO's depressed price—*e.g.*, a poison pill to stop Brookfield from getting over the 80% threshold that

would allow them to squeeze out all other investors.  Yet they took no action, because the General Partner and Board were the catspaws of Brookfield.

F.       **Brookfield Primes the Merger for an Unfair Price by Making a Take-Under Offer**

123.     Within days of the Exit Sale, and without publicly revealing its plan, "Brookfield discussed a potential sponsor take private transaction [of TOO] with its legal counsel, [K&E], and on May 15, 2019, representatives of Brookfield engaged Richard Layton Finger, P.A. ('RLF') as special Delaware counsel to assist with the review and evaluation of a potential sponsor take private transaction." Information Statement, *infra*.   On May 17, 2019, only a week after the Form 6-K announced the completion of the Exit Sale, Brookfield and its affiliates (the "Consortium") moved.  The Consortium delivered a publicly announced offer (the "Offer Letter") to the General Partner asking that the General Partner's Conflicts Committee consider selling to the Consortium the remaining publicly-traded units of TOO in the Merger.  This was the same Conflicts Committee who had earlier failed to prevent Teekay Corporation's fire sale of TOO units weeks earlier.  By this point, Brookfield had already set up the Partnership to accept a low price because it had driven down the common unit price beforehand.   In asking the Conflicts Committee to consider the Merger, Brookfield signaled for the Conflicts Committee to grant Special Approval.  But, as discussed in more detail in Section G, *infra*, the Conflicts Committee itself was hopelessly conflicted from inception.

124.     To ensure that the Merger price would remain low, Brookfield opened with an offer lower than what TOO was trading at on the NYSE, *i.e.*, a take-under.  In exchange for the outstanding TOO units held by minority unitholders, the Offer Letter provided a price of $1.05 per TOO common unit (the "Offer Price").

125.     On May 20, 2019, BAM filed the Offer Letter from Brookfield with the NYSE as an exhibit to a 13D filing.

126.    The Offer Letter stated that Brookfield expected that the Merger would be structured as a merger between TOO and a Brookfield Consortium subsidiary, with TOO surviving the Merger as a wholly-owned subsidiary of the Brookfield Consortium. Since Brookfield held a majority of the common units of TOO, it ran no risk that its Merger would be rejected by a majority of unaffiliated common unitholders. The Offer Letter did not include any agreement by Brookfield to refrain from launching a tender offer if the General Partner declined the proposal. Of course, as set out below, Brookfield had no concern that its proposal would be rejected.

127.    The $1.05 per common unit price was 10% below $1.16, the price at which the units were trading on the open market as of May 17, 2019, the last date before news that Brookfield had made its offer. Indeed, the units had never in their history traded as low as $1.05, and had traded as high as $1.78 in April 2019, less than a month before Brookfield's offer.

128.    The purpose and effect of Brookfield's announcement of their lowball offer was to further anchor the market's valuation of TOO common units closer to the price of $1.05 per unit than their actual value, which exceeds this price.

129.    This ploy additionally allowed Brookfield to buy up TOO common units as they become available and continue consolidating their ownership of the Partnership.

130.    On October 1, 2019, the Partnership announced that the Conflicts Committee had approved Brookfield's proposed acquisition of all outstanding common units for $1.55 (the "Final Offer Price"), which was still more than 12% lower than the units had been trading one month before the initial offer. As an alternative, the Merger would also permit unitholders to accept nonvoting shares of limited transferability in the new merged entity in lieu of cash. In reality, this alternative offer was pure illusion. First, the lack of voting rights or transferability means the non-voting shares are not truly economically equivalent to Brookfield's units, and even the Conflicts

Committee indicated that this option did not increase the value of the offers to unitholders.  Second, on information and belief, many of the funds that held TOO's units would be barred, by their own investment mandates, from accepting and holding equity that is not publicly traded.  Third, it would require the unitholders to trust Brookfield to safeguard their interests, just after Brookfield squeezed them out, and without the disclosure and governance safeguards that apply to public companies.

131.    Despite being a higher offer than the original proposal in May, the Final Offer Price still meaningfully undervalued the Partnership—as judged by analysis based on public information, *and as by Brookfield itself*.

### *Public Information Demonstrates Brookfield Undervalues TOO*

132.    By every metric the merger price grossly undervalues the units held by the public. Indeed, after BAM filed the Offer Letter publicly, Plaintiffs Noster, Monosson, and JDP each expressed their concerns that the lowball Offer Price severely undervalued TOO.  In a letter to the Conflicts Committee, Plaintiff JDP observed that the $1.05 Offer Price represented a "58% discount to what [Brookfield] paid for control of TOO in July 2017" before "the balance sheet was stabilized," "Brent crude prices had rebounded," and "TOO was strategically positioned to take advantage of a strong rebound in Offshore North Sea, Canada and Brazil drilling activity," *i.e.*, TOO's customers, and posited that TOO was worth $4 per unit based on a detailed analysis. Plaintiff Noster similarly expressed its concern in a letter to Brookfield that the $1.05 Offer Price represented "effectively a[n] all-time low" as well as its belief that each TOO unit would be worth $5.61 by 2022 in light of TOO's "contracted" and "non-speculative" cash flows.  Plaintiff Monosson similarly observed in a letter to the Conflicts Committee that the $1.05 Offer Price represented not only "the 1-year low price" of TOO units but "also represent[ed] the 5-year low

price and the all-time low price" and expressed his view that the valuation should be at least $2.25 per share and could be as high as $7.08 per share.

133.     The Final Offer Price was also nearly a 40% percent discount to the $2.50 per unit that Brookfield paid per TOO unit in 2017.  And the only negative changes to the Partnership's balance sheet since then were the direct result of Brookfield's self-dealing.

134.     Unlike other offshore midstream petroleum partnerships, some of which saw the price of their publicly traded common units grow by up to 40% through mid-2019, TOO's common units, as shown above in Section B, experienced zero or negative growth in the same time frame. In fact, over 2019 as a whole, TOO's common unit price inched up by a mere 16% while the other partnerships saw their unit prices skyrocket, some more than doubling.  What is more, this modest improvement in TOO's common unit price was attributable solely to Brookfield's $1.55 per unit price bump, with TOO's common unit price rising after the Partnership announced Brookfield's price bump on October 1, 2019.

135.     Similarly, TOO common units traded at a price that failed to reflect recent internal operational improvements, including the improved leverage ratio (to ~4.5x from ~7.4x), and the increased adjusted EBITDA (higher by ~48% from 2017 to 2018).

