**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE TEEKAY OFFSHORE PARTNERS L.P. COMMON UNITHOLDERS LITIGATION** | Case No. 1:19-cv-06483-RA |

**MEMORANDUM IN SUPPORT OF THE NON-BROOKFIELD DEFENDANTS'**
**MOTION TO DISMISS AMENDED CONSOLIDATED**
**CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iv

I.      PRELIMINARY STATEMENT ........................................................................ 1

II.     STATEMENT OF FACTS ................................................................................ 2

        A.      The Parties ............................................................................................ 2

        B.      The Merger ........................................................................................... 2

III.    SUMMARY OF ARGUMENT ......................................................................... 5

IV.     LEGAL STANDARD ...................................................................................... 6

V.      ARGUMENT .................................................................................................. 6

        A.      Plaintiffs fail to establish personal jurisdiction over the Non-Brookfield
                Defendants. ........................................................................................... 6

                1.      No general jurisdiction exists. ................................................... 7

                2.      No specific jurisdiction exists. .................................................. 7

                3.      The Non-Brookfield Defendants have not consented to jurisdiction
                        in New York ........................................................................... 10

        B.      Plaintiffs' claims against TKO and the Non-Brookfield Directors must be
                dismissed because they did not owe the contractual obligations that
                Plaintiffs seek to enforce ..................................................................... 11

        C.      Plaintiffs' claims against all Non-Brookfield Defendants must be
                dismissed because a properly constituted Committee gave the Merger
                "Special Approval." ............................................................................ 12

                1.      The Committee that negotiated and specially approved the Merger
                        comprised only Craig and Lemmon, both of whom satisfied the
                        LPA's criteria for Committee membership ................................ 13

                2.      Transier's and Utt's brief, earlier service on the Committee does
                        not take the Merger out of the safe harbor. ............................... 14

        D.      Plaintiffs fail to state a claim that the Non-Brookfield Defendants
                breached good faith obligations in Section 7.9(b) of the LPA (Counts I &
                V). ...................................................................................................... 17

                1.      Claims based on alleged pre-merger mismanagement are
                        derivative, and Plaintiffs cannot assert derivative claims. ........... 17

2.      Claims based on the merger negotiations are foreclosed by Sections 7.9(a) and 7.10(b). ..................................................... 21

E.      Plaintiffs fail to state a claim that the Non-Brookfield Defendants breached Section 7.9(a) because it does not mandate use of a safe harbor (Count II). ........................................................................................... 23

F.      Plaintiffs fail to state a claim that the Non-Brookfield Defendants breached an implied covenant (Count III). .......................................... 23

VI.    CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

**CASES**                                                                                              **PAGE(S)**

*Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*,
    98 F.3d 25 (2d Cir. 1996)...........................................................................................10

*Albert v. Alex Brown Mgmt. Servs., Inc.*,
    2005 WL 2130607 (Del. Ch. Aug. 26, 2005) ................................................19, 20

*Allen v. El Paso Pipeline GP Co.*,
    113 A.3d 167 (Del. Ch. 2014)...............................................................................12

*Allen v. Encore Energy Partners, L.P.*,
    72 A.3d 93 (Del. 2013) ..........................................................................................22

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................................6, 9

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..................................................................................................6

*Boehm v. SportsMem, LLC*,
    2019 WL 3239242 (S.D.N.Y. July 18, 2019) .........................................................8

*Brinckerhoff v. Enbridge Energy Co.*,
    159 A.3d 242 (Del. 2017) ...............................................................................18, 21

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985)..................................................................................................9

*Chirag v. MT Marida Marguerite Schiffahrts*,
    604 F. App'x 16 (2d Cir. 2015) ...............................................................................9

*Daimler AG v. Bauman*,
    571 U.S. 117, 137 (2014)..........................................................................................7

*Dieckman v. Regency GP LP*,
    155 A.3d 358 (Del. 2017) ......................................................................................15

*Dieckman v. Regency GP LP*,
    2019 WL 5576886 (Del. Ch. Oct. 29, 2019) ...................................................13, 15

*Emps. Ret. Sys. of City of St. Louis v. TC Pipelines GP, Inc.*,
    2016 WL 2859790 (Del. Ch. May 11, 2016)....................................................13, 25

*Feldman v. Cutaia*,
    951 A.2d 727 (Del. 2008) ......................................................................................18

*Flood v. Synutra Int'l, Inc.*,
    195 A.3d 754 (Del. 2018) ...............................................................................15

*Gerber v. Enter. Prods. Holdings, LLC*,
    67 A.3d 400 (Del. 2013) ...........................................................................22, 24

*Haber v. Bell*,
    465 A.2d 353 (Del. Ch. 1983).........................................................................20

*Hartsel v. Vanguard Grp., Inc.*,
    2011 WL 2421003 (Del. Ch. June 15, 2011) ...................................................19

*Haynes Family Tr. v. Kinder Morgan G.P., Inc.*,
    135 A.3d 76 (Del. 2016) .............................................................................1, 24

*In re El Paso Pipeline Partners, L.P. Deriv. Litig.*,
    2014 WL 2768782 (Del. Ch. June 12, 2014) ...................................................24

*In re Evergreen Mut. Funds Fee Litig.*,
    423 F. Supp. 2d 249 (S.D.N.Y. 2006)...............................................................18

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
    922 F. Supp. 2d 445 (S.D.N.Y. 2013)...............................................................20

*In re Kinder Morgan, Inc. Corporate Reorganization Litigation*,
    2015 WL 4975270 (Del. Ch. Aug. 20, 2015) ...................................................11

*In re Massey Energy Co. Deriv. & Class Action Litig.*,
    160 A.3d 484 (Del. Ch. 2017)..........................................................................19

*In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*,
    230 F. Supp. 2d 376 (S.D.N.Y. 2002)................................................................8

*In re Terrorist Attacks on Sept. 11, 2001*,
    714 F.3d 659 (2d Cir. 2013).............................................................................6

*Johnson v. Ward*,
    4 N.Y.3d 516 (2005) ........................................................................................8

*Lazard Debt Recovery GP, LLC v. Weinstock*,
    864 A.2d 955 (Del. Ch. 2004)..........................................................................12

*Lonergan v. EPE Holdings, LLC*,
    5 A.3d 1008 (Del. Ch. 2010).......................................................................23, 24

*Madison Realty Partners 7, LLC v. Ag ISA, LLC*,
    2001 WL 406268 (Del. Ch. Apr. 17, 2001) .....................................................10

*Millennium Prods. Grp., LLC. v. World Class Freight, Inc.*,
   2018 WL 1247384 (E.D.N.Y. Mar. 9, 2018) ..........................................................9

*NAMA Holdings, LLC v. Related World Mkt. Ctr., LLC*,
   922 A.2d 417 (Del. Ch. 2007)................................................................................10

*Nemec v. Shrader*,
   991 A.2d 1120 (Del. 2010) ....................................................................................24

*Norton v. K-Sea Transp. Partners L.P.*,
   67 A.3d 354 (Del. 2013) ...................................................................................22, 23

*Pablo Star Ltd. v. Welsh Gov't*,
   170 F. Supp. 3d 597 (S.D.N.Y. 2016)......................................................................7

*Penguin Grp. (USA) Inc. v. Am. Buddha*,
   609 F.3d 30 (2d Cir. 2010)........................................................................................6

