UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED:
```

IN RE TEEKAY OFFSHORE PARTNERS
L.P. COMMON UNITHOLDERS
LITIGATION

19-CV-6483 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiffs are former common unitholders in Teekay Offshore Partners L.P. ("TKO"), an international energy shipping and storage company that went private through a series of transactions in 2019 and 2020 ("the merger"). Plaintiffs bring this suit against the following entities, each of which was involved in the merger: TKO; TKO's general partner Teekay Offshore General Partner L.L.C. ("the GP"); members of the GP's board of directors Jim Reid, Denis Turcotte, Gregory Morrison, Walter Weathers, Craig Laurie, Ian Craig, William Utt, Kenneth Hvid, David Lemmon, and Bill Transier; and Brookfield Asset Management, Inc. ("BAM") and Brookfield Business Partners L.P. ("BBP"), two entities within the group that invested in and eventually took over TKO (generally, "the Brookfield Group"). Plaintiffs allege that Defendants either engaged in or allowed bad faith business practices that artificially depressed the value of TKO's common units and permitted the Brookfield Group to effectuate an inequitable take-under of TKO's business. Defendants have moved to dismiss this action on two grounds: lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) and failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the motion to dismiss is granted in part and denied in part.

## BACKGROUND[1]

The Court draws the following facts from the consolidated class action complaint, Dkt. 65; the Declaration of Amy Phar Hefley, attorney for TKO, Dkt. 70; the Declaration of Matthew Solum, attorney for BBP, Dkt. 71; the Declaration of Ryan Szainwald, managing partner of BAM, Dkt. 72; the Declaration of Jaspreet Dehl, chief financial officer of BBP, Dkt. 73; and the exhibits attached thereto. For the purposes of this motion, the Court accepts all of Plaintiffs' well-pled facts as true. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).

### I.   TKO and the Limited Partnership Agreement

TKO is a Marshall Islands limited partnership headquartered in Bermuda.  CAC ¶ 20.  TKO provides marine transportation, offshore storage, maintenance, and safety services to the offshore oil industry. *Id*. ¶ 75.  As a limited partnership, TKO is subject to a limited partnership agreement ("LPA").  As of 2018, the LPA applied to signatories Teekay Offshore General Partner L.L.C. ("the GP"), Brookfield TK TOGP L.P., and "any other Persons who become Partners in the Partnership or parties hereto as provided herein."  Dkt. 71 Ex. 1 (TKO LPA) at 8.

Section 7.9(b) of the LPA requires the GP and its affiliates, when acting in their official capacity, to act in good faith. *Id*. at 53 (§ 7.9(b)).  The LPA defines "good faith" as "reasonably believ[ing] that the determination or other action is in the best interests of the Partnership." *Id*.  The LPA contains several safe harbors under which actions by the GP and its affiliates are conclusively presumed to be in good faith.

---

[1] This opinion uses the following citations: "CAC" for the consolidated class action complaint, Dkt. 65; "Brookfield Mem." for the memorandum of law in support of BAM, BBP, Reid, Turcotte, Morrison, Weathers, and Laurie's motion to dismiss, Dkt. 68; "TKO Mem." for the memorandum of law in support of TKO, the GP, Craig, Utt, Hvid, Lemmon, and Transier's motion to dismiss, Dkt. 69; "Opp." for Plaintiffs' consolidated memorandum of law in opposition to both motions to dismiss, Dkt. 79; "Brookfield Reply" for BAM, BBP, Reid, Turcotte, Morrison, Weathers, and Laurie's reply, Dkt. 80; and "TKO Reply" for TKO, the GP, Craig, Utt, Hvid, Lemmon, and Transier's reply, Dkt. 81.  Citations to exhibits filed in conjunction with the motions to dismiss employ external page numbers.

Section 7.9(a) provides four mechanisms through which the GP and its affiliates can obtain a presumption of good faith when engaging in a potentially conflicted transaction.  This list includes, *inter alia*, obtaining "Special Approval" for the conflicted transaction.  *Id*. at 52 (LPA § 7.9(a)).  The LPA defines Special Approval as "approval by a majority of the members of the Conflicts Committee."  *Id*. at 26 (LPA § 1.1).  In turn, it defines "Conflicts Committee" as:

> [A] committee of the Board of Directors of the General Partner composed entirely of two or more directors who are not (a) security holders, officers or employees of the General Partner, (b) officers, directors or employees of any Affiliate of the General Partner or (c) holders of any ownership interest in the Partnership Group other than Common Units and who also meet the independence standards required of directors who serve on an audit committee of a board of directors established by the Securities Exchange Act of 1934, as amended, and the rules and regulations of the Commission thereunder and by the National Securities Exchange on which the Common Units are listed or admitted to trading.

*Id*. at 11–12 (§ 1.1).

Section 7.10(b) of the LPA also provides a safe harbor for actions taken in reliance upon the advice of "legal counsel, accountants, appraisers, management consultants, investment bankers and other consultants."  *Id*. at 54 (§ 7.10(b)).

## II.  Brookfield's Investment in and Takeover of TKO

Following a drop in oil prices that led the company to a liquidity crisis, TKO entered an agreement with the Brookfield Group in July 2017 through which the Group would invest $610 million in the company.  CAC ¶ 85, 89–90.  In exchange for its investment, the Brookfield Group obtained 60% of TKO's outstanding common units (purchasing the units at $2.50 per unit), a 49% voting interest in the GP, and the option to later purchase an additional 2% voting interest in the GP.  *Id*. ¶¶ 90–94.[2]

Additionally, TKO agreed to take certain steps to improve its financial condition, including reducing its quarterly dividends for common unitholders.  CAC ¶¶ 92, 96.  Until this point, TKO had

---

[2] The Brookfield Group held their interest in TKO through two entities they indirectly managed: Brookfield TK TOLP L.P. ("Brookfield TOLP") and Brookfield TK TOGP L.P ("Brookfield TOGP").  *Id*. ¶ 106; Dkt. 71 Ex. 4. at 20.  Neither of these entities is party to this lawsuit.