136.     Not only was the Final Offer Price exceedingly low relative to the trading history of TOO's common units, but also the fundamentals of the Partnership—including $5.4 billion of signed contracts—made evident that the price offered by Brookfield was predatory.  In merger industry parlance, the Merger is a "take-under."

137.     Until the Merger closed, the publicly traded price of TOO units was artificially depressed by the self-dealing and manipulative practices of its new controller, Brookfield.

### *Brookfield Believes That its Final Offer Price Undervalues TOO – And Makes a Green Bond Offering on the Strength of TOO's Performance*

138.    Perhaps unsurprisingly, *Brookfield itself* views TOO as worth far more than $1.55 per common unit, and its offering materials are carefully crafted to conceal this fact.

139.    In October 2019, at the same time as it obtained approval for the Merger at the Final Offer Price, Brookfield began marketing a "green bond" offering to potential investors.  The bonds would be issued by Teekay Shuttle Tankers L.L.C., a wholly-owned subsidiary of TOO.  However, rather than paint TOO as a distressed company that should be bought at a discount to its market price as of barely a month before the Consortium's initial Offer Price, Brookfield sung the praises of the Partnership as having "[s]tabilized [its] equity base," "[r]educed high cost capital on preferred equity retirements," and enjoying an "enhanced . . . capacity for growth" with "fully funded existing growth projects" and "additional newbuilding projects" in its pipeline.

140.    The difference between this bullishness and Brookfield's bearish offer is explained by a close reading of the fairness opinion prepared for the Conflicts Committee by Evercore—which, itself, has worked alongside Brookfield and cannot be presumed to be independent.  *See* Section G, *infra*.

### *Evercore's Fairness Opinion Paints an Unrealistic Picture*

141.    Evercore's discounted cash flow analysis understates TOO's projected revenue by making a historically and logically unsupportable assumption: that TOO will generate no revenue from new contracts or the renewal of existing contracts through 2023.  It also assumed—by using explicitly positive growth rates starting only in 2023—that every single contract that came up for renewal after that point would be renewed.  *See* TOO Schedule 13E-3, Ex. 99(C)(7), dated Dec. 12, 2019.

142.     Nor, in fact, does it justify Evercore's arbitrary selection of 2023 as the terminal year for its valuation (and, given the other assumptions in the model, the last year where TOO could expect no new revenue).  Picking even one year earlier, and applying the same valuation model, with the same assumptions, would yield a price per common unit of $3.05, and shortening the period by two years would drive the price up to $3.96 per unit.

143.     Evercore's analysis thus leads to the logically unsound conclusion that a company experiencing four straight years of declining revenue and no renewals would somehow, starting in year five, become magically more valuable, and in fact be properly valued by using a higher EBITDA "exit multiple" (8.0x) than is used to generate the present valuation of the company (implied to be 6.2x last-twelve-months' EBITDA).  In contrast, given the difficulty in divining, with any reasonable certainty, what an entity may be worth years into the future, exit multiples are typically lower than those used to calculate the current value of the entity.  The only conclusion is that Evercore applied a higher exit multiple than would otherwise be warranted to make the Offer Price look better than it was.

144.     Likewise, Evercore evaluated the Merger using EBITDA multiples that are not supported by the comparable transactions it itself identified.  Of the 32 comparable transactions Evercore identified in its September 30, 2019 analysis, only three involving TOO itself (the non-arm's length Exit Transaction with Brookfield and two asset deals from nearly a decade ago) have a multiple below 7.0x LTM EBITDA.  The remaining asset-based transactions use average multiples of 8.7x (for those involving floating storage/production equipment) and 10.1x (for shuttle tanker deals).  There is thus no rational justification for using such a low multiple to value TOO's business other than manipulating the valuation so Brookfield can squeeze out the minority unitholders on the cheap.

### G. The General Partner and Its Controller, Brookfield, Undertake A Fundamentally Unfair Sales Process

145.     As discussed *supra*, Section 7.9(a)(i) of the Partnership Agreement provides that transactions between the General Partner and its Affiliates, on the one hand, and the Partnership, on the other hand, can be cleansed of potential conflicts of interest if they are subject to "Special Approval," which is defined as "approval by a majority of the members of the Conflicts Committee[.]"  The Conflicts Committee must in turn be "composed *entirely* or two or more [GP] directors who are not . . . officers, directors or employees of any Affiliate of the General Partner . . . and who also meet the independence standards required by directors who serve on an audit committee of a board of directors established . . . by the National Securities Exchange on which the Common Units are listed or admitted to trading."  *Id*. (emphasis added).

146.     Brookfield and the General Partner claims to have followed this "Special Approval" process and had this Merger blessed by a Conflicts Committee.  This is false.  While a Conflicts Committee ultimately recommended the Merger, the Conflicts Committee was not validly constituted and was in fact hopelessly conflicted from inception, in violation of the Partnership Agreement.

147.     Moreover, Brookfield provided undue pressure on the Conflicts Committee through its actions before even making its Offer, which the Conflicts Committee knew of and took into account.  As discussed in Sections C, D and F, *supra*, Brookfield depressed the price of the units and purported to rescue Teekay Corporation by infusing more capital into TOO in the Exit Sale.  Immediately after this fire sale, however, Brookfield's true intention to buy up the whole Partnership for a fire-sale price became clear.  Within days of the Exit Sale, the Consortium discussed taking out the Partnership with its advisors and, on May 17, 2019, delivered the Offer Letter to the General Partner seeking Special Approval of the Merger, which set the Offer Price at

39

the price paid in the Exit Sale: $1.05 per common unit.  The Consortium sent the Offer Letter despite the fact that Teekay Corporation was forced to sell because of an increased incoming crushing debt while and the Partnership faced no such threat.  Nevertheless, Brookfield equated their values and offered only $1.05 in its unsolicited offer period, specifically tying the price to the Exit Sale.

148.    Aside from indelible conflicts inherent in its composition and selection of advisors, as discussed in further detail below, the Conflicts Committee also acted in bad faith by doing nothing to protect unitholders and instead acceding to all of Brookfield's substantive demands. The Conflicts Committee was acting under duress since Brookfield had enough voting power to push through the Merger regardless of whether it followed the Conflicts Committee procedure, and moreover had the ability to buy up enough shares to reach the 80% threshold that would allow it to buy up the remaining Limited Partnership units based on a 30-day average trading price. Knowing that Brookfield could buy up TOO for cheap when it reached the threshold to exercise its call right limited the Conflicts Committee's room for movement, which would make it more important that the Conflicts Committee actually exercise the handful of defensive measures available to it.  This is evident in how the Conflicts Committee had to repeatedly concede points to Brookfield and repeatedly failed to secure the most important protections for common unitholders.  The Committee repeatedly asked for the Merger to be conditioned on a majority of the minority vote, and was repeatedly rebuffed.  The Committee also repeatedly asked if Brookfield would consider third party alternative transactions and was repeatedly rebuffed.  The Conflicts Committee could have and should have refused to proceed with the Merger under so-called Special Approval if the Defendants would not comply with reasonable and appropriate steps to protect the process and the minority unitholders.