*Penn Mart Realty Co. v. Perelman*,
   1987 WL 10018 (Del. Ch. Apr. 15, 1987) ..............................................................20

*Prickett v. N.Y. Life Ins. Co.*,
   896 F. Supp. 2d 236 (S.D.N.Y. 2012)................................................................17, 18

*Reich v. Lopez*,
   858 F.3d 55 (2d Cir. 2017).........................................................................................9

*Shearin v. E.F. Hutton Grp., Inc.*,
   652 A.2d 578 (Del. Ch. 1994)..................................................................................20

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
   845 A.2d 1031 (Del. 2004) ......................................................................................18

*Weinstein v. Appelbaum*,
   193 F. Supp. 2d 774 (S.D.N.Y. 2002)......................................................................19

*Wiwa v. Royal Dutch Petrol. Co.*,
   226 F.3d 88 (2d Cir. 2000)..........................................................................................8

**OTHER AUTHORITIES**

N.Y. C.P.L.R. § 302(a) ...............................................................................................7

Defendants Teekay Offshore Partners L.P. ("TKO"), Teekay Offshore GP L.L.C. ("GP"), Ian Craig, William Utt, Kenneth Hvid, David Lemmon, and Bill Transier ("Non-Brookfield Directors") (collectively, "Non-Brookfield Defendants") submit this memorandum of law in support of their Motion to Dismiss the Amended Consolidated Class Action Complaint ("CAC").

## I.      PRELIMINARY STATEMENT

Plaintiffs have no basis to complain. Under the Sixth Amended and Restated Agreement of Limited Partnership of Teekay Offshore Partners L.P. dated as of January 23, 2018 (Ex. A, "LPA"), the GP was required to exercise "good faith" in connection with the proposed merger, which it did by delegating to a properly constituted Conflicts Committee ("Committee") the authority to negotiate and ultimately approve or disapprove the merger. The Committee performed its duties admirably. Over a four-month period, and advised by top-flight legal and financial advisors, it obtained a nearly 50% increase in the offer price for the partnership units Plaintiffs held. Its financial advisor issued a fairness opinion for a merger at that increased price, and the Committee then reported its favorable recommendation to the full Board. The final sale price included a significant premium to the units' unaffected market price.

Plaintiffs now seek even more with this meritless post-merger lawsuit. But this Court lacks personal jurisdiction over all Non-Brookfield Defendants; TKO and the Non-Brookfield Directors did not owe the duties on which Plaintiffs' claims are based; and Plaintiffs improperly assert derivative claims. Plaintiffs are bound by the LPA, and the highly professional negotiation and sale process did not violate it. As former Delaware Chief Justice Strine reiterated, "with the benefits of investing in alternative entities often comes the limitation of looking to the contract as the exclusive source of protective rights." *Haynes Family Tr. v. Kinder Morgan G.P., Inc.*, 135 A.3d 76 (Del. 2016). The Court should reject Plaintiffs' attempt to reach beyond the LPA.

## II.      STATEMENT OF FACTS

This putative class action was originally filed on July 12, 2019. On January 27, 2020, Plaintiffs filed the CAC, alleging that Defendants breached the LPA and contractual fiduciary duties. Plaintiffs allege that Brookfield took various actions to depress the unit price of TKO's common units so that it could acquire TKO's outstanding common units for an allegedly unfair price in the transaction that closed on January 22, 2020 ("Merger").

### A.      The Parties

Plaintiffs allegedly held common units of TKO at some point. TKO is a Marshall Islands limited partnership with its principal offices in Bermuda. CAC ¶¶ 20, 74. The GP is a Marshall Islands limited liability company. CAC ¶ 21. Defendants Ian Craig, William Utt, Kenneth Hvid, David Lemmon, and Bill Transier all served as members of the GP's Board of Directors ("Board" or "GP Board"); none is alleged to be a resident of New York. The "Brookfield Defendants" include Brookfield Asset Management, Inc., Brookfield Business Partners L.P., Jim Reid, Denis Turcotte, Gregory Morrison, Walter Weathers, and Craig Laurie.

### B.      The Merger

TKO is a global marine energy, transportation, and storage provider focused on the deep-water regions of the North Sea, Brazil and the eastern coast of Canada. CAC ¶¶ 20, 76. It operates an enormously capital-intensive business, as its infrastructure costs literally billions to build. CAC ¶ 78. A continued decline in oil prices that began in 2014 precipitated a liquidity crisis at TKO. CAC ¶¶ 86–87. To address it, in July 2017, certain Brookfield affiliates agreed to recapitalize TKO, paying $610 million for a 59.5% share of TKO's common units, a 49% voting interest in the GP, and an option to purchase an additional 2% voting interest, subject to TKO's agreement to take various actions to reduce its distributions to common unit holders, pay down debt, and improve its balance sheet. CAC ¶¶ 90–94.

But TKO's business continued to face challenges, and its common unit price lagged, in no small part because TKO had previously been marketed as a high-dividend paying limited partnership but had since reduced distributions to obtain the life-saving Brookfield recapitalization. CAC ¶¶ 101–02. On July 3, 2018, TKO disclosed that a Brookfield subsidiary had exercised its option to acquire an additional 2% voting interest in the GP, bringing its overall stake to 51%. CAC ¶ 109. The next year, on May 8, 2019, Teekay Corporation sold its remaining equity and debt interests in TKO and the GP to Brookfield affiliates. CAC ¶¶ 115–16. At that point, Brookfield indirectly owned 73.3% of TKO's common units and 100% of the GP. CAC ¶ 119. Under the LPA, if Brookfield acquired an additional 6.7% of the common units, it had the right to take TKO private. LPA § 15.1(a).

On May 17, 2019, Brookfield made a written, non-binding offer to the Board's Conflicts Committee—a standing committee of the board that, at the time, consisted of Craig, Lemmon, and Transier—proposing to acquire all of the issued and outstanding publicly held common units of TKO that were not owned by Brookfield and its affiliates in exchange for $1.05 in cash per unit. CAC ¶¶ 123–24; Ex. B, Information Statement[1] ("IS") 16.

On May 19, the Committee met by telephone to discuss Brookfield's offer—specifically, the formation and membership of a special committee to assess the offer, the subsequent convening of a GP Board meeting to formalize the membership and empowerment of such committee, potential legal counsel and financial advisors, and a draft press release to be issued by TKO in response to the offer. IS 17. Also present on the call by invitation of the Committee were Utt, Hvid, and certain members of management. *Id.* Two days later, on May 21, the Board appointed Utt as an additional member of the Committee and adopted resolutions empowering the Committee to (i) review and evaluate the terms and conditions, and determine the

---

[1] TKO Schedule 13E3/A, Exhibit (a)(1), dated December 12, 2019.

advisability, of the proposed transaction, (ii) negotiate, or delegate the ability to negotiate to any persons, with any party the Committee deemed appropriate, with respect to the terms and conditions of the proposed transaction, (iii) determine whether to give or withhold the approval of the proposed transaction, including by Special Approval under § 7.9(a) of the LPA, and (iv) determine whether to approve the proposed transaction. *Id*.