been marketed as a high-dividend paying company, and its common units were primarily owned by "yield-oriented investors." *Id*. ¶ 102.  Upon the change in dividend policy, TKO did not take steps to market itself differently to attract a new investor base.  *Id*.  Plaintiffs allege that as a result of this failure to attract a new investor base, TKO's common unit price lagged.  *Id*. ¶ 101.  Prior to mid-2017, TKO's common unit price consistently mirrored that of the relevant industry.  *Id*. ¶¶ 84–88.  Starting in mid-2017, however, "the market price for TKO common units [] declined over 53 percent," while "over the same period indices for Brent Oil and S&P 500 [grew] 38 and 19 percent, respectively."  *Id*. ¶ 88.  By September 2018, TKO's nominal trading volume had dropped to the 97th percentile of the Russell 3000 companies.  *Id*. ¶ 104.

On July 3, 2018, Brookfield TOGP acquired an additional 2% voting interest in the GP, which rendered it the majority holder of voting interest in the GP.  *Id*. ¶ 109.

In January 2019, the Brookfield Group allegedly caused the GP to reduce the common unitholders' dividend to zero.  *Id*. ¶ 112.  It did this despite a cash flow that was purportedly "more than sufficient" to justify distributions to common unitholders.  *Id*. ¶ 4.  According to Plaintiffs, "[t]he only reason to eliminate distributions would have been to shatter investor confidence in the value of the units, thereby lowering their price without altering the fundamentals of the business."  *Id*.

On May 8, 2019, Teekay Corporation, the previous controlling shareholder of the GP, sold the remainder of its interest in TKO and the GP to Brookfield TOLP and Brookfield TOGP, respectively.  *Id*. ¶ 116.[3]  After this sale, the Brookfield Group held approximately 74% of the outstanding common units in TKO and an 100% interest in the GP.  *Id.* ¶ 119.  They were thus only 6% away from being entitled to enact a "squeeze out" of the remaining common unitholders pursuant to a call right established in TKO's LPA.  *Id*. ¶ 120.  Plaintiffs allege that at this point, the GP's board of directors could have taken several actions to prevent the squeeze out from happening, including enacting a poison pill,

---

[3] Teekay Corporation is not party to this lawsuit.

entering a standstill, or requiring a vote by a majority of unaffiliated unitholders. *Id*. ¶ 122.  None of these actions were taken.  *Id*.

On May 17, 2019, the Brookfield Group delivered a non-binding offer to purchase the remaining publicly held common units in TKO for $1.05 per unit.  *Id*. ¶¶ 123–24.  This was less than the common units' actual trading value and was lower than TKO's stock had ever traded.  *Id*. ¶ 127.  According to Plaintiffs, this low initial offer was intended to "anchor the market's valuation of TKO common units closer to the price of $1.05 per unit than their actual value, which exceeds this price."  *Id*. ¶ 128.

On May 19, 2019, TKO's Conflicts Committee—which at that time consisted of Craig, Lemmon, and Transier—met to discuss the offer.  *Id*. ¶ 152.  On May 21, 2019, Utt was added as a member of the Conflicts Committee.  *Id*. ¶ 158.  The Committee issued a press release stating that either it or a new "Special Committee" would "retain advisors and evaluate the proposed offer on behalf of the owners of the non-Brookfield owned limited partnership interests."  *Id*. ¶ 157.  The press release stated that the committee evaluating the merger would consist "only of non-Brookfield affiliated [TKO] Directors." *Id*. (emphasis omitted).

On May 22, the Conflicts Committee selected Potter Anderson & Corroon LLP ("Potter") as legal counsel for the merger, *id*. ¶ 162, and on May 23, it selected Evercore Group L.L.C. ("Evercore") as a financial advisor to assist with the merger, *id*. ¶ 163.[4]  Neither of these decisions were publicly announced until May 30.  *Id*. ¶ 169.

On May 27, the Conflicts Committee met with Potter to discuss the requirements for service on the Conflicts Committee.  *Id*. ¶ 166; Dkt. 71 Ex. 4 (TKO Information Statement, dated Dec. 11, 2019) at 39–40.  During that meeting, it was determined that Transier and Utt could no longer serve on the Committee.  CAC ¶ 166.  Transier was a director of Westinghouse, a purported affiliate of BAM.  *Id*. ¶ 153.  Utt was the chairman of Teekay Corporation, the GP, and the GP's general partner.  *Id*. ¶ 158.

---

[4] Neither Potter nor Evercore is party to this lawsuit.

Both men resigned from the Conflicts Committee immediately.  Dkt. 71 Ex. 4 at 40.  Nevertheless, Plaintiffs assert that both continued to play a role in the negotiation of the merger.  CAC. ¶ 181.  For example, on July 19, 2019, the Conflicts Committee allegedly "held an informational meeting" with both Utt and Transier.  *Id.*

Over the course of the next several months, the Conflicts Committee, through Evercore and Potter, engaged with the Brookfield Group and its counsel in efforts to increase the proposed unit price or pursue an alternative transaction.  *See*, *e.g.*, *id.* ¶ 170, 174, 176.  Yet "beyond reviewing publicly available information, Evercore and the Conflicts Committee relied solely on financial information provided by the General Partner's management and conducted no additional diligence of their own." *Id.* ¶ 174.  After four months of negotiation, and upon receiving a fairness opinion from Evercore, the Conflicts Committee granted "Special Approval" for the merger on September 30, 2019 at a final price of $1.55 per unit.  *Id.* ¶ 195, 130.  The merger closed on January 22, 2020.  *Id.* ¶ 9.

## III.    This Litigation

Plaintiffs J. Deal Partnership I L.P., Noster Capital Master Fund, and Aquamarine Master Fund LP commenced this action on July 12, 2019.  Dkt. 1.  On August 12, 2019, Plaintiffs Steven Monosson and Mark Whiting commenced their own lawsuit against the Defendants, raising the same claims as did the J. Deal Plaintiffs.  *See Monosson v, Teekay Offshore Partners L.P.*, No. 19-CV-7522 (RA) at Dkt. 1.  On October 28, 2019, the Court issued an order consolidating both lawsuits into a single class action, appointing lead counsel, and directing Plaintiffs to file a consolidated complaint.  Dkt. 49.  On January 29, 2020, Plaintiffs filed the operative consolidated class action complaint.  Dkt. 65.

On March 12, 2020, BAM, BBP, Laurie, Morrison, Reid, Turcotte, and Weathers filed a joint motion to dismiss this action, alleging lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) and failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  Dkt. 66.  That same

day, TKO, the GP, Craig, Lemmon, Transier, and Utt filed a motion to dismiss on these same grounds. Dkt. 67. J. Deal Partnership I L.P. voluntarily dismissed all of its claims on October 30, 2020. Dkt. 83.