149.    In response, the Committee did not exercise any leverage, including to refuse to proceed unless these usual and appropriate steps were taken.  Instead, without taking steps to level the playing field, they accepted a minor price-bump, and even there, achieved little, given Brookfield anchoring the initial Offer Price to the Exit Sale.  After months of negotiations where Brookfield held all the cards, the Conflicts Committee agreed to sell for $1.55, which is barely above the artificially depressed price of TOO and far below what TOO was trading at when Brookfield began its campaign to depress the price.

150.    In light of the known pressures the Committee faced, its decisions to accede to Brookfield instead of protect limited-partner unitholders constituted bad faith.  Brookfield and the General Partner, which it controls, cannot claim the benefits of the Special Approval procedure because the Conflicts Committee was not independent and validly constituted as required, and because simply going through the motions is inadequate, where the Committee itself was tainted and ineffective.  As such, Brookfield and the General Partner cannot claim credit for its blessing.

151.    This tainted process was in play from the beginning.  *First*, the Conflicts Committee was initially formed with a patently non-independent member (Transier) and later added another non-independent member (Utt) to its ranks.  *Second*, the initially tainted Conflicts Committee selected its purportedly independent financial and legal advisors while under the taint of its non-independent members.  *Third*, even after those non-independent members left the Conflicts Committee, the Conflicts Committee continued to involve non-independent individuals in its process.

152.    The Conflicts Committee that initially convened on May 19, 2019 to consider the Offer Letter consisted of Craig, Lemmon and Transier.

153.    Transier, who was appointed to the Conflicts Committee in March 2019, did not

meet the qualifications of independence required by the Partnership Agreement to serve of the

Conflicts Committee.  Transier was (and remains) a board member of a Brookfield portfolio

company.  Since 2017, Transier has served as a director of Westinghouse—a Brookfield affiliate—

and indeed worked with Brookfield on the Westinghouse restructuring.  Moreover, TOO disclosed

in its Information Statement that Transier *continues* to serve as a director on the boards of other

Brookfield portfolio companies.  Brookfield is an Affiliate of the General Partner since it is the

*only* company that holds General Partner units.  Thus, Transier, who serves as a director on

Brookfield portfolio companies, is himself a director of an Affiliate of the General Partner.  As

such, the Conflicts Committee was not "entirely" independent (and not validly constituted) as the

Partnership Agreement required.

154.    Transier similarly did not meet the criteria that he needed to "meet the

independence standards required of directors who serve on an audit committee established . . . by

the National Securities Exchange on which the Common Units are listed," *i.e.*, the NYSE, as

required to serve on the Conflicts Committee under the Partnership Agreement.  Under the NYSE

Listed Company Rules, "[n]o director qualifies as 'independent' unless the board of directors

affirmatively determines that the director has no material relationship with the listed company

(either directly or as a partner, shareholder or officer of an organization that has a relationship with

the listed company)."  The NYSE defines "listed company" to include "any parent or subsidiary

in a consolidated group with the listed company."  The NYSE further states in its official

commentary that "[i]t is not possible to anticipate, or explicitly to provide for, all circumstances

that might signal potential conflicts of interest," but boards that make independence determinations

have to "broadly consider all relevant facts and circumstances" and, "when assessing the

materiality of a director's relationship with the listed company, the board should consider the issue not merely from the standpoint of the director, but also from that of persons or organizations with which the director has an affiliation."  A "material relationship" can include "commercial, industrial, banking, consulting, legal, accounting, charitable and familial relationships, among others."  For the same reason that Transier was a director of an Affiliate of the General Partner, so too would he have had "material relationships with the listed company." In other words, Transier did not meet the Partnership Agreement's criteria necessary to serve as a member of the Conflicts Committee.

155.    Transier's inclusion on the Conflicts Committee meant that it had not been validly constituted and thus indelibly tainted its process.  Given Brookfield's long-standing investments and its transactions with TOO and Teekay Corporation earlier, it is puzzling that Transier would have been placed on the Conflicts Committee at all unless it was by design to ensure an easy takeover.

156.    Even Craig and Lemmon, who were legacy appointees by Teekay Corporation, had proven weeks earlier that they were easily bullied by Brookfield and would accede to its demands. They had constituted the Conflicts Committee when Brookfield moved to buy Teekay Corporation and TOO units at a fire sale.  Instead of resisting Brookfield, they had approved the transaction. Thus, Lemmon and Craig had already proved that they were beholden to Brookfield, even if they did not have conflicts of interest, and therefore were not independent Committee members.

157.    Making matters worse, on May 20, 2019, TOO issued a press release disclosing receipt of the Offer Letter and stating, "Teekay Offshore's Conflicts Committee or a separate Special Committee appointed for these purposes, in each case **consisting only of non-Brookfield affiliated Teekay Offshore Directors**, will retain advisors and evaluate the proposed offer on

43

behalf of the owners of the non-Brookfield owned limited partnership interests." That was false because, as of that date, the Conflicts Committee actually ***did not*** consist of only non-Brookfield-affiliated directors in light of Transier's membership.

158. Instead of eliminating conflicts, the Conflicts Committee actually became ***more*** conflicted when, on May 21, 2019, the General Partner's Board adopted a resolution appointing Utt as an additional member of the Conflicts Committee. But, like Transier, Utt too did not meet the independence qualifications of the Partnership Agreement to serve on the Conflicts Committee. Utt served as the Chairman of both Teekay Corporation and the General Partner. Teekay Corporation was, in turn, an affiliate of the General Partner because it was one of the two members of the General Partner, when Brookfield acquired all of Teekay Corporation's interests in the General Partner and TOO in April 2019. In addition, Utt is the Chairman of the general partner of the General Partner, making him a director of an Affiliate of the General Partner. For the same reasons, Utt did not "meet the independence standards required of directors who serve on an audit committee established . . . by" the NYSE by virtue of his "material relationships with the listed company." As such, his presence on the Conflicts Committee violated the requirements of the Partnership Agreement.