The next day, the Committee retained Potter Anderson & Corroon LLP ("Potter") as its legal counsel, and over the next two days, members of the Committee and Potter interviewed potential financial advisors. *Id*. On May 27, the Committee met telephonically, and after a discussion about the qualifications of each member of the Committee, it was determined that neither Utt nor Transier should serve on the Committee. IS 18. Accordingly, both Utt and Transier left the call, and Craig and Lemmon, as the remaining Committee members, continued the meeting. *Id*. By this time, there had been no communications between Brookfield and the Committee since the Committee's receipt of Brookfield's May 17 offer. *See* IS 17–18.

Thereafter, the Committee—now consisting of only Craig and Lemmon—asked Potter to engage with Brookfield's counsel, Kirkland & Ellis ("Kirkland"), to determine if Brookfield would consider alternatives to its proposed transaction and request that Brookfield enter into a standstill agreement. *Id*. at 18. On May 29, the Committee retained Evercore Group L.L.C. ("Evercore") as its financial advisor. *Id*. On May 30, Kirkland informed Potter that Brookfield would not enter into a standstill agreement and was not interested in pursuing an alternative to the proposed transaction. *Id*. Kirkland also advised, however, that Brookfield did not intend to pursue a hostile transaction not supported by the Committee or other Board members. *Id*.

On June 11, the Committee held an in-person meeting in Bermuda with members of the Board and certain members of management (with Potter representatives attending telephonically)

to discuss the Committee's progress with respect to the proposed transaction and management's initial due diligence meeting with Evercore. *Id.* at 19. The Committee and Evercore discussed Evercore's preliminary analysis of the proposed transaction on multiple occasions in June. *Id.* at 19–20. On June 28, the Committee delivered a written counterproposal to Brookfield. IS 20. Negotiations continued, and on September 30, the parties executed the Merger Agreement, under which Brookfield would acquire the outstanding common units for $1.55 per unit—a price well above the units' unaffected market price. IS 25, 28; *see also* CAC ¶ 203. Thus, over a period of four months, the Committee had successfully negotiated a nearly 50% price increase from Brookfield's initial offer of $1.05 per unit. The Merger closed on January 22, 2020. CAC ¶ 9.

## III.    SUMMARY OF ARGUMENT

As a threshold matter, Plaintiffs fail to establish personal jurisdiction over the Non-Brookfield Defendants, requiring dismissal of all claims against them. On the merits, the claims should be dismissed for multiple, independent reasons. At the outset, the claims against TKO and the Non-Brookfield Directors must be dismissed because they did not owe the duties allegedly breached. The claims against all Non-Brookfield Defendants must be dismissed because a properly constituted Committee gave the Merger Special Approval, conclusively establishing that there was no breach of the LPA or any other duty.

The individual Counts against the Non-Brookfield Defendants suffer from other, fatal infirmities. First, Plaintiffs' claims that the Non-Brookfield Defendants breached LPA § 7.9(b) by mismanaging TKO before the Merger are barred because they are derivative claims that Plaintiffs cannot assert as a matter of law. And Plaintiffs' claims that the Non-Brookfield Defendants breached § 7.9(b) by failing to adequately negotiate the Merger are precluded by § 7.9(a)'s Special Approval safe harbor and § 7.10(b)'s reliance-on-experts safe harbor. Second, Plaintiffs' claim that the Non-Brookfield Defendants breached § 7.9(a) fails because that section

lays out *optional* safe harbors; it does not *mandate* the use of any. Third, Plaintiffs' implied covenant of good faith and fair dealing claim improperly attempts to rewrite the LPA and should be dismissed because the CAC fails to allege any supporting facts.

## IV.   LEGAL STANDARD

To survive "a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34–35 (2d Cir. 2010).[2] "Such a showing entails making legally sufficient allegations of jurisdiction, including an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant." *Id.* at 35. "In determining whether a plaintiff has met this burden," courts "will not draw argumentative inferences in the plaintiff's favor," or "accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013).

To survive a motion to dismiss for failure to state a claim, a plaintiff must plead enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard requires "[f]actual allegations . . . [that] raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## V.   ARGUMENT

### A.   Plaintiffs fail to establish personal jurisdiction over the Non-Brookfield Defendants.

The Court should dismiss all claims against the Non-Brookfield Defendants because Plaintiffs have failed to establish personal jurisdiction over them. General jurisdiction does not exist because the Non-Brookfield Defendants are not at home in New York. Specific jurisdiction

---

[2] All internal quotation marks and footnotes have been omitted unless otherwise indicated.

does not exist because Plaintiffs do not plausibly allege that their claims arise from any Non-Brookfield Defendant's activities in New York. And no jurisdiction by consent exists because Plaintiffs are not parties to and do not have standing to enforce the Second Amended and Restated Limited Liability Company Agreement ("GP Agreement") on which they rely, and their claims do not arise from the GP Agreement.

### 1.   No general jurisdiction exists.

The CAC fails to allege facts establishing general jurisdiction. In *Daimler AG v. Bauman*, the Supreme Court explained that "the paradigm forum for the exercise of general jurisdiction is the individual's domicile," for individuals, and "the place of incorporation and principal place of business," for corporations." 571 U.S. 117, 137 (2014). The CAC does not allege that any Non-Brookfield Director resides in New York. *Id.* ¶¶ 22–24, 26, 30. Nor does it allege that TKO or the GP is organized under New York law or headquartered in New York; instead, it concedes that both are organized under Marshall Islands law and that TKO has "its principal executive offices in Bermuda."[3] *Id.* ¶¶ 20–21. Thus, the Non-Brookfield Defendants are not at home in New York, and there is no general jurisdiction.

### 2.   No specific jurisdiction exists.

The CAC also fails to allege facts establishing specific jurisdiction. The New York long-arm statute provides specific jurisdiction over claims "arising from" certain activities in New York. N.Y. C.P.L.R. § 302(a); *see Pablo Star Ltd. v. Welsh Gov't*, 170 F. Supp. 3d 597, 606 (S.D.N.Y. 2016) ("Specific jurisdiction requires a connection between the forum and the underlying controversy, most often activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation."). New York courts have "recognized that a

---

[3] The CAC makes no allegations regarding the GP's principal place of business.

'substantial relationship' must be established between a defendant's transactions in New York and a plaintiff's cause of action in order to satisfy the nexus requirement of the [long-arm] statute"; "jurisdiction is not justified where the relationship between the claim and transaction is too attenuated." *Johnson v. Ward*, 4 N.Y.3d 516, 519–20 (2005); *see also Boehm v. SportsMem, LLC*, 2019 WL 3239242, at *1 (S.D.N.Y. July 18, 2019) ("A suit will be deemed to have arisen out of a party's activities in New York if there is an 'articulable nexus,' or a 'substantial relationship,' between the claim asserted and the actions that occurred in New York.").

The CAC fails to plausibly allege that Plaintiffs' claims "arise from" the Non-Brookfield Defendants' activities in New York. With respect to the GP, the CAC does not allege that it engaged in *any activity* in New York, much less activity giving rise to Plaintiffs' claims. With respect to TKO, the CAC alleges only that (1) TKO's units are "traded on the NYSE," (2) TKO's legal advisor had lawyers who were "based in New York City" and worked on the Merger, (3) employees of the Committee's financial advisor discussed the merger while "physically in New York City," and (4) the Committee's (Delaware-based) legal advisor made telephone calls to New York regarding the Merger. CAC ¶¶ 41, 47–49. But these allegations, whether considered individually or collectively, do not establish specific jurisdiction.