Other than Laurie, CAC ¶ 45, none of the parties to this litigation are alleged to be based in New York. *See id*. ¶ 39 ("Plaintiffs JDP, Monosson, and Whiting are residents and citizens of California. Plaintiff Noster is a resident and citizen of the Cayman Islands. Plaintiff Aquamarine is a resident and citizen of the British Virgin Islands."); *id*. ¶ 40 ("Defendants TKO and the General Partner are residents or citizens of Bermuda and the Marshall Islands. Defendants [BBP] and BAM are residents and citizens of Canada. Individual Defendants Utt, Transier, and Weathers are residents of Texas. Individual Defendant Morrison is a resident in Bermuda. Individual Defendant Craig is a resident of the United Kingdom. Individual Defendants Turcotte, Reid, and Hvid are residents of Canada. Individual Defendant Lemmon is a resident of Nevada."). Plaintiffs assert, however, that Defendants have extensive connections to the state. They allege that "each Individual Defendant regularly meets and conducts shareholder business related to the Partnership in New York." *Id*. ¶ 50. TKO's units are traded on the NYSE. *Id*. ¶ 41. BAM and BBP have corporate offices in New York, *id*. ¶ 45, and hold an annual investor day in New York, *id*. ¶¶ 34, 44. The Teekay Group has a similar annual meeting in New York, at which officers from TKO are present. *Id*. ¶ 43. Evercore is based in New York. *Id*. ¶ 47. Negotiations between Potter and Kirkland either occurred in New York or were conducted over the phone with attorneys in New York. *Id*. ¶ 48. TKO's counsel, Baker Botts, also had New York-based attorneys work on the merger. *Id*. ¶ 49. Finally, "multiple key events in the negotiation, finalization, and execution of the Merger took place in New York," and "TKO, [BBP], the Conflicts Committee, and their representatives coordinated, negotiated, and finalized the Merger over a weekslong period from the New York offices of Kirkland & Ellis LLP." *Id*. ¶ 46.

**LEGAL STANDARD**

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), "the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999). "[W]here a court relies on pleadings and affidavits, rather than conducting a full-blown evidentiary hearing, the plaintiff need only make a *prima facie* showing that the court possesses personal jurisdiction over the defendant." *Dorchester Fin. Sec, Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (internal quotation marks omitted). "All pleadings and affidavits are to be construed in the light most favorable to the plaintiff." *Id.* (alterations adopted).

Similarly, in evaluating a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must "accept as true the factual allegations of the complaint, and construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff." *Arar v. Ashcroft*, 585 F.3d 559, 567 (2d Cir. 2009). While a court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," where "there are well-pleaded factual allegations, a court should assume their veracity." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). A court may only grant a motion to dismiss under Rule 12(b)(6) if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957).

In evaluating a motion to dismiss under either Rule 12(b)(2) or 12(b)(6), a court may consider documents beyond the complaint including "any written instrument attached to [the complaint] as an exhibit, materials incorporated in [the complaint] by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (internal citations omitted).

## DISCUSSION

### I.  Personal Jurisdiction

"In diversity cases, the issue of personal jurisdiction is governed by the law of the forum state . . . so long as the district court's exercise of jurisdiction comports with the requirements of due process." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006); *see also* Fed. R. Civ. P. 4(k)(1)(A).  The Court will discuss each of these requirements in turn.

#### A.  New York's Long Arm Statute

New York's long arm statute allows the exercise of personal jurisdiction over a non-domiciliary defendant if:

> 1. [the defendant] transacts any business within the state or contracts anywhere to supply goods or services in the state; or 2. commits a tortious act within the state[;] . . . or 3. commits a tortious act without the state causing injury to person or property within the state . . . if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce . . . .

N.Y. C.P.L.R. § 302(a).   Plaintiffs allege that this Court has specific personal jurisdiction over Defendants under N.Y. C.P.L.R. § 302(a)(1).  "To determine the existence of jurisdiction under section 302(a)(1), a court must decide (1) whether the defendant 'transacts any business' in New York and, if so, (2) whether this cause of action 'aris[es] from' such a business transaction." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007).  "To satisfy this test, this Court first looks to: (1) 'whether a defendant has transacted business in such a way that it constitutes purposeful activity'; and (2) whether 'there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York.'" *DNT Enterprises, Inc. v. Tech. Sys*., 333 F. App'x 611, 613 (2d Cir. 2009). Moreover, because § 302(a)(1) is a "single act statute," proof of a single transaction in New York may suffice to invoke jurisdiction, so long as that transaction is sufficiently substantive and purposeful. *Kreutter v. McFadden Oil Corp.*, 522 N.E.2d 40, 43 (N.Y. 1988).

Plaintiffs raise numerous factual allegations to demonstrate that Defendants transact business within the state, the majority of which do not suffice to satisfy § 302(a)(1). Many of Defendants' alleged connections to New York lack an articulable nexus to the claims at issue here. For example, while Plaintiffs have pled that BAM and BBP maintain an office in New York, CAC ¶¶ 33, 45, they have not alleged that the actions BAM or BBP purportedly took to breach the LPA occurred at that office. Similarly, while Plaintiffs assert that TKO, BAM, BBP, and several of the individual Defendants participated in annual investor meetings in New York, *id.* ¶¶ 34, 43, 44, they have not alleged that the merger was discussed at those meetings, see Oral Arg. Tr. at 15:13–17 (acknowledging that the complaint does not connect the annual investor days to the merger).[5]

Yet other allegations do suffice to establish this Court's jurisdiction under § 302(a)(1). Plaintiffs, for example, assert that "multiple key events in the negotiation, finalization, and execution of the Merger took place in New York," and "[TKO], [BBP], the Conflicts Committee, and their representatives coordinated, negotiated, and finalized the Merger over a weekslong period from the New York offices of Kirkland & Ellis LLP." CAC ¶ 46. "[C]ourts have repeatedly held that New York-based contractual negotiations can by themselves constitute the transaction of business in New York under Section 302(a)(1) if they 'substantially advanced' or were 'substantively important' or 'essential' to the formation of the contract." *Bialek v. Racal–Milgo, Inc.,* 545 F. Supp. 25, 34–35 (S.D.N.Y. 1982); *see also New Asia Enters. Ltd. v. Fabrique, Ltd.,* No. 13-CV-5271 (JFK), 2014 U.S. Dist. LEXIS 112438, 2014 WL 3950901, at *4 (S.D.N.Y. Aug. 13, 2014) ("[N]egotiations that take place in New York and

---

[5] Plaintiffs also note that Defendants listed securities on the NYSE. CAC ¶ 41. Under both Second Circuit and New York precedent, this fact is insufficient to establish personal jurisdiction as a matter of law. *Poms v. Dominion Diamond Corp.,* 2019 N.Y. Misc. LEXIS 2418, 2019 WL 2106090, at *3 (N.Y. Sup. Ct. May 15, 2019) ("[I]t has been long held that a corporation is not doing business in New York for the purposes of conferring jurisdiction merely because its shares are listed on a New York Stock Exchange."); *see also Wiwa v. Royal Dutch Petrol. Co.,* 226 F.3d 88, 97 (2d Cir. 2000) ("[P]revailing caselaw accords foreign corporations substantial latitude to list their securities on New York-based stock exchanges . . . without thereby subjecting themselves to New York jurisdiction for unrelated occurrences.").