159. Despite the fact that neither Utt nor Transier met the Partnership Agreement's criteria necessary to serve as members of the Conflicts Committee, they nonetheless served on the Conflicts Committee with Lemmon and Craig from May 21 to May 27, 2019.

160. A Conflicts Committee acting in good faith would have made sure that it had been validly constituted. Thus, between May 21 and May 27, 2019, the Conflicts Committee was not validly constituted. Nor was it validly constituted before May 21, 2019, during the first few days

44

after the Committee received Brookfield's Offer, when Transier was an incumbent member of the Committee.

161.    This six-day period when Utt and Transier served on the Conflicts Committee was crucial, because the Conflicts Committee retained legal and financial advisors during that time. Because a tainted Committee chose those advisors, the advice they offered could have also been tainted, and the taint could have been irreparable.  This is evident through Evercore's unsound analysis of the purported "fairness" of the Merger.  ¶¶141-144, *supra*.

162.    There is also reason to believe the Committee received tainted advice because it ultimately chose conflicted advisors with ties to Brookfield.  Indeed, with more than half of the membership of the Conflicts Committee conflicted, the Committee nonetheless interviewed and selected legal and financial advisors.  On May 22, 2019, after interviewing only two law firms, the Committee selected Potter to be the Committee's counsel, "based on, among [other] things, Potter Anderson's experience representing the Conflicts Committee on a prior assignment . . . and its independence with respect to the Partnership and Brookfield."  This representation turned out to be incorrect because: (i) the "prior assignment" was Brookfield's initial investment in TOO in 2017; and (ii) Potter represented individual defendants in *In re Rouse Properties, Inc. Fiduciary Litig.*, C.A. No. 12194-VCS (Del. Ch.), where BAM and affiliates were also defendants.

163.    Then the conflicted Conflicts Committee—with Transier and Utt still as members—interviewed financial advisors and, after interviewing only two financial advisors, the Committee selected Evercore on May 23, 2019.  The Information Statement reveals that one of Transier or Utt directly participated in the selection of Evercore.

164.    While the Information Statement claims that Evercore was "independen[t] from Brookfield," this also turns out to be not true, as Evercore was Kinder Morgan's financial advisor

when Kinder Morgan and Brookfield had joined forces to acquire Myria Holdings Inc.'s gas pipeline interests in a transaction worth $242 million.

165.    Having selected its advisors, two members of the Conflicts Committee met on May 23, 2019, with Potter.  The Information Statement cryptically reveals that Craig was one of the attendees but fails to identify the other attendee.  During the meeting, Potter gave these two members advice regarding "the independence requirements of members of the Conflicts Committee and the resolutions adopted by the GP Board on May 21 delegating authority to the Conflicts Committee."  Despite the rush to hire advisors, however, the Committee then waited four more days to meet as a whole to discuss independence requirements and potential new resolutions authorizing the Committee's charge.

166.    It was not until May 27, 2019 when the entire Conflicts Committee met to discuss the requirements of membership and it was only then when the Committee determined that Transier and Utt could no longer serve as Committee members.  By then the Committee had already made its key decisions as to the advisors it would retain.  An independent Conflicts Committee whose sole purpose was to consider a conflicted transaction could not, in good faith, have selected its advisors with the help and input of two patently non-independent members.

167.    Moreover, even after the Conflicts Committee consisted of ostensibly non-conflicted members, the Conflicts Committee rapidly proved it was beholden to Brookfield's outsized power and, therefore, was not truly independent.  On May 27, 2019, the Conflicts Committee discussed "Brookfield's approximate 73.3% ownership of the Common Units and noted that if Brookfield were to acquire more than 80% of the outstanding Common Units, it would have the right under the Partnership Agreement, subject to certain conditions, to acquire all of the remaining outstanding Common Units not held by Brookfield at the greater of the Current Market

Price (as defined in the Partnership Agreement) and the highest price paid by Brookfield for any Common Units purchased during the 90-day period prior to the exercise of such right."

168.    But rather than seek additional powers or make recommendations to the Board to protect common unitholders from Brookfield's Tender Offer right, which it knew about and analyzed, the Conflicts Committee instead used the backdrop of this coercive power to only meekly propose procedural protections—such as a standstill agreement or a majority of the minority voting requirement—and then rapidly give them up once Brookfield resisted.  The Conflicts Committee should have refused to proceed with a Special Approval process without these basic protections for the minority unitholders.

169.    On May 30, 2019, the Conflicts Committee publicly announced that it had formally appointed Evercore and Potter.  Consistent with the General Partner's intent to push the deal through the Special Approval safe harbor, the announcement also stated that the "Conflicts Committee mandated to consider the Proposed Transaction consists entirely of non-Brookfield affiliated [TOO] directors."  This announcement contained several inaccuracies.  It implied that Evercore and Potter were retained on May 30, 2019, when in fact the decisions to retain both had been made 7 and 8 days earlier, respectively, with only the details for Evercore being worked out during the last few days.  Moreover, the press release gave the impression that the Conflicts Committee had always consisted of non-conflicted members when in fact during the crucial early days when it was deciding on its advisors, half of its members were conflicted.

170.    The Information Statement admits that Brookfield tried to lock up the deal by dictating to the Conflicts Committee that it would not vote for a deal that involves a third party. The Information Statement disclosed that while the Conflicts Committee asked Brookfield if it would consider alternative transactions, Brookfield through K&E informed Potter "that Brookfield

was not interested in selling its interests in the Partnership or Partnership GP and was also not interested in pursuing an alternative to the Proposed Transaction at such time, including any transaction that involved the sale of any of the Partnership's assets or business groups[.]" Brookfield also "would not enter into a standstill agreement" because it deemed such an agreement to be "unusual given Brookfield's approximate 73.3% ownership of the Partnership as well as its ownership of Partnership GP." While Brookfield also promised to not make a hostile offer, its controlling stake and its expressed unwillingness to consider third party transactions made it unnecessary to do so, and its refusal to enter a standstill agreement kept the pressure on the Committee that Brookfield preserved its full artillery for doing so. The General Partner also made no effort to see if other buyers exist that would present better terms to the Partnership and the minority unitholders.

171. As discussed in Section F, *supra*, each of Plaintiffs JDP, Noster, and Monosson, sent letters to Brookfield, the Board, and the Conflicts Committee, each of which expressed concern that the $1.05 per unit Offer Price failed to take the Partnership's strong fundamentals and bright future prospects into account. These letters further marshalled public information in detailed analyses that demonstrates that the Offer Price far undervalued the Partnership on a per-unit basis. The Information Statement discloses that Brookfield received unitholders' views on the Offer Letter, which were discussed with the Conflicts Committee, and further discloses that Brookfield intended to respond. Neither Monosson nor Noster received a response to their letters and JDP received only a phone call from Jan Rune Steinsland, TOO's CFO. But Brookfield and its advisors did then discuss "options to provide existing Unaffiliated Unitholders the ability to continue their investment in the Partnership following a privatization, including various equity and equity-like options."