The mere fact that a company's securities were traded on the NYSE is "insufficient to confer jurisdiction." *In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 230 F. Supp. 2d 376, 383 (S.D.N.Y. 2002); *see also, e.g.*, *Wiwa v. Royal Dutch Petrol. Co.*, 226 F.3d 88, 97 (2d Cir. 2000) ("[P]revailing caselaw accords foreign corporations substantial latitude to list their securities on New York-based stock exchanges . . . without thereby subjecting themselves to New York jurisdiction for unrelated occurrences."). And the CAC's vague and conclusory allegations—not about TKO, but rather about its legal and financial advisors—do not establish

personal jurisdiction over *TKO*. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (specific jurisdiction exists "where the contacts proximately result from actions by *the defendant himself* that create a 'substantial connection' with the forum State") (emphasis added); *see also Reich v. Lopez*, 858 F.3d 55, 64 (2d Cir. 2017) (retaining New York legal counsel insufficient to confer specific jurisdiction where plaintiff's claims did not arise from that retention of counsel).

But even if the allegations about the legal and financial advisors could somehow be imputed to TKO, they do not support jurisdiction. A prima facie case of specific jurisdiction "requires non-conclusory fact-specific allegations . . . showing that activity that constitutes the basis of jurisdiction has taken place." *Chirag v. MT Marida Marguerite Schiffahrts*, 604 F. App'x 16, 19 (2d Cir. 2015). The CAC, by contrast, generally alleges that TKO's "representatives coordinated, negotiated, and finalized the Merger over a weekslong period from the New York offices of Kirkland & Ellis," but never identifies when the alleged meetings took place, what was discussed, or who participated. CAC ¶ 46. Nor does the CAC tie those general allegations to its substantive allegations supporting its claims. Instead, it makes "naked assertions devoid of further factual enhancement," *Iqbal*, 556 U.S. at 678, that do not satisfy FRCP 8 and do not show that Plaintiffs' claims arise from TKO's activities in New York.

With respect to the Non-Brookfield Directors, the CAC again fails to make a single "non-conclusory, fact-specific allegation" supporting personal jurisdiction. *Chirag*, 604 F. App'x at 19. The CAC fails to allege *any* New York contacts specific to the Non-Brookfield Directors; instead, it makes boilerplate allegations that "each Individual Defendant conducts business in New York and has minimum contacts sufficient to establish personal jurisdiction over each of them in New York," CAC ¶ 50, but those do not satisfy FRCP 8 or otherwise establish personal jurisdiction. *See Millennium Prods. Grp., LLC. v. World Class Freight, Inc.*, 2018 WL 1247384,

at *3 (E.D.N.Y. Mar. 9, 2018) ("Conclusory allegations of transacting business are insufficient."). And although the CAC alleges that Hvid presents at non-party "Teekay Group['s]" annual "live investor and analyst meeting in New York City to discuss the Teekay entities' financial performance," CAC ¶ 43, those allegations do not establish jurisdiction because Plaintiffs' claims do not arise from "Teekay Group's" annual meetings. *See Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 31 (2d Cir. 1996) (New York long-arm statute's "arise out of" prong requires "substantial nexus" between claims and forum contacts).

### 3.   The Non-Brookfield Defendants have not consented to jurisdiction in New York.

Plaintiffs also have not established that the Non-Brookfield Defendants consented to jurisdiction in New York. They allege that consent appears in § 13.16 of the *GP* Agreement, not the LPA. CAC ¶ 55. But the Non-Brookfield Defendants are not parties to the GP Agreement, nor were they at the relevant times beginning in late May 2019. The CAC does not allege otherwise. *See id.* ¶ 21 (acknowledging Brookfield TK TOGP, L.P. owns 100% of GP).

Nor are Plaintiffs parties to the GP Agreement, which means they lack standing to enforce it. *NAMA Holdings, LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 434 (Del. Ch. 2007) ("As a general rule, only parties to a contract and intended third-party beneficiaries may enforce an agreement's provisions."). Plaintiffs halfheartedly argue that they can nevertheless enforce the GP Agreement as third-party beneficiaries, CAC ¶ 56, but GP Agreement § 13.15 expressly disclaims any third-party beneficiaries.[4] *See* Ex. D, GP Agreement § 13.15.

---

[4] Furthermore, Plaintiffs fail to allege any facts (plausibly or otherwise) establishing the requirements for third-party beneficiary status under Delaware law. *See Madison Realty Partners 7, LLC v. Ag ISA, LLC*, 2001 WL 406268, at *5 (Del. Ch. Apr. 17, 2001) ("(i) the contracting parties must have intended that the third party beneficiary benefit from the contract, (ii) the benefit must have been intended as a gift or in satisfaction of a pre-existing obligation to that person, and (iii) the intent to benefit the third party must be a material part of the parties' purpose in entering into the contract"). It is undisputed that the Marshall Islands Limited Partnership Act ("MILPA") governs Plaintiffs' claims and that MILPA provides that it is to be "applied and construed" to be "uniform with the laws of the State of

Finally, GP Agreement § 13.16 applies only to "suits, legal actions or proceedings *arising out of this agreement*," *id.* § 13.16 (emphasis added), but Plaintiffs do not allege that the Non-Brookfield Defendants (or any other Defendant) breached the GP Agreement.

**B.    Plaintiffs' claims against TKO and the Non-Brookfield Directors must be dismissed because they did not owe the contractual obligations that Plaintiffs seek to enforce.**

Plaintiffs assert four claims against TKO and the Non-Brookfield Directors—Counts I, II, III, and V—all based on purported breaches of contractual duties in the LPA. These claims must be dismissed because under the LPA, neither TKO nor the Non-Brookfield Directors owed the contractual duties that form the basis of those claims.

As illustrated by *In re Kinder Morgan, Inc. Corporate Reorganization Litigation*, 2015 WL 4975270, at *5 (Del. Ch. Aug. 20, 2015), *aff'd sub nom. Haynes Family Tr. v. Kinder Morgan G.P., Inc.*, 135 A.3d 76 (Del. 2016), Delaware courts recognize that limited partnership agreement claims against parties like the Non-Brookfield Directors and TKO are not viable as a matter of law. There, plaintiffs brought breach-of-contract claims against a limited partnership, its general partner, and the general partner's directors, among others, alleging that a merger between the limited partnership and a subsidiary of the general partner's parent company was unfair to the common unitholders and breached the limited partnership agreement. *Id.* at *1–4. The court dismissed all breach of express or implied contractual obligation claims against the general partner's directors because only the general partner owed the relevant contractual duties. *Id.* at *5 ("The [GP] is the only defendant that was a party to the LP Agreement and who owed the obligations that the plaintiffs seek to enforce. The individual defendants and Parent were parties to the LP Agreement in their capacities as holders of common units representing limited

---

Delaware" where they do not conflict with MILPA's express provisions or the decisions of the High and Supreme Courts of the Marshall Islands. Ex. C, MILPA § 66(5); *see also* CAC ¶ 59.

partner interests, but they did not owe the contractual obligations that the complaint seeks to enforce."); *see also Allen v. El Paso Pipeline GP Co.*, 113 A.3d 167, 177–78 (Del. Ch. 2014) (granting summary judgment to all but the GP on breach of express and implied contract claims).