substantially advance a business relationship culminating in a contract are alone sufficient for a prima facie showing of transacting business for specific personal jurisdiction.").   Accordingly, even if the merger was not finalized in New York, Brookfield Reply at 3 n.15, that "multiple key events" occurred in New York is enough to satisfy § 302(a)(1).

At oral argument, Defendants argued that Plaintiffs' allegations regarding the location of these negotiations are the "exact type of conclusory, non-fact-specific allegation that" do not suffice to establish personal jurisdiction.  Oral Arg. Tr. at 5:20–21.  The Court disagrees.  The amended complaint alleges who attended these negotiations (TKO, BBP, the Conflicts Committee), for approximately how long the negotiations continued ("over a weekslong period"), and where the negotiations took place (the New York offices of Kirkland & Ellis LLP).  CAC ¶ 46.  The Court is satisfied that these allegations are sufficient to survive a motion to dismiss.  *See Iqbal*, 556 U.S. at 678–79.

Plaintiffs further allege that Individual Defendant Laurie "maintains his principal office" in New York, CAC ¶ 25, and is "based" in the state, *id*. § 45.  As Defendants noted at oral argument, Plaintiffs do not allege that Laurie actually resides in New York.  Oral Arg. Tr. at 10:3–4.  Nonetheless, that his principal place of business is within the state is sufficient to establish this Court's personal jurisdiction over him.  *Cf. Malmsteen v. Universal Music Group, Inc*., No. 10-CV-3955 (PAE), 2012 U.S. Dist. LEXIS 82969, 2012 WL 2159281, at *4 (S.D.N.Y. June 14, 2012) (finding personal jurisdiction lacking because the company's employee who worked in New York was "not even alleged to work full time in New York City").

While this allegation suffices to establish personal jurisdiction over TKO, BBP, Conflicts Committee members Lemmon and Craig, and Laurie, "the plaintiff . . . bears the burden of demonstrating personal jurisdiction over *each* defendant."  *Vista Food Exch., Inc. v. Champion Foodservice, LLC*, 124 F. Supp. 3d 301, 307 (S.D.N.Y. 2015) (emphasis added).  Because Plaintiffs have failed to demonstrate any relevant business in New York conducted by BAM, the GP, Reid, Turcotte, Morrison, Weathers,

Utt, Hvid, and Transier, N.Y. C.P.L.R. § 302(a)(1) is not satisfied and this Court lacks personal jurisdiction over those defendants.

### B. Due Process

For those Defendants for whom "personal jurisdiction is proper under § 302(a)(1) of the New York long-arm statute, this Court must make the ultimate determination whether this jurisdiction satisfies constitutional due process." *Ehrenfeld v. Mahfouz*, 489 F.3d 542, 547 (2d Cir. 2007). "As the Second Circuit has noted, the due process test for personal jurisdiction has 'two related components: the minimum contacts inquiry and the reasonableness inquiry.'" *Foot Locker Retail Inc. v. SBH, Inc.*, No. 03-CV-5050 (DAB), 2005 U.S. Dist. LEXIS 599, 2005 WL 91306, at *5 (S.D.N.Y. Jan. 18, 2005) (quoting *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996)). "The import of the reasonableness inquiry varies inversely with the strength of the minimum contacts showing." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002) (internal quotation marks omitted). Plaintiffs' complaint satisfies the minimum contacts requirement "for the same reasons that it satisfies New York's long-arm statute." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 171 (2d Cir. 2010). The reasonableness inquiry is more involved.

"The Supreme Court has set forth five factors that must be considered when determining the reasonableness of a particular exercise of jurisdiction," including "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Chloe*, 616 F.3d at 164, 173 (citing *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 113–14 (1987)). Here, these factors favor the exercise of personal jurisdiction.

Given that several Defendants are alleged to maintain offices in New York, litigating this action in New York will be less burdensome for them than it would be for other foreign organizations. *Cf. Wortham v. KarstadtQuelle AG (In re Nazi Era Cases Against German Defendants Litig.)*, 153 F. App'x 819, 825–26 (3d Cir. 2005) ("Forcing a wholly foreign company with no day-to-day operations to litigate in New York is no small burden."). Further, numerous Defendants have signaled a willingness to litigate in New York, as evidenced by the forum selection clauses contained within the GP's limited partnership agreement, *see* Dkt. 71 Ex. 15 (GP Agreement) at 86 (§ 13.16), as well as an Equity Commitment Letter published by Brookfield Capital Partners, *see* Dkt. 71 Ex. 16 (Equity Letter) at 9 (¶ 16), both of which require litigation in New York.[6]

Additionally, "courts generally consider where witnesses and evidence are likely to be located" in evaluating the interstate judicial system's interest in obtaining the most efficient resolution of the controversy. *Metro. Life Ins. Co.*, 84 F.3d at 574–75. Plaintiffs allege that Defendants' lawyers and financial advisors are—at least in part—New York based, and the negotiations of the merger occurred in large part in the state. CAC ¶¶ 46–49.

The Court thus concludes that exercising personal jurisdiction over those Defendants whose connection to New York satisfies § 302(a)(1) comports with due process.