172.     Furthermore, despite the fact that the Conflicts Committee was designed to ensure independence in the deliberation process, the Committee's advisors, Evercore and Potter, gave periodic updates to those outside the Committee.  At its initial meeting to evaluate the Offer, on May 19, 2019, the Committee invited "directors William Utt and Kenneth Hvid, and certain members of Management" to participate in deliberations.  At meetings evaluating potential financial advisors, including Evercore, on May 22 and 23, 2019, "certain members of Management [were] present."  On June 6, 2019, they "held a telephonic informational session with certain representatives of Management."  And on June 11, 2019, "the Conflicts Committee held an in-person meeting with members of the GP Board and certain members of Management" to discuss its initial progress, including an initial due diligence meeting with Evercore from Management.

173.     Similarly, on June 13, 2019, Potter reported on its conversation on May 30, 2019 with K&E, where K&E had conveyed that Brookfield would not entertain a third-party bid.  Thus, either the Committee was informed late and unnecessarily self-restricted its powers or it was informed of Brookfield earlier but delayed receiving a more formal report.

174.     On June 20, 2019, Evercore discussed potential alternative transactions with the Committee but framed it in the context of "Brookfield's ownership across the Partnership's capital structure," which further highlighted for the Committee its limited range of choices, and also highlighted "a review of the TKC-Brookfield transaction, including, among other things, a summary of Brookfield's allocation of consideration from the transaction to the general partner interest, the Warrants, the Common Units, and the working capital loan purchased[.]"  Moreover, Evercore also reviewed preliminary internal financial projections prepared by management, and the Conflicts Committee then proceeded to use an analysis built on those financial projections and "discussed certain potential sensitivity scenarios based on Evercore's preliminary analysis and the

Preliminary Management Projections[.]"  Beyond reviewing publicly available information, Evercore and the Conflicts Committee relied solely on financial information provided by the General Partner's management and conducted no additional diligence of their own.

175.    Later on June 20, 2019, Potter again asked K&E if Brookfield would consider an alternative transaction with a third party, and K&E reiterated that Brookfield's position was the same as articulated on May 30, 2019, *i.e.*, it would not consider a third party proposal.

176.    On June 28, 2019, because of the priming that Brookfield had done to depress the stock price, even though the Conflicts Committee decided to counter with a higher counteroffer, it only proposed $1.80 per unit, far below the fair value of the units.  Moreover, for the first time, the Conflicts Committee proposed that the Merger be subject to approval by a majority of the common units excluding Brookfield and its affiliates, *i.e.*, a majority of the minority vote. Craig then communicated the counterproposal to Brookfield.

177.    On July 4, 2019, a representative of Brookfield communicated to Craig that it was considering the Committee's counterproposal and requested that Brookfield be allowed to engage with Evercore directly.  The Committee discussed Brookfield's request the next day and acceded to it, authorizing Evercore to engage with Brookfield directly.  In doing so, the Committee risked being uninformed if Evercore and Brookfield engaged in discussions that they did not pass onto the Committee.

178.    Shortly thereafter, plaintiffs J. Deal, Noster, and Aquamarine filed their action on July 12, 2019, as Brookfield's actions to depress the unit price ahead of the Merger and the slipshod process taken to effectuate the Merger ultimately grossly undervalued the units held by the minority public investors.  The Conflicts Committee met several times over the next few days but the Information Statement does not indicate if the Committee discussed this action or if it was even

informed of the action at all.  Had they reviewed the action, the Conflicts Committee would have known that the Merger was highly unfair to the unaffiliated unitholders.

179.    Instead, on July 12, 2019, Evercore met directly with Brookfield and presented the price and majority of the minority counterproposal.  Brookfield immediately rejected conditioning the Merger on the majority of the minority.

180.    Meanwhile, during the sale process, Brookfield continued to consolidate their stake in the Partnership.  As of the date of the JDP complaint in July 2019, Brookfield owned around 74% of the common units of TOO and held a conditional option to buy another 3%.

181.    Despite having earlier removed Utt and Transier from the Conflicts Committee because of their lack of independence, and despite pending litigation that raised the issue of Committee independence, the Committee nonetheless "held an informational meeting with" Utt and Transier on July 19, 2019.  Though the Information Statement claims that it was only a "high-level update on the status of the process" and did not disclose details of the counterproposal or Evercore's financial analyses, the Information Statement does not reveal what information *was* disclosed to Utt and Transier and what input the Committee sought, if any, from them.

182.    The re-insertion of Utt and Transier into the Conflicts Committee's process suggests that they were removed for appearances and smacks of their continued involvement and the Committee's bad faith.

183.    Throughout August 2019, Brookfield continued to discuss the Conflicts Committee counterproposal.  Apparently, during this period, Brookfield internally came up with the idea of "offering Unaffiliated Unitholders the opportunity, at their option, to continue to hold economic interests in the Partnership following privatization."

184.   On August 12, 2019, Brookfield conveyed its counterproposal to Evercore, in which it proposed a price of $1.50 per common unit and confirmed that this was assuming the Merger would not be conditioned on a majority of the minority vote.

185.   Also on August 12, 2019, Plaintiffs Monosson and Whiting filed their action, as Brookfield's actions to depress the unit price ahead of the Merger and the slipshod process taken to effectuate the Merger ultimately grossly undervalued the units held by the minority public investors, but it is unclear if the Conflicts Committee was ever informed of the action.  Again, had they been, the Conflicts Committee would have known that the Merger was highly unfair to the unaffiliated unitholders.

186.   On August 14, 2019, the Conflicts Committee met with Potter and Evercore and Evercore discussed Brookfield's counterproposal.  On August 16, the Conflicts Committee again discussed the counterproposal after Evercore had updated its financial analysis, and the Committee partially acceded to Brookfield by lowering its counterproposal to $1.60 per share, and again asked Evercore to convey its request that the Merger be conditioned on a majority of the minority vote. On August 18, the Committee's counterproposal was conveyed to Brookfield.

187.   On August 20, 2019, Brookfield rejected the Committee's counterproposal, holding firm to $1.50 per share and to not conditioning the vote on a majority of the minority.  Brookfield offered the option for accredited investors to receive a security with no voting rights and with no transferability (except when Brookfield itself exits the investment in TOO) in lieu of the cash merger consideration, what the Information Statement referred to as a "Rollover Option."