The same reasoning applies here. The duties allegedly breached were owed (if at all) only by the GP. *See* LPA § 7.9(b) ("[w]henever the *[GP]* makes a determination or takes or declines to take any other action ... *in its capacity as the general partner of the Partnership* as opposed to in its individual capacity, ... *the [GP]* ... shall make such determination or take or decline to take such other action in good faith") (emphases added); *id.* § 7.9(a) ("[t]he *[GP]* shall be authorized but not required … to seek Special Approval") (emphases added). TKO and the Non-Brookfield Directors are not signatories to the LPA, and while the LPA applies to limited partners, the CAC's allegations against the Non-Brookfield Directors relate only to their role as Board members. The Non-Brookfield Directors have not "assume[d] the same duties as the General Partner" over the business and affairs of the partnership simply by becoming limited partners. *Lazard Debt Recovery GP, LLC v. Weinstock*, 864 A.2d 955, 963–64, 973–74 (Del. Ch. 2004); *see* LPA § 3.2 ("No Limited Partner, in its capacity as such, shall participate in the operation, management or control … of the Partnership's business…."); *id.* § 7.9(e) (eliminating "duties or liabilities, including fiduciary duties, to the Partnership or any Limited Partner" other than those "expressly set forth"). Because TKO and the Non-Brookfield Directors did not owe the duties at issue in Plaintiffs' claims, the Court must dismiss all Counts against them.

## C. Plaintiffs' claims against all Non-Brookfield Defendants must be dismissed because a properly constituted Committee gave the Merger "Special Approval."

Plaintiffs' claims against the Non-Brookfield Defendants also should be dismissed based on the LPA's "Special Approval" safe harbor for conflicted transactions. *See* LPA § 7.9(a). It establishes a conclusive presumption that "any resolution or course of action by the [GP] … shall

be permitted and deemed approved by all Partners, and shall not constitute a breach of this Agreement … or of any duty stated or implied by law or equity." *Id.* "Special Approval" is defined as "approval by a majority of the members of the Conflicts Committee," which is defined as "a committee of the Board of Directors of the [GP] composed entirely of two or more directors who are not … officers, directors or employees of any Affiliate of the [GP] … and who also meet the independence standards required by directors who serve on an audit committee of a board of directors" established by the relevant exchange. *Id.* § 1.1. Because Special Approval was given by a duly constituted Committee here, judicial scrutiny is not available, and the Court must dismiss Plaintiffs' claims. *Emps. Ret. Sys. of City of St. Louis v. TC Pipelines GP, Inc.*, 2016 WL 2859790, at *5 (Del. Ch. May 11, 2016) ("[T]he plain language of the LPA leaves no room for judicial scrutiny of a conflicted transaction … if Special Approval is given by a duly constituted and informed Conflicts Committee."), *aff'd*, 152 A.3d 1248 (Del. 2016).

### 1. The Committee that negotiated and specially approved the Merger comprised only Craig and Lemmon, both of whom satisfied the LPA's criteria for Committee membership.

Brookfield delivered its non-binding offer to the GP's standing Conflicts Committee (Craig, Lemmon, and Transier) on May 17, and the Board added Utt to the Committee on May 21. CAC ¶¶ 152, 158; IS 16–17. But neither Transier nor Utt was on the Committee that actually negotiated and specially approved the Merger. CAC ¶¶ 159, 195; IS 18–27. Rather, both stepped down from the Committee on May 27, and on May 31, the GP Board formally adopted a resolution establishing that Craig and Lemmon would serve as the Committee empowered to negotiate and specially approve the proposed transaction, which they did over the next four months. IS 18–19.[5] Thus, the Committee that negotiated and approved the terms of the Merger

---

[5] This resolution "supersed[ed]" and negated the GP Board's earlier, May 21 resolution, which had established a four-person Conflicts Committee that also included Utt and Transier. *See* IS 19; *see also Dieckman v. Regency GP*

was the two-person committee consisting only of Craig and Lemmon. *See* IS 28–33.

Although Plaintiffs halfheartedly attack Craig's and Lemmon's independence—alleging they "were beholden to Brookfield" because they had served on the Committee when Brookfield previously bought Non-Brookfield Corporation's GP interest and TKO units, CAC ¶ 156— Plaintiffs do not even attempt to tie that allegation to the LPA's express criteria for Committee service. And for good reason—the allegation has no bearing on those criteria. *See* LPA § 1.1 at 4–5. Regardless, Plaintiffs concede that Craig and Lemmon "did not have conflicts of interest." CAC ¶ 156. Their allegations simply do not undermine Craig's or Lemmon's fitness to serve on the Committee.

Because the Committee that negotiated and specially approved the Merger consisted only of Craig and Lemmon, and because both satisfied the LPA's criteria for Committee service, the Merger falls into the Special Approval safe harbor, insulating it from judicial review.

> **2.     Transier's and Utt's brief, earlier service on the Committee does not take the Merger out of the safe harbor.**

Unable to seriously challenge the two-member Committee that negotiated and specially approved the Merger, Plaintiffs claim that Transier's and Utt's earlier service nullifies the Committee's Special Approval. According to Plaintiffs, Transier and Utt were conflicted yet served on the Committee for an alleged six-day period during which the Committee hired (the widely used and well-respected) Potter and Evercore. CAC ¶ 161. "Because a tainted Committee chose those advisors," Plaintiffs postulate, "the advice they offered *could* have also been tainted, and the taint *could* have been irreparable." *Id.* (emphases added). As an initial matter, the Committee did not appoint Evercore as its financial advisor until May 29—*after* Transier and Utt left the Committee on May 27. IS 18.  But even setting that fact aside, Plaintiffs' allegations fail

---

*LP*, 2019 WL 5576886, at *10 (Del. Ch. Oct. 29, 2019) (acknowledging that a board resolution can supersede and negate a previous board resolution where the later resolution "indicate[s] contrary intent").

to take the Merger outside the safe harbor for three reasons.

First, Transier's and Utt's brief service predated the Committee's substantive economic negotiations with Brookfield, which is what matters in assessing whether the Committee was properly constituted. *Cf., e.g.*, *Flood v. Synutra Int'l, Inc.*, 195 A.3d 754, 762 (Del. 2018) (holding, in context of corporate transaction, that an empowered, fully functioning special committee must exist "before any substantive economic negotiations begin" for business judgment rule to apply). Indeed, when Transier and Utt stepped down from the Committee on May 27, there had not even been any *communications* between Brookfield and the Committee since Brookfield's May 17 offer letter, much less any *negotiations*. IS 17–18. Because Transier and Utt departed the Committee before substantive economic negotiations commenced, their presence is legally irrelevant, even if they were involved in selecting Potter or Evercore.[6]

Second, Plaintiffs' "tainted" advice accusations against Potter and Evercore are beyond the pale. Plaintiffs suggest that Potter was compromised because it previously represented (a) the Committee with respect to Brookfield's initial investment in TKO, and (b) certain defendants in some completely unrelated case in which certain Brookfield parties also were defendants. And Plaintiffs suggest Evercore was not independent of Brookfield because Evercore was *Kinder Morgan's* advisor when it bought Myria Holdings' gas pipeline interests along with Brookfield. CAC ¶¶ 162, 164. To call these attacks on Potter and Evercore frivolous is arguably giving them more credit than they deserve.