---

[6] Because Plaintiffs are not signatories to either of these documents, and because both expressly disclaim third-party beneficiaries, Plaintiffs cannot enforce these forum selection clauses in this case. *See* Dkt. 71 Ex. 15 at 86 (§ 13.15) ("Nothing herein shall be construed to be to the benefit of or enforceable by any third party including, but not limited to, any creditor of the Company."); Dkt. 71 Ex. 16 at 3 (¶ 3) ("Nothing herein expressed or implied is intended or shall be construed to confer any rights, benefits, remedies, obligations or liabilities hereunder upon any Person, other than (a) the Sponsor, Parent and their respective successors and assigns and (b) the Sponsor Related Parties (as defined below), which are express third-party beneficiaries of Sections 7 and 8."); *see also India.Com, Inc. v. Dalal*, 412 F.3d 315, 322 (2d Cir. 2005) ("[T]he mention of [a third party] in the contract . . . is insufficient to confer third-party status where the parties themselves are explicit that they did not intend to create third-party beneficiaries."). Nonetheless, Defendants' willingness to litigate in New York in other contexts is relevant to this inquiry.

For the above stated reasons, the motion to dismiss for lack of personal jurisdiction is granted as to Defendants BAM, the GP, Reid, Turcotte, Morrison, Weathers, Utt, Hvid, and Transier but denied as to Defendants TKO, BBP, Lemmon, Craig, and Laurie.[7]

## II.      Breach of Contract: Violation of LPA § 7.9(b)

Plaintiffs allege that Defendants breached their contractual obligation to act in good faith.  CAC ¶¶ 214–19.  Because breach of contract is a matter of state law, the Court must begin by conducting a choice of law analysis.  Federal courts sitting in diversity apply the choice of law rules of the state in which they sit.  *Klaxon Co. v. Stentor Elec. Mfg. Co*., 313 U.S. 487, 496 (1941).  Under New York law, courts addressing an action for breach of contract will generally defer to the choice of law provision contained within the parties' contract.  *Cargill, Inc. v. Charles Kowsky Res., Inc*., 949 F.2d 51, 55 (2d Cir. 1991).  In this case, the operative contract—the LPA—is governed by Marshall Islands Law.  Dkt. 71 Ex. 1 at 91 (§ 17.8).  Section 66(5) of the Marshall Islands Limited Partnership Act ("MILPA") provides that the Marshall Islands follow Delaware's "non-statutory law" regarding limited partnerships, so long as it does not conflict with MILPA.  Accordingly, Delaware common law—and when applicable, MILPA—applies to this claim.

Under Delaware common law, "only a party to a contract may be sued for breach of that contract."  *Gotham P'rs L.P. v. Hallwood Realty P'rs L.P*., 817 A.2d 160, 172 (Del. 2002).  The only Defendant in this action who is party to TKO's LPA is the GP, over whom this Court lacks personal jurisdiction.  *See* Dkt. 71 Ex. 1 at 8.  However, under both MILPA and Delaware common law, "a limited partnership is bound by its partnership agreement whether or not the limited partnership executes the

---

[7] In the alternative, Plaintiffs seek leave to conduct jurisdictional discovery.  Opp. at 11.  "A party seeking jurisdictional discovery, like a party seeking other kinds of discovery, bears the burden of showing necessity."  *Molchatsky v. U.S.*, 778 F. Supp. 2d 421, 438 (S.D.N.Y. 2011).  Plaintiffs have not alleged that jurisdictional discovery will uncover facts that would establish personal jurisdiction over BAM, the GP, Reid, Turcotte, Morrison, Weathers, Utt, Hvid, or Transier.  *See* Opp. 12 n.3 (discussing what Plaintiffs hope to uncover in jurisdictional discovery, but referring only to those Defendants for whom the Court has already determined jurisdiction is proper).  Jurisdictional discovery is thus denied.

partnership agreement."   MILPA § 1(12); *see also Bandera Master Fund LP v. Boardwalk Pipeline Partners, LP,* 2019 Del. Ch. LEXIS 1296, 2019 WL 4927053, at *21 (Del. Ch. Oct. 7, 2019) (allowing a breach of contract claim to proceed against a limited partnership that was not party to its own LPA under a provision of Delaware law identical to MILPA § 1(12)).   Although Defendants rightly note that the Delaware Chancery Court reached a different result in *In re Kinder Morgan, Inc. Corp. Reorg. Litig*., 2015 Del. Ch. LEXIS 2221, 2015 WL 4975270, at *5 (Del. Ch. Aug. 20, 2015) (dismissing a breach of contract claim against a limited partnership that was not party its LPA), here, given the clarity of the relevant MILPA provision, as well as the persuasive analysis of a parallel provision of Delaware law in *Boardwalk*, 2019 WL 4927053, at *21, the Court concludes that MILPA § 1(12) permits Plaintiffs to raise this contractual claim against TKO.   This law applies only to the limited partnership itself, however, and does not authorize Plaintiffs to raise contractual claims against the other non-signatory Defendants.

Plaintiffs contend that the remaining Defendants may nonetheless be held liable for violating the LPA because they are "directly related to the contract."   CAC ¶¶ 216, 217.   Yet Delaware law is clear that this "direct relat[ion]" is insufficient to sustain a breach of contract claim against a non-signatory. In *Wallace v. Wood*, the Delaware Chancery Court unambiguously answered "no" to the question "Can the Officers, Parents and Affiliates be liable for Breach of Contract if they were not Parties to the Partnership Agreement?"   752 A.2d 1175, 1180 (Del. Ch. 1999).   The Delaware Supreme Court came to the same conclusion in *Gotham Partners*, holding that affiliates of a general partner "cannot be held liable for breach of the Partnership Agreement because they were not parties to it."   *Gotham Partners*, 817 A.2d at 172.

In the alternative, Plaintiffs assert that, following the Delaware Chancery Court's decision in *Mesirov v. Enbridge Energy Co.*, claims against non-signatories to a contract will survive dismissal so long as Plaintiffs "ha[ve] well-pled that [the non-signatories] acted in bad faith."   *Id.* at *10 (citing *Mesirov v. Enbridge Energy Co Inc*., 2018 Del. Ch. LEXIS 294, 2018 WL 4182204 (Del. Ch. Aug. 29,

2018)).  Without disputing the validity of this rule, the Court notes that the *Mesirov* decision employed

an extremely narrow definition of bad faith that has not been met here.  *See Mesirov*, 2018 WL 4182204

at \*10 (adopting the standard of bath faith articulated in *Brinckerhoff v. Enbridge Energy Company, Inc.*,

159 A.3d 242, 259 (Del. 2017), which defined bad faith as a decision "so far beyond the bounds of

reasonable judgment that it seems essentially inexplicable on any ground other than bad faith").