188.   On August 21, 2019, the Conflicts Committee discussed Brookfield's counterproposal.  The Information Statement indicates the majority of the discussion revolved around the Rollover Option.  The Committee determined "that it did not review a Rollover Option

52

as an added value proposition."   From August 21 to August 30, 2019, Brookfield and the Committee continued to negotiate over all terms.

189.   On August 30, 2019, the Committee again updated Utt on negotiations (as well as provided an update to Defendant Hvid, who is CEO of Teekay Corporation).  While it purportedly did not reveal the terms of the proposals or the financial analyses, the Information Statement does not disclose the specifics of what was discussed and what, if any, input the Committee took from Utt and Hvid.   The re-insertion of conflicted directors into the Conflicts Committee's process suggests that they were removed for appearances and smacks of their continued involvement and the Committee's bad faith.

190.   On September 4, 2019, Brookfield verbally communicated to Craig that it would revise its offer to $1.55—its best-and-final offer— and that the offer assumed a Rollover Option that would now be offered to all unaffiliated unitholders rather than only to accredited investors.

191.   The next day, on September 5, 2019, the Conflicts Committee met to discuss Brookfield's offer.   Apparently, at this time, the Conflicts Committee abandoned its requests to have the Merger conditioned on a vote of the majority of the minority, as the Information Statement does not reveal any discussion on that matter.   Moreover, the Committee expressed that it "would be willing to accommodate Brookfield's request to include a Rollover Option in the transaction, given that such Rollover Option had not impacted the negotiation of the cash merger consideration and, as described by Brookfield, would be available to all Unaffiliated Unitholders."   But the Committee did not push back further on price; rather it "tentatively accept[ed] the terms of the Brookfield Third Proposal[.]"   Craig then conveyed the Committee's position to Brookfield that day.   Thus, a month before the Merger was announced, the Committee had already acceded to Brookfield's low-ball offer that appeared attractive only relative the dramatically undervalued

initial Offer Price of $1.05.  At that time, the stock was trading at $1.19 per share, and prior to the announcement of the Exit Sale on April 29, 2019, was trading at $1.41.

192.    Over the next two weeks, discussions were focused on finalizing the more technical items, including a September 18, 2019 in-person meeting (on information and belief, in New York City) between Brookfield, K&E, RLF, Potter, Baker, and TOO.  Potter and Baker removed a fiduciary-out option from the draft agreement, acknowledging that it had limited value because it was anticipated that "given Brookfield's ownership of Partnership GP and Brookfield's anticipated delivery, immediately following the execution of the Merger Agreement, of a written consent of limited partners constituting Partnership Unitholder Approval[.]"  Later, on September 19, 2019, Potter "delivered a further revised draft of the Merger Agreement to [K&E] incorporating minor changes."

193.    On September 19, 2019, the Board held a regularly scheduled meeting, in which "the Conflicts Committee provided a high-level, process only update on the ongoing negotiations with Brookfield."  Management also provided the Board with a draft five-year business plan.  But the Information Statement does not disclose, and indeed by omission indicates the opposite, that the Committee had actually acceded to Brookfield's offer on price a full two weeks ago.

194.    Meanwhile, in the days afterward, it appeared the Committee was involved only in supervising its counsel's negotiation and drafting of minor technical terms in the merger agreement, without challenging the price further, even as the Committee (on September 23, 2019) had the opportunity to discuss the five-year plan and incorporate it into Evercore's analysis.  But the Committee made no further attempt to negotiate the price upward.

195.    On September 30, 2019, the Committee met with Potter and Evercore and approved the Merger Agreement, resolving that its approval constituted "Special Approval" and

recommended approval of the Merger to the Board.  On the same day, the Board met, heard from Craig and Baker regarding the Merger Agreement, and voted unanimously to approve the Merger and Merger Agreement, to have the Merger approved by written consent, and to recommend approval to limited partners.  The parties then executed the Merger Agreement in September 30, 2019, Brookfield delivered its written consents that approved the Merger (thus making it a fait accompli because of Brookfield's ownership of the majority of the common units) and the Merger Agreement was announced on October 1, 2019, via press release.

196.    As the above chronology illustrates, the Conflicts Committee was itself rife with conflicts, which it did not effectively cure because even after it removed conflicted members, it continued to involve those members in the process.  Moreover, the Conflicts Committee—even when it consisted of ostensibly non-conflicted members—was not really independent because it was beholden to Brookfield.  Its members had earlier approved a fire sale of Teekay Corporation's interests in the General Partner and TOO; and its members, acting on the knowledge of Brookfield's Tender Offer right, repeatedly acceded to Brookfield's demands to consider only its deal (and not third party alternatives) and to allow Brookfield to unilaterally push through the merger instead of condition the merger approval on a vote of the majority of the minority.  In reaching its decision, the Conflicts Committee relied solely on financial information provided by management of the General Partner and performed no diligence of its own.  Finally, the Conflicts Committee was uninformed: even as two lawsuits (the two unitholder actions consolidated here) were filed in the middle of Merger negotiations that raised the unfairness of the process and of the offer, the Conflicts Committee did not appear to discuss the issues raised in those lawsuits and did not appear to even be aware of their existence.  For all these reasons, a conflicted, beholden, and uninformed Committee can not be said to have given "Special Approval."

**H. Brookfield Unilaterally Pushed Through the Merger and Made False Representations to Unitholders**

197.    On October 1, 2019, Brookfield announced the Merger in a Form 13-E.  It made some minor revisions to the form through the next two months, with the last amendment dated December 12, 2019.

198.    Brookfield revealed that it would effect approval of the Merger through delivering written consents for votes held by its units.  Because Brookfield held the vast majority of the common units, and there was no majority of the minority vote, the approval of the Merger was a foregone conclusion.

199.    Despite the fact that Brookfield neither sought nor received approval by the non-affiliated common unitholders, it still forced TOO to issue an information statement as an attachment to the Form 13-E that contains material misstatements.

200.    Crucially, Brookfield and TOO represented that they obtained "Special Approval" when, for the reasons explained above, they did not.  While they went through the motions by having the Conflicts Committee negotiate with Brookfield, this did not effect a "Special Approval" under the terms of the Partnership Agreement because: (1) during the crucial period when the Conflicts Committee selected its financial and legal advisors, the Conflicts Committee was itself conflicted because it had two non-independent members, Transier and Utt; (2) it continued to involve those conflicted members, even after ostensibly removing them, in the Committee's decision-making process; and (3) it also involved the General Partner's conflicted Management and other conflicted Board directors in the Committee's decision-making process.