---

[6] For the same reason, this case is easily distinguishable from *Dieckman*, where (1) the conflicted director served on the committee during the entire merger negotiation and approval process, including when the committee recommended the merger, (2) the committee's negotiation and review of the merger lasted only 9 days, and (3) the conflicted director resigned from the Affiliate's board during the committee process (and after the director had already participated substantively in merger negotiations by, for instance, reviewing a draft of the merger agreement), only to rejoin the Affiliate's board the day the merger closed. *See* 2019 WL 5576886, at *3, 10; *Dieckman v. Regency GP LP*, 155 A.3d 358, 364–65 (Del. 2017). The CAC fails to plead facts even remotely similar here.

Third, although proceeding without Transier and Utt ensured that the Committee's independence was beyond reproach, the CAC's allegations do not plausibly allege that either was actually ineligible to serve based on the LPA's express criteria. LPA § 1.1 at 4–5.

- Plaintiffs allege that Transier was ineligible to serve because "*Brookfield* is an Affiliate of [the GP]," Transier serves on the boards of "Brookfield portfolio companies," and Transier therefore "is himself a director of an Affiliate of the [GP]." CAC ¶ 153 (emphasis in original). But critically absent is an allegation that Transier is a director of the alleged Affiliate—Brookfield.

- Plaintiffs similarly allege that Utt was ineligible to serve because he was chairman of Teekay Corporation, which Plaintiffs contend "was . . . an affiliate of the [GP] because it was one of the two members of the [GP], when Brookfield acquired all of Teekay Corporation's interests in the [GP] and [TKO] in April 2019."[7] CAC ¶ 158. By Plaintiffs' own allegation, however, Teekay Corporation (and thus Utt) had severed their relationship with the GP by April 2019, after which the GP was 100% owned by Brookfield. *See id.* ¶¶ 115–16; IS 16. Utt did not join the Committee until May 2019, CAC ¶ 157; IS 17, and the LPA does not preclude a director of a *former* Affiliate of the GP from serving on the Committee. *See* LPA § 1.1 at 4–5.

- Finally, Plaintiffs allege that Transier and Utt were ineligible to serve on the Committee because they did not meet the NYSE's independence rules for directors who serve on an audit committee due to their "material relationships with the listed company." CAC ¶¶ 154, 158. The NYSE independence rules, however, are relevant only if a director is a

---

[7] Plaintiffs also make the puzzling allegation that "Utt is the Chairman of the general partner of the [GP], making him a director of an Affiliate of the [GP]." CAC ¶ 158. It is not clear what that allegation means; regardless, when Utt joined the Committee, Brookfield owned the GP 100%, and Utt had no affiliation with the GP. *See* IS 19.

"holder[] of any ownership interest in the Partnership Group other than Common Units,"

LPA § 1.1 at 5, which Plaintiffs do not allege Transier or Utt were.[8]

As a result, Plaintiffs have not adequately pleaded that Transier and Utt could have "tainted" the

Committee with their presence early on.

**D.      Plaintiffs fail to state a claim that the Non-Brookfield Defendants breached good faith obligations in Section 7.9(b) of the LPA (Counts I & V).**

Counts I and V—which accuse the Non-Brookfield Defendants of breaching the good

faith standard in LPA § 7.9(b)—should be dismissed for the additional reason that (1) to the

extent they are based on allegations of pre-Merger mismanagement of TKO, they are derivative,

not direct, and Plaintiffs cannot bring derivative claims; and (2) to the extent they are based on

allegations that any Defendant failed to adequately negotiate the Merger, they are barred by both

§ 7.9(a)'s Special Approval safe harbor and § 7.10(b), which "conclusively" establishes good

faith when the GP relies on "the advice or opinion" of "investment bankers" or other experts, as

was the case here.

**1.      Claims based on alleged pre-merger mismanagement are derivative, and Plaintiffs cannot assert derivative claims.**

Under New York law, "the laws of the jurisdiction under which a foreign limited

partnership is organized govern its organization and internal affairs," including whether a

plaintiff's claims "are derivative or direct." *Prickett v. N.Y. Life Ins. Co.*, 896 F. Supp. 2d 236,

248 (S.D.N.Y. 2012). TKO and the GP are Marshall Island companies governed by the LPA,

---

[8] Even if the NYSE independence rules were relevant, Plaintiffs' own allegations defeat their contention. According to the CAC, under the relevant NYSE rule, "no director qualifies as 'independent' unless *the board of directors* affirmatively determines that the director has no material relationship with the listed company." CAC ¶ 154 (emphasis added). The CAC contains no allegations that the Board failed to make that determination, nor could it, given that the Board has indeed determined that Transier and Utt satisfied the NYSE independence requirements and appointed them to the Board's audit committee. *See* Ex. E, TKO Form 20-F at 70 (Feb. 28, 2020) ("The Audit Committee of our [GP] is composed of three or more directors, each of whom must meet the independence standards of the NYSE, the SEC and any other applicable laws and regulations governing independence from time to time. This committee is currently comprised of directors William L. Transier (Chair), Bill Utt and Ian Craig, all independent directors.").

which is subject to the Marshall Island Limited Partnership Act ("MILPA"). CAC ¶¶ 20–21. MILPA provides that it "shall be applied and construed to make the laws of the Marshall Islands, with respect to the subject matter hereof, uniform with the laws of the State of Delaware." Ex. C, MILPA § 66(5). MILPA also adopts the "non-statutory law of the State of Delaware" to the extent not inconsistent with Marshall Islands law. *Id.*

"According to Delaware law, whether a stockholder's claims are derivative or direct turns on the following: '(1) who suffered the alleged harm, the corporation or the suing stockholders, individually, and (2) who would receive the benefit of any recovery or other remedy, the corporation or the stockholders, individually?'" *In re Evergreen Mut. Funds Fee Litig.*, 423 F. Supp. 2d 249, 260 (S.D.N.Y. 2006) (quoting *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004)).[9] "Courts consider substance over form in determining whether a claim is direct or derivative." *Id.* at 260–61. To state a direct claim, a plaintiff must demonstrate an injury that is "independent of any alleged injury to the corporation," *Tooley*, 845 A.2d at 1039, and must identify an "individualized harm not suffered by all of the stockholders at large," *Feldman v. Cutaia*, 951 A.2d 727, 733 (Del. 2008). "Where all of a corporation's stockholders are harmed and would recover *pro rata* in proportion with their ownership of the corporation's stock solely because they are stockholders, then the claim is derivative in nature." *Id.*

LPA § 7.9(b) provides that whenever the GP acts in "its capacity as the general partner," it must act "in good faith and shall not be subject to any other or different standards imposed by this Agreement" or "any other law, rule or regulation." LPA § 7.9(b). As long as the GP "reasonably believe[s] that the determination or other action is in the best interests of the Partnership," the good faith standard is satisfied. *Id.*; *see also Brinckerhoff v. Enbridge Energy*

---

[9] *See also Prickett*, 896 F. Supp. 2d at 249 n.3 ("[A]nalysis applies not only to corporations, but also to limited partnerships.").

*Co.*, 159 A.3d 242, 252–53 (Del. 2017) (holding that when "fiduciary duties have been validly disclaimed," limited partners "must look exclusively to the [partnership agreement's] complex provisions to understand their rights and remedies").