Turning to the merits of this claim, Plaintiffs contend that TKO violated the duty of good faith

by allowing the publication of misleading disclosures about the merger, CAC at ¶ 169, facilitating

continued communications between the Conflicts Committee and those members removed for lack of

independence, *id*. at ¶¶ 181, 189, and ultimately permitting the merger to proceed at a price that grossly

undervalued the units held by the public, CAC ¶ 132.  Taking all factual allegations as true and drawing

all inferences in Plaintiffs' favor, these allegations suffice to state a claim for breach of contract.  *See In*

*Re CVR Refining, LP Unitholder Litigation*, 2020 Del. Ch. LEXIS 43, 2020 WL 506680, \*6, \*10 (Del.

Ch. Jan. 31, 2020) (finding that actions which "depress the market price of the common units" were

"adverse to the interests of the limited partners" and thus not done in good faith).

TKO raises several defenses to this charge.  First, it argues that under the safe harbor established

in § 7.9(a)(i) of the LPA, the merger cannot be considered a breach of contract because it received Special

Approval by the Conflicts Committee.  *See* TKO Mem. at 21.  Second, TKO contends that under the

safe harbor established in § 7.10(b) of the LPA, the merger cannot be considered a breach of contract

because it was "taken in reliance upon the advice" of outside legal counsel and financial consultants.  *Id*.

at 21–22.  The Court will address each argument in turn.

### A.  The § 7.9(a) Safe Harbor

Section 7.9(a) of the LPA provides, *inter alia*, that a potentially conflicted transaction is entitled

to a conclusive presumption of good faith if "Special Approval" for the transaction is obtained.  Dkt. 71

Ex. 1 at 52 (LPA § 7.9(a)(i)).  Special Approval under the LPA requires majority support by "a committee

of the Board of Directors of the General Partner composed entirely of two or more directors who are not (a) security holders, officers or employees of the General Partner, (b) officers, directors or employees of any Affiliate of the General Partner or (c) holders of any ownership interest in the Partnership Group other than Common Units and who also meet the independence standards required of directors who serve on an audit committee of a board of directors established by the Securities Exchange Act of 1934, as amended, and the rules and regulations of the Commission thereunder and by the National Securities Exchange on which the Common Units are listed or admitted to trading." *Id*. at 11–12 (§ 1.1).

The Conflicts Committee granted the merger Special Approval on September 30, 2019. CAC ¶¶ 195, 130. Plaintiffs allege, however, that because Transier and Utt were members of the Committee prior to May 27, 2019 and participated in some early decisions related to the merger, the Special Approval was thus tainted and the safe harbor does not apply. Opp. at 25.

TKO argues that because Transier and Utt left the Conflicts Committee before "substantive economic negotiations" began, the Special Approval remains valid. *See* TKO Mem. at 15. To support this argument, it cites the Delaware Supreme Court's decision in *Flood v. Synutra International Inc.*, 195 A.3d 754 (Del. 2018). As a preliminary matter, the *Flood* decision is distinguishable because it concerned the business judgment rule, a principle that imposes different conditions than those imposed by § 7.9(a) of the LPA. *See id*. at 756. Even if *Flood*'s "substantive economic negotiations" rule did apply, however, the factual differences between this case and that prevent the Court from concluding that—as a matter of law—no substantive economic negotiations transpired here. In *Flood*, the special committee had met only once before reconstituting itself in a way that complied with the conditions levied. *Id*. at 758. No financial advisors or legal counsel had been engaged, and no economic negotiations had yet occurred. *Id*. By contrast, it is alleged that the TKO Conflicts Committee discussed the proposed merger and engaged legal and financial counsel while Transier and Utt were still members. CAC ¶¶ 152, 181. The facts of this case are arguably more similar to those presented in the *Dieckman*

*v. Regency* line of cases.  *See Dieckman v. Regency GP LP*, 2019 Del. Ch. LEXIS 1334, 2019 WL 5576886 (Del. Ch. Oct. 29, 2019).  There, for the first five days of a proposed merger's consideration, one of the two members of the operative conflicts committee was conflicted.  *Id*. at *3, *10.  During that time, the conflicts committee received a draft of the proposed merger, engaged in conference calls, and retained a financial advisor and legal counsel.  *Id*.  The court ultimately concluded that the conflicts committee was not validly constituted and granted summary judgment to plaintiffs.  *Id*. at *11.

Based on the facts alleged here, at this early stage of the litigation, the Court concludes that § 7.9(a) of the LPA does not insulate the merger from legal challenge.

### B.  The § 7.10(b) Safe Harbor

Section 7.10(b) of the LPA provides a safe harbor for actions taken in reliance upon the advice of "legal counsel, accountants, appraisers, management consultants, investment bankers and other consultants."  Dkt. 71 Ex. 1 at 54 (§ 7.10(b)).

Plaintiffs contend that this safe harbor does not apply to conflicted transactions like the merger. Opp. at 34–35.  The Delaware Chancery Court's decision in *Morris v. Spectra Energy* supports this contention.  *See Morris v. Spectra Energy Partners (De) General Partner, LP*, 2017 Del. Ch. LEXIS 114, 2017 WL 2774559, *11 (Del. Ch.  June 27, 2017).  In that case, the defendant Spectra was party to an LPA which closely mirrored the one here, including both a § 7.9 safe harbor provision for conflicted transactions and a § 7.10 safe harbor provision for decisions made in reliance on outside experts.  *Id*. at *7.  In both this case and that, the latter safe harbor was entitled "*other matters* concerning the GP."  *Id*.; *see also* Dkt. 71 Ex. 1 at 54 (§ 7.10).  The *Spectra* court interpreted that provision to cover only those matters "that other sections of the LPA do not address."  *Spectra*, 2017 WL 2774559 at *11.  Because the safe harbor provision in § 7.9 of the LPA explicitly covered conflicted mergers, the Court concluded that the § 7.10 safe harbor provision did not, and thus could not be used to establish a conclusive presumption of good faith in order to defeat plaintiff's breach of contract claim.  *Id*. at *13.  This Court

now comes to the same conclusion.  Because § 7.9(a) of the TKO LPA governs conflicted transactions like the merger at issue here, § 7.10(b) cannot be used to shield the merger from legal challenge.