201.    Moreover, the Conflicts Committee lacked independence because it operated in the backdrop of Brookfield's coercive tactics.  Repeatedly, Brookfield rejected the possibility of supporting a third-party offer, and thus the Conflicts Committee could not run an auction process

or perform a market check.  Repeatedly, Brookfield also rejected having the Merger approved by a majority of the minority vote, *i.e.*, conditioning the Merger on an affirmative approval by non-Brookfield affiliated unitholders.  Because Brookfield held a majority of the common units, a the Merger was a *fait accompli*.  Brookfield also owned enough units and warrants to purchase further units so that it could quickly reach the threshold of exercising its Tender Offer Right, a fact that the Conflicts Committee was aware of and discussed, which further limited the Conflicts Committee's ability to evaluate Brookfield's offer.  For all these reasons, any representations that Brookfield had "Special Approval" because it went through the motions of negotiating with a Conflicts Committee are false.

202.    The Conflicts Committee's recommendation for the Merger reinforces these misrepresentations.  It states that the Committee "consists of two members of the GP Board that meet the independence qualifications for service" and later again mentions, "[t]he Conflicts Committee consisted solely of directors who are not officers, employees or controlling shareholders of the Partnership GP or its affiliates and who satisfied the requirements . . . for service on the Conflicts Committee."  But the Conflicts Committee neglected to mention that during the period when it was selecting its advisors, half of its members (Transier and Utt) were not independent, in violation of the Partnership Agreement.  The Conflicts Committee also neglected to mention in its recommendation that it had continued to keep Transier and Utt in the loop as to the progress of Merger negotiations even after Transier and Utt had left the Committee precisely because of their lack of independence.

203.    Furthermore, Brookfield and TOO misrepresented the benefit of the Merger by touting the size of the premium compared to the May 16, 2019 closing price of $1.21 per unit, the September 30, 2019 closing price of $1.21, and the VWAP of the 10, 20, and 30 day period ending

on September 30, 2019.  They neglect to mention that Brookfield deliberately depressed TOO's unit price in the lead up to the offer and then further kept the price depressed by making a take-under offer at $1.05, almost 15% below the stock price.

## CLASS ALLEGATIONS

204.   Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all other holders of Partnership common units that are being, have been, or will be harmed by the conduct described herein from the announcement of the proposed merger at $1.55 per share through the closing of the Merger (the "Class"). Excluded from the Class are Defendants, and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant, and their successors in interest.

205.   This action asserts that Limited Partners were directly harmed through Brookfield and the General Partner's breach of contract, breach of the implied covenant of good faith and fair dealing, or breach of contractual fiduciary duty (and as the Brookfield Defendants, in the alternative, tortious interference with the contract).  Brookfield effected an unfair Merger agreement that resulted in limited-partner unitholders directly losing value in their shares.

206.   Moreover, Brookfield was not similarly situated to the holders of the non-Brookfield units, despite also holding limited partnership units, because it and it alone retained all the rights it had prior to the Merger in its limited partnership units.  The non-Brookfield limited partners have only two rights: the right to cash consideration of $1.55 per unit, which is vastly below the fair value of each unit; or the right to receive illiquid and untransferable shares that will only share in the same economic rights that Brookfield's units will have, but will not be transferable unless Brookfield takes TOO public, and which have no voting rights.

207.   This action is properly maintainable as a class action.

208.    The Class is so numerous that joinder of all members is impracticable.  As of July 10, 2019, there were 410.4 million common units outstanding, with 109.4 million of those units in the public float and held by numerous individuals and entities across the country.  While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs believe there are over twenty members in the Class.  All members of the Class may be identified from records maintained by TOO or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

209.    Questions of law and fact are common to the Class, including:

    i.    Whether the Defendants have breached their obligation to act in good faith and/or their duties under the Partnership Agreement with respect to Plaintiffs and other members of the Class in connection with the Merger;

    ii.    Whether Defendants are entitled to a presumption of good faith for seeking approval from a Conflicts Committee, despite the fact that the Conflicts Committee suffered from conflicts of interest when it retained advisors;

    iii.    Whether Defendants paid a fair price for the Limited Partnership common units;

    iv.    Whether Brookfield aided and abetted breaches of duty, tortiously interfered with the contract, or engaged in direct breach of contract and fiduciary duty breaches through abusing its position as controller of the General Partner to cause the limited partnership to lose liquidity and market value;

    v.    Whether Plaintiffs and the other members of the Class have been or will be harmed by such misconduct; and

vi. Whether Plaintiffs and the other members of the Class are entitled to damages as a result of such misconduct.

210.    Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.  Plaintiffs' claims are typical of the claims of other members of the Class and Plaintiffs have the same interests as the other members of the Class.  Accordingly, JDP, Noster, Aquamarine, Monosson, and Whiting are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.

211.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to such adjudications or would substantially impair or impede their ability to protect their interest.

212.    The Defendants have acted or refused to act on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

213.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.  Plaintiffs anticipate that there will be no difficulty in the management of this litigation as a class action.

## COUNT I

### Against All Defendants for
### Breach of Section 7.9(b) of the Partnership Agreement (Duty To Act in Good Faith)

214.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

215.     Under Section 7.9(b) of the Partnership Agreement, the General Partner owes duties to act or cause the General Partner to act in good faith.

216.     BAM and Brookfield, as the sole owners and controlling unitholders of the General Partner and thus Affiliates of the General Partner, are directly related to the contract, and therefore, when they cause the General Partner to breach the contract, they are also directly liable for the breach.

217.     The General Partner's directors and officers are also directly related to the contract, and therefore, when they cause the General Partner to breach the contract, they are also directly liable for the breach.  By not resisting the controlling shareholder's efforts to suppress the price of TOO common units through, among other strategies, the take-under offer, and the other actions and omissions alleged herein, the Partnership, the General Partner, the General Partner's directors and officers, BAM, and Brookfield failed to act in good faith.

218.     This failure breached the Section 7.9(b) of the Partnership Agreement.

219.     Plaintiffs and the Class suffered and are suffering damages as a direct and proximate result of the breaches of the Partnership Agreement by the Partnership, the General Partner, BAM, and Brookfield in an amount to be proved at trial.

## COUNT II

### Against All Defendants for
### Breach of Section 7.9(a) of the Partnership Agreement

220.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

221.     Under Section 7.9(a) of the Partnership Agreement, the General Partner may only proceed with a conflicted transaction if certain safe harbors or conditions are met.