Plaintiffs (incorrectly) allege the Non-Brookfield Defendants breached § 7.9(b)'s good faith requirement by (1) issuing "notes and preferred stock that served marginal purposes but further buried the [TKO] units in the capital structure," CAC ¶ 5; (2) failing to adequately market TKO through "roadshows or [TKO] investor days," which caused TKO's trading volumes to "[fall] off a cliff," *id.* ¶¶ 103–04; (3) failing to "take more defensive measures in light of [TKO]'s depressed price—*e.g.*, a poison pill," *id.* ¶ 122; and (4) failing to "resist[] the controlling shareholder's efforts to suppress the price of [TKO] common units," *id.* ¶ 217. In other words, Plaintiffs allege that the Non-Brookfield Defendants mismanaged the Company, depressing TKO's unit price and making the company ripe for takeover—a quintessential *derivative* claim. *See, e.g.*, *In re Massey Energy Co. Deriv. & Class Action Litig.*, 160 A.3d 484, 503 (Del. Ch. 2017) ("Delaware courts have long recognized that actions charging mismanagement which depress the value of stock allege a wrong to the corporation; *i.e.*, the stockholders collectively, to be enforced by a derivative action."); *Albert v. Alex Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *13 (Del. Ch. Aug. 26, 2005) (defining "claim for mismanagement" as "paradigmatic derivative claim").[10] Further confirming the claim's derivative nature, the CAC fails to identify a single alleged harm specific to Plaintiffs (as opposed to Common Unitholders at large) caused by a purported breach of § 7.9(b), or any alleged injury to Plaintiffs separate and distinct from an injury to TKO. *See Hartsel v. Vanguard Grp., Inc.*, 2011 WL 2421003, at *17 (Del. Ch. June 15, 2011) (claim was derivative because

---

[10] *See also Weinstein v. Appelbaum*, 193 F. Supp. 2d 774, 782 (S.D.N.Y. 2002) ("[S]uch a claim is derivative, not direct, since it alleges mismanagement, which harms the corporation as an entity. While harm to shareholders may indeed flow from mismanagement, Delaware law provides that the corporation alone has a cause of action.").

plaintiffs "failed to allege an injury separate and distinct from an injury alleged to have been suffered" by company), *aff'd*, 38 A.3d 1254 (Del. 2012).

Plaintiffs, however, cannot assert derivative claims for two reasons. First, as the CAC itself notes, the Merger closed on January 22, 2020, which means Plaintiffs no longer own units in TKO. Under longstanding Delaware law, "a stockholder who has been cashed-out no longer has standing to maintain a stockholder derivative suit." *Penn Mart Realty Co. v. Perelman*, 1987 WL 10018, at * 3 (Del. Ch. Apr. 15, 1987); *see Shearin v. E.F. Hutton Grp., Inc.*, 652 A.2d 578, 591 (Del. Ch. 1994) ("[S]hareholders cashed out in a merger no longer have standing to bring [derivative claims] on the corporation's behalf.").

Second, Plaintiffs have not satisfied the prerequisites to assert a derivative claim. "Pursuant to Delaware law, a plaintiff in a shareholder derivative action must allege either (1) that he has made a demand upon the corporation's board of directors to take the requested action; or (2) the reasons why such a demand upon the board would be futile." *In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 922 F. Supp. 2d 445, 467 (S.D.N.Y. 2013), *aff'd*, 797 F.3d 148 (2d Cir. 2015). As explained by a Delaware Chancery Court:

> This rule is one of substantive right—not simply a technical rule of pleading. It is designed to give a corporation, on whose behalf a derivative suit is brought, the opportunity to rectify the alleged wrong without suit or to control any litigation brought for its benefit. A plaintiff, therefore, who chooses not to make a demand prior to suit is faced with the responsibility of demonstrating with particularity why his demand on the Board of Directors would have been futile. If the plaintiff fails in meeting this burden he will find that his suit will be dismissed, in response to a motion to dismiss, even if he has an otherwise meritorious claim.

*Haber v. Bell*, 465 A.2d 353, 357 (Del. Ch. 1983); *see Albert*, 2005 WL 2130607, at *13 ("If a party brings derivative claims without first making demand, and demand is not excused, those claims must be dismissed."). The CAC does not allege that Plaintiffs made the requisite demand on the Board or that demand was excused.  Thus, Counts I and V must be dismissed to the extent

they are based on allegations of pre-Merger mismanagement.

      **2.**      **Claims based on the merger negotiations are foreclosed by Sections 7.9(a) and 7.10(b).**

      Plaintiffs also allege that the Non-Brookfield Defendants violated § 7.9(b)'s good faith standard by failing to adequately negotiate the merger on behalf of the limited partners. For example, Plaintiffs allege that the Committee (1) "acced[ed] to all of Brookfield's substantive demands" and failed to "exercise the handful of defensive measures available to it," CAC ¶ 148; (2) "meekly" proposed "procedural protections—such as a standstill agreement [and] a majority of the minority voting requirement—and then rapidly [gave] them up once Brookfield resisted," *id.* ¶ 168; (3) "involved the [GP]'s conflicted Management and other conflicted Board directors in the Committee's decision-making process, *id.* ¶ 200; and (4) "agreed to sell for $1.55"—a near 50% increase from Brookfield's initial offer—which, according to Plaintiffs, was "far below what [TKO] was trading at when Brookfield began its campaign to depress the price," *id.* ¶ 149. These allegations do not state a claim for breach of § 7.9(b) for two reasons.

      First, the LPA expressly states that compliance with its Special Approval process conclusively preempts *any* claim, whether under the LPA or otherwise, LPA § 7.9(a), and the Committee complied with that process, *see supra* at 12–17.[11]

      Second, LPA § 7.10(b)—which Plaintiffs fail to even mention in their CAC—bars the claims. It provides as follows:

> The [GP] may consult with legal counsel, accountants, appraisers, management consultants, investment bankers and other consultants and advisers selected by it, and any act taken or omitted to be taken in reliance upon the advice or opinion (including an Opinion of Counsel) of such Persons as to matters that the [GP]

---

[11] Plaintiffs badly miss the mark with their assertion that *Brinckerhoff*, 159 A.3d at 262, held that language "almost identical" to LPA § 7.9(b) "imposes a 'contractual fiduciary standard similar if not identical to entire fairness.'" CAC ¶ 64. *Brinckerhoff* held that the phrase "fair and reasonable to the Partnership" imposes a standard akin to entire fairness, 159 A.3d at 256–57, but the LPA uses the phrase "fair and reasonable" in only one place—in an optional § 7.9(a) safe harbors not at issue here. The entire fairness standard thus has nothing to do with this case.

reasonably believes to be within such Person's professional or expert competence *shall be conclusively presumed to have been done or omitted in good faith* and in accordance with such advice or opinion.

LPA § 7.10(b) (emphasis added). It is undisputed that the GP and Committee consulted with and relied on legal counsel and financial advisors in approving the Merger. *See, e.g.*, IS 29 (stating that "in unanimously determining" that the Merger was "fair to and in the best interests of the Partnership," the GP considered "the assistance of legal and financial advisors to the Conflicts Committee," including the Committee's receipt of "an opinion from Evercore" that the Merger "was fair, from a financial point of view, to the Unaffiliated Unitholders"); *id.* at 31 (stating that the Committee "consulted with its financial and legal advisors ... in making its determinations and approvals" and that the "financial analysis prepared by Evercore" was among the reasons the Committee recommended the Merger).