In sum, Plaintiffs have plausibly pled a breach of LPA § 7.9(b).  Accordingly, TKO's motion to dismiss Plaintiffs' first cause of action is denied, although the motion is granted as to all other Defendants.

## III.    Breach of Contract: Violation of LPA § 7.9(a)

Plaintiffs next contend that "[u]nder Section 7.9(a) of the Partnership Agreement, the General Partner may only proceed with a conflicted transaction if certain safe harbors or conditions are met." CAC ¶ 221.  Because they have plausibly pled that TKO failed to properly invoke the Special Approval safe harbor, Plaintiffs maintain that the safe harbor provision has been breached.  *Id*. ¶ 222.

This argument is belied by the plain text of § 7.9(a), which reads that TKO "*shall be authorized but not required* in connection with its resolution of such conflict of interest to seek Special Approval of such resolution, and . . . may also adopt a resolution or course of action that has not received Special Approval."  Dkt. 71 Ex. 1 at 53 (LPA § 7.9(a)(iv)) (emphasis added).  The Delaware Supreme Court, in interpreting a nearly identical safe harbor provision in *Norton v. K-Sea Transportation Partners, LP*, similarly held that such safe harbor provisions are permissive, not mandatory.  *See* 67 A.3d 354, 363–64 (Del. 2013).[8]  Defendants' motion to dismiss Plaintiffs' second cause of action is thus granted.

## IV.    Breach of the Implied Covenant of Good Faith and Fair Dealing

Plaintiffs also allege that Defendants violated the implied covenant of good faith and fair dealing. For there to be an implied covenant between two parties, those parties must have a contract between them.  *See Chamison v. Healthtrust, Inc.*, 735 A.2d 912, 920 (Del. Ch. 1999).[9]  Here, Plaintiffs contend

---

[8] Because this claim sounds in contract, Delaware common law applies, as does MILPA, when applicable.  *See supra*.

[9] Because this claim sounds in contract, Delaware common law applies, as does MILPA, when applicable.  *See supra*.

that the implied covenant arises from the LPA.  *See* CAC ¶ 225.  Accordingly, for the reasons stated above, Plaintiffs may not raise this claim against those Defendants who were not party to the LPA other than TKO.  *See supra*.

To state a claim for breach of the implied covenant, it must be "clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter."  *Katz v. Oak Indus. Inc.,* 508 A.2d 873, 880 (Del. Ch. 1986).  The "implied covenant is [thus] well-suited to imply contractual terms that are so obvious"—like a requirement that a general partner not entertain a manipulative take-under—"that the drafter would not have needed to include the conditions as express terms in the agreement."  *Dieckman v. Regency GP LP*, 155 A.3d 358, 361 (Del. 2017).

Plaintiffs allege that TKO violated the implied covenant by "entertain[ing]" and failing to "unambiguously rejec[t]" the "manipulative take-under offer."  CAC ¶ 227.  In multiple recent decisions, the Delaware courts have denied motions to dismiss claims for breach of the implied covenant in similar cases.  For example, in *In re CVR Refining*, the General Partner engaged in conduct that allegedly caused the partnerships' unit price to "plummet[]," allowing it to engage in a take-under using a contractual call right.  2020 WL 506680 at *1.  On these facts, the court held that the plaintiffs had stated a claim for breach of the implied covenant upon which relief could be granted.  *Id*. at *13.  Similarly, in *Bandera Master Fund,* 2019 WL 4927053, after partnership action caused the share price to fall 16% in one week, *id*. at *5, the court held that plaintiffs had stated a claim for breach of an implied contractual provision "prohibiting manipulation of the call price," *id*. at *23.  This Court likewise concludes that it cannot dismiss Plaintiffs' implied covenant claim as a matter of law at this time.  For this reason, TKO's motion to dismiss Plaintiffs' third cause of action is denied, although the motion is granted as to all other Defendants.

**V.    Tortious Interference**

Plaintiffs assert that BBP and BAM tortiously interfered with the LPA by intentionally causing the TKO to engage in an unfair merger.  CAC ¶¶ 233–37.  Because this Court lacks jurisdiction over BAM, it will proceed in analyzing this claim against BBP alone.

To state a cause of action for tortious interference, Plaintiffs must establish "the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996) (citations omitted). [10]  Moreover, where, as here, the defendant "has an 'economic interest' in an entity and interferes with an existing contractual relationship between the plaintiff and that entity, such interference is considered privileged and the plaintiff must show malice or illegality in order to establish a tortious interference claim." *White Plains Coat & Apron Co. v. Cintas Corp.*, 460 F.3d 281, 283 (2d Cir. 2006).  New York defines "economic interest" as a "legal or financial stake in the breaching party's business." *White Plains Coat & Apron Co. v. Cintas Corp.*, 867 N.E.2d 381, 383 (N.Y. 2007).

In its motion to dismiss, BBP raises its economic interest in TKO as a defense against Plaintiffs' claim of tortious interference.  Brookfield Mem. at 25.  This claim may thus only survive if Plaintiffs make a showing of malice or illegality.  *White Plains Coat & Apron Co.*, 460 F.3d at 283.  Plaintiffs have not done so.  While Plaintiffs assert that BBP "intentionally and improperly procured a breach of the Partnership Agreement without justification," CAC ¶ 235, this allegation does not demonstrate the requisite level of scienter to amount to a plausibly pled claim that BBP acted illegally or with malice.  In numerous decisions, courts in this Circuit have held that allegations that defendants "intentionally and

---

[10] Both parties agree that New York law, rather than MILPA, governs this claim because it sounds in tort rather than contract.  *See* Brookfield Mem. at 24 (citing *Fin. One Pub. Co.*, 414 F.3d at 336–37); *see also* Opp. at 44–45.