222.     By the actions and omissions alleged herein, the Partnership, General Partner, BAM, and Brookfield pushed a conflicted transaction through a sham process, that cannot meet any of the four safe harbors or conditions.

**223.**     Plaintiffs and the Class suffered and are suffering damages as a direct and proximate result of the breaches of the Partnership Agreement by the Partnership, the General Partner, BAM, and Brookfield in an amount to be proved at trial.

## COUNT III

### Against the All Defendants for, in the Alternative,
### Breach of Implied Covenant of Good Faith and Fair Dealing

224.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

225.     Every limited partnership agreement has implied a covenant of good faith and fair dealing, such that no party to such contract may act to deprive the other of the benefits and bargains of the agreement.

226.     The Partnership, General Partner, BAM, and Brookfield were thus bound by an implied-in-law covenant under the Partnership Agreement to perform their obligations in good faith and not take any action that might deprive Plaintiffs of the benefits of their bargain under the Partnership Agreement.

227.    The Partnership, the General Partner, and the Individual Defendants breached the implied covenant to act in good faith and deal fairly by entertaining the manipulative take-under offer.  That is, the Partnership, General Partner, and Individual Defendants breached the implied covenant by not unambiguously rejecting the take-under offer.

228.    BAM and Brookfield breached—in addition or in the alternative to the breach of contract set forth in Count I—the implied covenant to act in good faith and deal fairly with each Plaintiffs by, among other things, using their control positions to manipulate the price of TOO units to make and make publicly the take-under offer, and a Merger at an unfair price.

229.    By the actions and omissions alleged herein, the Partnership, the General Partner, BAM, and Brookfield violated the implied covenant of good faith and fair dealing.

230.    The actions and omissions alleged herein by the Partnership, the General Partner, BAM, and Brookfield substantially and directly impaired the value of the Partnership Agreement and the TOO units to Plaintiffs and are inconsistent with the intent of the parties.

231.    Each breach of the implied covenant by the Partnership, General Partner, BAM, and Brookfield was material, intentional, knowing, and in willful and reckless disregard of the rights and interests of Plaintiffs and the Class.

232.    Plaintiffs and the Class suffered damages as a direct and proximate result of the Partnership, the General Partner, BAM, and Brookfield's breaches of the implied covenant of good faith and fair dealing in an amount to be proved at trial.

## COUNT IV

### In the Alternative, Against Brookfield and BAM for Tortious Interference

233.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

234.    BAM and Brookfield know of the existence and validity of the Partnership Agreement and the contractual relationship between each Plaintiffs and the Partnership.

235.    By intentionally making an unfairly low offer and engaging in an unfair negotiation, BAM and Brookfield intentionally and improperly procured a breach of the Partnership Agreement without justification.

236.    BAM and Brookfield used their control over the Partnership and the General Partner to cause those entities to breach the Partnership Agreement.

237.    Plaintiffs and the Class have been injured by being deprived of the benefit of their bargain in an amount to be determined at trial.

## COUNT V

## Against All Defendants for Breach of Contractual Fiduciary Duties

238.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

239.    Defendants owe contractual fiduciary duties to the Partnership and the Limited Partners:

    a.    Section 66 of the Marshall Islands Limited Partnership Act allows for fiduciary duties to be "expanded or restricted" by the Partnership Agreement but does not expressly allow for these duties to be eliminated.

    b.    TOO, in its public filings, represents that its General Partner has fiduciary duties to the Partnership.  *E.g.,* 2019 Annual Report at 21; Information Statement at 125.

    c.    The GP Agreement states that Directors have fiduciary duties to the General Partner;

    d.    The Partnership Agreement includes a "good faith" standard based on "reasonabl[e] belie[f]" that the Delaware Supreme Court has explained is a "contractual fiduciary

duty" standard for the General Partner to act in the best interests of the Partnership; and

    e.   The controller and the Board of the General Partner have the same fiduciary duties as the General Partner because they directed the General Partner to undertake the actions at issue in this case;

240.    Defendants have breached their contractual fiduciary duties by undertaking actions, or acquiescing in actions, that suppressed the value of the common units, and through effecting a merger at an unfair price, and through negotiating and then closing a Merger through an unfair process rife with conflicts; and

241.    Plaintiffs and the Class suffered and are suffering damages as a direct and proximate result of Defendants' breach of contractual fiduciary duties.

<u>COUNT VI</u>

**In the Alternative, Against Brookfield and BAM for**
**<u>Aiding and Abetting Breach of Contractual Fiduciary Duties</u>**

242.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as through fully set forth herein.

243.    By inducing TOO, the General Partner, and its Board to take the above-referenced wrongful actions, Brookfield and BAM knowingly participated in TOO, the General Partner, and the Board's breach of their contractual fiduciary duties.

244.    Plaintiffs and the Class suffered and are suffering damages as a direct and proximate result of Defendants' breach of contractual fiduciary duties.

245.    As a result, Brookfield and BAM aided and abetted TOO, the General Partner, and its Board's breach of their contractual fiduciary duties.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demands judgment against the Defendants, jointly and severally, as follows:

A.  Declaring that this action is properly maintainable as a Class Action;

B.  Declaring that the Defendants breached the Partnership Agreement;

C.  Declaring that the Defendants breached their contractual fiduciary duties to the Class;

D.  Declaring that the Defendants breached their duties in failing to stop Brookfield from effecting the Merger at an unfair price through an unfair process;

E.  Awarding Plaintiffs and the Class rescissory damages;

F.  Awarding damages to Plaintiffs and the Class;

G.  Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorneys' fees; and

H.  Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury.


DATED: January 29, 2020

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

/s/ *Mark Lebovitch*
Mark Lebovitch
David Wales
Thomas James
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
MarkL@blbglaw.com
DavidW@blbglaw.com
Thomas.James@blbglaw.com

**HARRIS ST. LAURENT LLP**

/s/ *Jonathan Harris*
Jonathan Harris
Joseph Gallagher
Correy A. Kamin
40 Wall Street, 53rd Floor
New York, NY 10005
Tel: (212) 397-3370
Fax: (212) 202-6206
jon@hs-law.com
jgallagher@hs-law.com
ckamin@hs-law.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

/s/ *Thomas L. Laughlin, IV*
Thomas L. Laughlin, IV
Jing-Li Yu
The Helmsley Building
230 Park Avenue, 17th Floor
New York, New York 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
tlaughlin@scott-scott.com
jyu@scott-scott.com

Geoffrey M. Johnson
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Telephone: (216) 229-6088
Facsimile:  (860) 537-4432
gjohnson@scott-scott.com

*Attorneys for Plaintiffs and the Class*