Delaware courts routinely hold that obtaining a fairness opinion from a financial advisor insulates a conflicts committee (and by extension the general partner and its board) from claims alleging breach of good faith when the limited partnership agreement contains a provision like § 7.10(b). *See, e.g.*, *Norton v. K-Sea Transp. Partners L.P.*, 67 A.3d 354, 367 (Del. 2013) (holding GP was "conclusively presumed to have acted in good faith when it approved the Merger" based on conflicts committee's advisor's fairness opinion); *Allen v. Encore Energy Partners, L.P.*, 72 A.3d 93, 103 (Del. 2013) (stating, based on term virtually identical to § 7.10(b), that "[w]e interpreted this language in *Gerber* to entitle the general partner to a conclusive presumption that it had discharged its contractual duty of good faith if it took or failed to take action in reliance on the investment banker's opinion and 'reasonably believe[d]' that rendering the opinion was within the investment banker's professional or expert competence" (citing *Gerber v. Enter. Prods. Holdings, LLC*, 67 A.3d 400, 419 (Del. 2013), *overruled on other grounds by Winshall v. Viacom Int'l Inc.*, 76 A.3d 808 (Del. 2013))).  Thus, Counts I and V must be dismissed to the

extent they are based on allegations about the Merger negotiations. [12]

**E.     Plaintiffs fail to state a claim that the Non-Brookfield Defendants breached Section 7.9(a) because it does not mandate use of a safe harbor (Count II).**

The Court should dismiss Plaintiffs' nonsensical claim for "breach" of § 7.9(a), which creates four *optional* safe harbors. According to Plaintiffs, the GP "may only proceed with a conflicted transaction if certain safe harbors or conditions are met," and the GP failed to satisfy them. CAC ¶¶ 221–22. This claim fails for at least two reasons. First, as discussed above, the Special Approval safe harbor *was* met. *See supra* at 12–17. Second, the LPA does not obligate Defendants to satisfy (or even attempt to satisfy) one of the safe harbors. Rather, § 7.9(a) expressly states that the relevant safe harbor—Special Approval—is optional: "The [GP] shall be authorized *but not required* in connection with its resolution of such conflict of interest to seek Special Approval of such resolution, and the [GP] may also adopt a resolution or course of action that has not received Special Approval." LPA § 7.9(a) (emphasis added). Furthermore, Delaware courts have interpreted near-identical special harbors as permissive, not mandatory. *See Norton*, 67 A.3d at 363–64 ("[Plaintiff] contends that, because under the LPA Special Approval is optional, that implies that § 7.9(a) as a whole is mandatory. We disagree.").

**F.     Plaintiffs fail to state a claim that the Non-Brookfield Defendants breached an implied covenant (Count III).**

Plaintiffs' conclusory and sparse allegations likewise fail to state a claim for breach of the implied covenant of good faith and fair dealing. "The implied covenant is not a substitute for a fiduciary duty analysis." *Lonergan v. EPE Holdings, LLC*, 5 A.3d 1008, 1017 (Del. Ch. 2010). Rather, it "is best understood as a way of implying terms in the agreement," but "[e]xisting

---

[12] Plaintiffs' vague Count V purports to assert a claim for "breach of contractual fiduciary duties" based on the LPA's good faith standard. CAC ¶¶ 238–41. As Plaintiffs themselves recognize, MILPA "allows for fiduciary duties to be 'expanded or restricted,'" *id*. ¶ 239a, and the LPA provides that the GP must act in "in good faith and shall not be subject to any other or different standards," LPA § 7.9(b). Thus, Count V is entirely duplicative of Count I and should be dismissed for all of the same reasons discussed above.

contract terms control … such that implied good faith cannot be used to circumvent the parties'

bargain, or to create a free-floating duty unattached to the underlying legal documents." *Id.*

(quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005)). "One generally

cannot base a claim for breach of the implied covenant on conduct authorized by the agreement";

Delaware courts "will only imply contract terms when the party asserting the implied covenant

proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of

the bargain that the asserting party reasonably expected." *Nemec v. Shrader*, 991 A.2d 1120,

1125–26 (Del. 2010). The Court "must assess the parties' reasonable expectations at the time of

contracting and not rewrite the contract to appease a party who later wishes to rewrite a contract

he now believes to have been a bad deal." *Id.* at 126. "When an LP agreement eliminates

fiduciary duties as part of a detailed contractual governance scheme, Delaware courts should be

all the more hesitant to resort to the implied covenant." *Lonergan*, 5 A.3d at 1018; *see Haynes

Family Tr.*, 135 A.3d at 76 ("This case … stands as another reminder that with the benefits of

investing in alternative entities often comes the limitation of looking to the contract as the

exclusive source of protective rights."); *In re El Paso Pipeline Partners, L.P. Deriv. Litig.*, 2014

WL 2768782, at *21 (Del. Ch. June 12, 2014) (LP agreements often "expand the [GP]'s freedom

of action and dial back the protections that otherwise would exist if fiduciary duties applied");.

The Court should reject Plaintiffs' *ex post* attempt to rewrite the LPA here. Like the

LPA's express terms, the implied covenant could bind only signatories to the contract, not non-

signatories like the Non-Brookfield Directors or TKO. *See Gerber*, 67 A.3d at 421 n.53 ("We

reject Gerber's argument that the implied covenant applies to nonparties to the contract.").

Regardless, the CAC fails to allege how *any* Non-Brookfield Defendant violated the implied

covenant. The CAC's vague allegations that the Non-Brookfield Defendants "entertain[ed] the

manipulative take-under offer" and did "not unambiguously reject[] the take-under offer," CAC ¶ 227, do not state a claim for breach of an implied term. "[T]he parties anticipated that conflicted transactions would arise, and they bargained for a procedural safeguard," *TC Pipelines*, 2016 WL 2859790, at *7, and the Non-Brookfield Defendants complied with the procedural safeguards by creating a Conflicts Committee to negotiate and review any proposed deal and by obtaining a fairness opinion from a financial advisor with a sterling national reputation. Plaintiffs' "primary complaint . . . is not that the Conflicts Committee acted in a way that was unanticipated, but that [it] approved a transaction that Plaintiff[s] believe[] is unfair to the unitholders from their point of view as of the time of the transaction—that is, *not* at the time of contracting." *Id.* This is not an appropriate case to imply terms into the LPA or recreate the fiduciary duties that the parties expressly disclaimed.

## VI.    CONCLUSION

For the foregoing reasons, the Non-Brookfield Defendants respectfully request that the Court dismiss with prejudice Plaintiffs' claims against them.

Dated: March 12, 2020                      Respectfully submitted,

                                           */s/ David D. Sterling*
                                           Richard B. Harper
                                           BAKER BOTTS, L.L.P.
                                           30 Rockefeller Plaza
                                           New York, New York 10112-4498
                                           Tele:  (212) 408-2500
                                           Fax:   (212) 408-2501
                                           richard.harper@bakerbotts.com


                                           David D. Sterling (admitted *pro hac vice*)
                                           Amy Pharr Hefley (admitted *pro hac vice*)
                                           BAKER BOTTS, L.L.P.
                                           910 Louisiana Street
                                           Houston, Texas 77002
                                           Tel:    (713) 229-1946
                                           Fax:   (713) 229-7946
                                           david.sterling@bakerbotts.com
                                           amy.hefley@bakerbotts.com

                                           ***Counsel for Defendants Teekay Offshore
                                           Partners, L.P., Teekay Offshore GP, L.L.C.,
                                           William Utt, Craig Laurie, David Lemmon,
                                           Bill Transier, and Ian Craig***