deliberately induced" a breach of contract do not suffice to overcome invocation of the economic interest defense, even at the pleadings stage. *See Metro-Goldwyn-Mayer Studios Inc. v. Canal+ Distrib. S.A.S.*, No. 07-CV-2918 (DAB), 2010 U.S. Dist. LEXIS 12765, 2010 WL 537583, at *8 (S.D.N.Y. Feb. 5, 2010) (finding that plaintiff failed to plead malice in spite of plaintiff's allegation that defendants "intentionally and deliberately induced" the breach of contract at issue); *see also Natale v. Beth Israel Med. Ctr.*, No. 14-CV-2844 (LLS), 2014 U.S. Dist. LEXIS 148714, 2014 WL 5374349, at *2 (S.D.N.Y. Oct. 10, 2014) (finding that plaintiff "ha[d] not alleged malice or illegality" despite pleading that defendant explicitly ordered the contract to be breached).[11]

Accordingly, the motion to dismiss Plaintiffs' claims for tortious interference is granted.

## VI.    Breach of Contractual Fiduciary Duties

Finally, Plaintiffs assert that Defendants breached their contractual fiduciary duties, CAC ¶¶ 238–41, and that BBP and BAM aided and abetted in this breach, CAC ¶¶ 242–45. "A contractual fiduciary duty is a fiduciary duty (1) the scope of which is established by contract; *or* (2) compliance with which is measured by a contractual standard." *Wenske v. Blue Bell Creameries, Inc.*, 2018 Del. Ch. LEXIS 221, 2018 WL 3337531, *33 (Del. Ch. July 6, 2018) (internal quotation marks omitted).[12]

"When a limited partnership agreement eliminates the GP's common law fiduciary duties to the entity and its limited partners . . . the GP cannot—and does not—owe contractual fiduciary duties to such parties." *Id.* In this case, the contract at issue—the LPA—expressly disclaims all contractual fiduciary duties. *See* Dkt. 71 Ex. 1 at 54 (§ 7.9(e)) ("Except as expressly set forth in this Agreement, neither the GP nor any other Indemnitee shall have any duties or liabilities, including fiduciary duties,

---

[11] Plaintiffs also assert that courts should not grant a motion to dismiss on the basis of economic interest given the fact intensive nature of the inquiry involved. Opp. at 46. The Court disagrees. Where, as here, Plaintiffs fail to even allege the facts needed to overcome this defense, dismissal is appropriate. Indeed, both of the cases cited herein were resolved on a motion to dismiss. *See Metro-Goldwyn-Mayer Studios Inc.*, 2010 WL 537583, at *8; *see also Natale*, 2014 WL 5374349, at *2.

[12] As with Plaintiffs' other claims sounding in contract, MILPA and Delaware common law govern this claim. *See supra*.

to the Partnership or any Limited Partner.").  Accordingly, there was no contractual fiduciary duty to breach or to aid and abet in the breach of.

In their complaint, Plaintiffs assert that MILPA does not permit parties to eliminate fiduciary duties.  *See* CAC ¶ 239.  Although they briefly mentioned this argument in a supplemental letter to the Court filed on March 29, 2021, Dkt. 91, they did not pursue this argument in their memorandum in opposition to the motion to dismiss, *see* Opp. at 42–44 (arguing that TKO's SEC filing reintroduced contractual fiduciaries, but no longer arguing that Defendants' elimination of the duties was prohibited). Plaintiffs have thus arguably waived this argument.  *See State St. Banking Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 172 (2d Cir. 2004) ("When a party fails adequately to present arguments in [its] brief, we consider those arguments abandoned.").  Even if the Court considered this argument on the merits, it would fail.  Although MILPA does not expressly permit the elimination of fiduciary duties, it employs identical language to a former provision of Delaware law that Delaware courts held to implicitly permit elimination of fiduciary duties, *see Sonet v. Timber Co. L.P.*, 722 A.2d 319, 322 n.6, 323 (Del. Ch. 1998), an interpretation later confirmed by the Delaware legislature, *see* 2004 Delaware Laws Ch. 265 (S.B. 273); *see also Fannin v. UMTH Land Dev. L.P.*, 2020 Del. Ch. LEXIS 253, 2020 WL 4384230, at *18 (Del. Ch. July 31, 2020) (explaining that the 2004 amendment to the relevant Delaware statute was intended to "clarif[y]" that "the drafters of a limited partnership agreement[] may eliminate duties, including fiduciary duties").

In the alternative, Plaintiffs assert that even if the LPA disclaims all fiduciary duties, these duties were reinstated in TKO's SEC filings.  CAC ¶ 239.  Under Delaware law, however, "a claim of breach of fiduciary duty must first be analyzed in terms of the operative governing instrument—the partnership agreement—and only where that document is silent or ambiguous, or where principles of equity are implicated, will a Court begin to look for guidance from . . . other extrinsic evidence."  *Sonet v. Timber*

*Co. L.P.*, 722 A.2d 319, 324 (Del. Ch. 1998).  Because the LPA is clear on this issue, the Court will not now look to SEC filing in question to determine the existence of contractual fiduciary duties.[13]

Accordingly, Plaintiffs have failed to plausibly plead a breach of contractual fiduciary duties. The motions to dismiss Plaintiffs' claims for breach of contractual fiduciary duties and for aiding and abetting a breach of contractual fiduciary duties are thus granted.

## CONCLUSION

For the foregoing reasons, the motion to dismiss is granted in part and denied in part.  The motion to dismiss for lack of personal jurisdiction is granted as to Reid, Turcotte, Morrison, Weathers, Utt, Hvid, Transier, the GP, and BAM.  The motion to dismiss for failure to state a claim is granted as to Lemmon, Craig, Laurie, and BBP.  TKO's motion to dismiss count one (breach of § 7.9(b)) and count three (breach of implied covenant) is denied, while its motion to dismiss the remainder of claims is granted.

The Clerk of Court is respectfully directed to terminate Defendants Jim Reid, Denis Turcotte, Gregory Morrison, Walter Weathers, William Utt, Kenneth Hvid, Bill Transier, David Lemmon, Ian Craig, Craig Laurie, Teekay Offshore General Partner L.L.C., Brookfield Business Partners L.P. and Brookfield Asset Management from this action, note the changed caption, and terminate the motions pending at docket entries 66 and 67.

To the extent that Plaintiffs have a good faith basis to do so, they may seek leave to file an amended complaint within 30 days of this order.

SO ORDERED.

Dated:   March 31, 2021
         New York, New York

RONNIE ABRAMS
United States District Judge

---

[13] Following oral argument, the Court gave Plaintiffs the opportunity to submit case law in support of their claim that this SEC filing could form the basis of a contractual fiduciary duty.  *See* Dkt. 90.  They were unable to do so.  Dkt. 91.